# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARK S. ZAID, ESQ.

       Plaintiff,

   v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al*.

       Defendants.

Civil Action No.: 1:25-cv-1365-AHA

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
## <u>MARK ZAID'S MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ..............................................................................2

ARGUMENT ....................................................................................................12

   I.       PLAINTIFF HAS STANDING TO BRING HIS CLAIMS.........................12

      A.    Injury-in-Fact ...................................................................................12

      B.    Causal Connection ..........................................................................14

      C.    Redressability .................................................................................15

   II.      PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.....................19

      A.    Plaintiff Is Likely to Succeed on the Merits of His Administrative Procedure Act Claim (Count One)........................................................................19

         1.    Agency Defendants Failed to Follow the Law and Their Own Policies. ...................19

         2.    Agency Defendants' Actions Were Arbitrary and Capricious. ...................................21

      B.    Plaintiff Is Likely to Succeed on His Fifth Amendment Procedural Due Process (Count Two) and Vagueness (Count Four) Claims. ...................................................23

         1.    Defendants' Actions Violate the Fifth Amendment's Guarantee of Procedural Due Process.................................................................................23

         2.    The March 22, 2025 Rescinding Security Clearances Memorandum is Unconstitutionally Vague............................................................................26

      C.    Plaintiff Is Likely to Succeed on His First Amendment Claim (Count Three). ........27

         1.    Defendants' Actions Violate the Right to Petition Clause. ......................................27

         2.    Defendants' Actions Violate Freedom of Speech and Association. .........................29

      D.    Plaintiff Is Likely to Succeed on His Fifth Amendment Right to Counsel Claim.....31

   III.     PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF...............................................................................33

   IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING PLAINTIFF'S INJUNCTIVE RELIEF. .................................34

   V.     THIS COURT SHOULD EXERCISE ITS DISCRETION TO WAIVE FEDERAL RULE OF CIVIL PROCEDURE 65(C)'S SECURITY REQUIREMENT. .................35

CONCLUSION..................................................................................................................36

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of U.S.*,
  840 F.Supp.2d 327 (D.D.C. 2012) .......................................................... 34

*Am. Airways Charters, Inc. v. Regan*,
  746 F.2d 865 (D.C. Cir. 1984) .............................................................. 32

*Am. First Legal Found. v. Becerra*,
  2024 WL 3741402 (D.D.C. Aug. 9, 2024) .......................................... 36

*Americans for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ............................................................................. 30

*Ams. for Clean Energy v. EPA*,
  864 F.3d 691 (D.C. Cir. 2017) .............................................................. 19

*BE & K Const. Co. v. N.L.R.B.*,
  536 U.S. 525 (2002) ............................................................................. 28

*Beacon Assocs., Inc. v. Apprio, Inc.*,
  308 F. Supp. 3d 277 (D.D.C. 2018) ...................................................... 34

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................. 21

*\*Borough of Duryea, Pa. v. Guarnieri*,
  564 U.S. 379 (2011) ............................................................................. 28

*Boutilier v. INS*,
  387 U.S. 118 (1967) ............................................................................. 26

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
  404 U.S. 508 (1972) ............................................................................. 28

*Campbell v. D.C.*,
  894 F.3d 281 (D.C. Cir. 2018) .............................................................. 25

*\*Caplin & Drysdale, Chartered v. United States*,
  491 U.S. 617 (1989) ...................................................................... 13, 31

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .............................................................. 33

iv

*Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla.*,
   368 U.S. 278 (1961) ........................................................................................... 26

*Ctr. for Democracy & Tech. v. Trump*,
   507 F. Supp. 3d 213 (D.D.C. 2020) ............................................................... 13, 14

*Ctr. for L. & Educ. v. Dep't of Educ.*,
   396 F.3d 1152 (D.C. Cir. 2005) ...................................................................... 15

*\*Dep't of Navy v. Egan*,
   484 U.S. 518 (1988) ........................................................................... 15, 16, 18

*\*Doe v. Austin*,
   2024 WL 864270 (D.D.C. Feb. 29, 2024) ...................................................... 25

*Doe v. Casey*,
   796 F.2d 1508 (D.C. Cir. 1986) ...................................................................... 25

*Doe v. Cheney*,
   885 F. 2d 898 (D.C. Cir. 1989) ....................................................................... 26

*Duane v. U.S. Dep't of Def.*,
   275 F.3d 988 (10th Cir. 2002) ........................................................................ 18

*Elrod v. Burns*,
   427 U.S. 347 (1976) ........................................................................................ 13

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ........................................................................................ 27

*Fla. Audubon Soc. v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) .......................................................................... 15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................................... 12, 15

*Garcia v. U.S. Citizenship & Immigr. Servs.*,
   168 F. Supp. 3d 50 (D.D.C. 2016) .................................................................. 12

*Grayscale Invs., LLC v. SEC*,
   82 F.4th 1239 (D.C. Cir. 2023) ....................................................................... 22

*Greene v. McElroy*,
   360 U.S. 474 (1959) ........................................................................................ 24

*Hill v. Colorado*,
530 U.S. 703 (2000) ........................................................................................... 26

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) ........................................................................................... 31

*Johnson v. United States*,
576 U.S. 591 (2015) ........................................................................................... 26

*Karem v. Trump*,
960 F.3d 656 (D.C. Cir. 2020) ............................................................................ 13

*Kartseva v. Dep't of State*,
37 F.3d 1524 (D.C. Cir. 1994) ............................................................................ 24

*\*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ............................................................................... 13, 28, 29

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................................ 35

*Lee v. Garland*,
120 F.4th 880 (D.C. Cir. 2024) ..................................................................... 15, 16

*Legal Svcs. Corp. v. Velazquez*,
531 U.S. 533 (2001) ........................................................................................... 32

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982) ........................................................................................... 23

*\*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ..................................................................................... 12, 13

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009) .......................................................................... 13

*\*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................. 19

*Muniz v. Meese*,
115 F.R.D. 63 (D.D.C. 1987) .............................................................................. 33

*Nader v. Democratic Nat'l Comm.*,
567 F.3d 692 (D.C. Cir. 2009) ............................................................................ 29

*Nat'l Ass'n for Advancement of Colored People v. Button*,
    371 U.S. 415 (1963) ........................................................................ 27, 30

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
    2025 WL 597959 (D.D.C. Feb. 25, 2025) ........................................ 15

*Nat'l Fed'n of Fed. Emps. v. Greenberg*,
    983 F.2d 286 (D.C. Cir. 1993) .......................................................... 16

*Nat'l Mining Ass'n v. Jackson*,
    768 F.Supp.2d 34 (D.D.C. 2011) ...................................................... 33

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024) .......................................................................... 29

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................... 34

*NTE Conn., LLC*,
    26 F.4th 980 (D.C. Cir. 2022) .......................................................... 34

*O'Donnell v. Barry*,
    148 F.3d 1126 (D.C. Cir. 1998) .................................................. 24, 25

*Open Cmtys. All. v. Carson*,
    286 F. Supp. 3d 148 (D.D.C. 2017) .................................................. 35

*\*Palmieri v. United States*,
    72 F. Supp. 3d 191 (D.C. Cir. 2014) ................................................ 17

*Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*,
    963 F. Supp. 1 (D.D.C. 1997) .......................................................... 34

*\*Perkins Coie LLP v. U.S. Dep't of Just.*,
    2025 WL 1276857 (D.D.C. May 2, 2025) .................................. *passim*

*Powell v. State of Ala.*,
    287 U.S. 45 (1932) ............................................................................ 32

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
    831 F.3d 500 (D.C. Cir. 2016) .......................................................... 12

*R.I.L.-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .................................................... 35

*Ramirez v. U.S. Immigr. & Customs Enf't,*
  568 F. Supp. 3d 10 (D.D.C. 2021) ........................................................... 35

*Ramirez v. U.S. Immigr. & Customs Enf't,*
  471 F. Supp. 3d 88 (D.D.C. 2020) ........................................................... 22

*Ranger v. Tenet,*
  274 F. Supp. 2d 1 (D.D.C. 2003) ............................................................ 25

*Rattigan v. Holder,*
  689 F.3d 764 (D.C. Cir. 2012) ................................................................. 18

*Reinbold v. Evers,*
  187 F.3d 348 (4th Cir. 1999) ................................................................... 18

*Reno v. Am. C.L. Union,*
  521 U.S. 844 (1997) ................................................................................. 27

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) ................................................................................. 29

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) ............................................................................. 13, 33

*Romero v. DoD,*
  527 F.3d 1324 (Fed. Cir. 2008) ............................................................... 18

*Service v. Dulles,*
  354 U.S. 363 (1957) ................................................................................. 17

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011) ................................................................. 12

*Stillman v. CIA,*
  319 F.3d 546 (D.C. Cir. 2003) ................................................................... 4

*U.S. Dep't of Lab. v. Triplett,*
  494 U.S. 715 (1990) ............................................................................. 13, 31

*United States v. Cardiff,*
  344 U.S. 174 (1952) ................................................................................. 26

**United States v. Williams,*
  553 U.S. 285 (2008) ................................................................................. 26

*Vitarelli v. Seaton,*
   359 U.S. 535 (1959) ............................................................................................ 17

*Webster v. Doe,*
   486 U.S. 592 (1988) ............................................................................................ 17

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................... 12, 34, 35

*Wisconsin v. Constantineau,*
   400 U.S. 433 (1971) ............................................................................................ 24

*Wonders v. Dep't of the Army,*
   659 Fed. Appx. 646 (Fed. Cir. 2016).................................................................. 18

*Wounded Knee Legal Def./Offense Comm. v. FBI,*
   507 F.2d 1281 (8th Cir. 1974) ............................................................................ 31

*Xiaomi Corp. v. Dep't of Def.,*
   2021 WL 950144 (D.D.C. Mar. 12, 2021) .......................................................... 34

*Zinerman v. Burch,*
   494 U.S. 113 (1990) ............................................................................................ 23

**Constitution and Statutes**

U.S. Const. art. III .............................................................................................. 12

U.S. Const. amend. I ...................................................................................... *passim*

U.S. Const. amend. V ..................................................................................... *passim*

5 U.S.C. § 704 .................................................................................................... 21

5 U.S.C. § 706 ........................................................................................ 19, 21 23

**Rules**

D.C. R. Prof'l Conduct l .3 ............................................................................... 24

Fed. R. Civ. P. 65 ........................................................................................... 2, 35

Local Civ. R. 65.1 .......................................................................................... 2, 36

## INTRODUCTION

For over three decades, Plaintiff Mark Zaid has painstakingly built a career as a national security litigator, whistleblower advisor, and bulwark against government overreach. His work requires him to traverse some of the most inaccessible areas of government on behalf of his clients: scouring through classified discovery, parsing the details of covert operations, and digesting the particulars of sensitive national security material. Given the nature of his work—providing legal advice to individuals related to sensitive government operations—Mr. Zaid has consistently been granted and maintained security clearances tailored to his representations. As "cleared counsel," he is often the only person with whom his clients can speak about their problems and, by extension, the sole advocate they can trust to represent them.

His remarkable track record has made him a sought-after advisor for individuals involved in both adversarial and non-adversarial legal proceedings. His clientele spans the spectrum of political ideology and his practice commits to neither party nor persuasion. From the ground up— the American way—he has established himself over the years as an objective, fact-based expert in a niche area of law. He has done so through steadfast adherence to the principles of the national security communities he serves, zealously and ethically representing his clients.

But today, the caprice of a vengeful Executive has upended Mr. Zaid's life's work and professional practice. A progression of events inimical to the rule of law and precipitated by the unbridled vindictiveness of a person in power has intruded upon attorney-client relationships, obstructed zealous advocacy on active cases, and summarily overwritten Mr. Zaid's hard-fought reputation through a nationally circulated Presidential decree. On March 22, 2025, in a publicly posted Presidential Memorandum, President Donald J. Trump identified Mr. Zaid by name, grouped him in with other perceived political enemies, and directed federal agencies to immediately revoke Mr. Zaid's security clearance and access to classified information. The edict

was not premised upon any alleged breach of his security obligations, but in the name of an undefined "national interest." Defendants fell in line, flouting their agencies' own long-recognized due process requirements for the adjudication of security clearances. No notice was ever provided to Mr. Zaid. This off-with-their-heads approach created predictable and irreparable collateral damage: Defendants encroached on the sacred constitutional relationship between an attorney and his clients, disrupting numerous active cases being handled by Mr. Zaid including at least one before this Court.

Targeted, conclusory, and punitive, this is precisely the type of monarchal retribution the Framers of our Constitution were committed to eradicating in their new republic. Defendants have offended the core tenets of the Constitution's First and Fifth Amendments, and Mr. Zaid and his clients have suffered and continue to suffer irreparable harm as a result. Defendants, for their part, remain unconcerned with the legality and consequences of their actions. These flagrant violations of citizens' rights cannot be tolerated in a functioning democracy.

In accordance with Fed. R. Civ. P. 65 and Local Civ. R. 65.1, Mr. Zaid respectfully asks this Court to preliminarily enjoin Defendants from their patently unlawful actions and course of conduct while this case proceeds on the merits. Mr. Zaid respectfully requests a hearing on his application for a preliminary injunction pursuant to Local Civil Rule 65.1(d).

## FACTUAL BACKGROUND

### *Mr. Zaid's Livelihood as a National Security Attorney*

As outlined in the Complaint (ECF No. 1, "Compl."), Plaintiff Mark Zaid is a Washington, D.C.-based attorney who has built a career over nearly 35 years in the fields of national security, international law, foreign sovereign and diplomatic immunity, the Freedom of Information Act, and the Privacy Act. Compl. ¶¶ 9, 22. His clientele consists of current and former federal employees, military servicemembers, and government contractors, to name a few. *Id.* ¶ 1. Over

the decades, he has established a respectable reputation as a legal advisor to lawful government whistleblowers, particularly in the national security arena, eventually forming his own non-profit foundation to facilitate pro bono legal representation to whistleblowers. *Id.* ¶ 31. As an attorney, he has never been a state or federal employee and has strived to remain apolitical throughout his career. *Id.* ¶ 1. Since being admitted to the bar in 1993, Mr. Zaid has advised clients facing off against every Presidential Administration that has occupied the White House. *Id.* ¶ 32.

As it happens, a significant share of the cases he has litigated over the past three decades involved individuals challenging impending denials or revocations of their security clearances. *Id.* ¶ 3. He has also defended current and former federal employees who faced criminal allegations or other adverse action initiated by the government. *Id.* ¶ 54; Declaration of Mark S. Zaid ("Zaid Decl.") ¶ 7. Not all of Mr. Zaid's representations are adversarial in nature; he has frequently advised whistleblower witnesses and acted as counsel for neutral participants in government inquiries. *Id.* at. ¶ 39. He also has served as an expert witness and advisor in the field of national security, classification, and prepublication reviews, including providing testimony to a variety of legislative and executive branch governmental bodies. Compl. ¶ 23.

Mr. Zaid's work originates primarily from the Intelligence, Military, and Law Enforcement Communities. Zaid Decl. ¶ 5. For example, as a private lawyer, he is a crucial source of discreet, unconflicted counsel for current and former employees of the Central Intelligence Agency ("CIA"), Department of Defense ("DoD"), Defense of Counterintelligence and Security Agency ("DCSA"), and the Office of the Director of National Intelligence ("ODNI") (hereinafter, the "Agency Defendants"). *Id.* Consequently, in order to properly assess his clients' issues, he frequently must access, review, or discuss classified material. *Id.* ¶¶ 16–22. As a result, the government has approved Mr. Zaid's access to classified information since approximately

1995 through various types of case-specific authorizations. *Id.* ¶ 5. For three decades, he has adhered to non-disclosure agreements with the government, successfully underwent multiple background checks, and been cleared to review some of the most sensitive government information so that his clients could rely on competent, private counsel. *Id.* ¶¶ 16–18. Over that time period, Mr. Zaid has been consistently and favorably adjudicated trustworthy.[1] *Id.* ¶¶ 18, 22.

Having maintained authorized access to classified information for the better part of three decades and having represented a wide variety of clients involved in sensitive government operations, Mr. Zaid has established himself as a leading lawyer in his field. Compl. ¶ 31. As a highly sought-after attorney for complex national security cases, Mr. Zaid's livelihood and reputation are inextricably tied to his ability to analyze and advocate for positions he discovers, develops, and cultivates, in whole or in part, from his access to classified information. *Id.* ¶ 31; Zaid Decl. ¶¶ 15, 48. It goes without saying, then, that being suddenly and arbitrarily denied access to classified information, coupled with being tarred as untrustworthy, will force him to abandon cases and his clients to either proceed without counsel or seek it elsewhere. In sum, Mr. Zaid's life's work and reputation have been irreparably undermined by unfounded accusations of untrustworthiness.

Although this would be unacceptable for any lawyer, this is a particularly disconcerting reality when considering Mr. Zaid's distinguished and hard-earned career. As outlined in the Complaint, he has excelled professionally and has been admitted to practice law in a multitude of state and federal jurisdictions. Compl. ¶ 31(a). He frequently provides instruction to lawyers and law students on his areas of expertise. *Id.* ¶¶ 31(b), (f). He has been recognized by a variety of

---

[1] *See, e.g.*, *Stillman v. CIA, et al.*, 319 F.3d 546, 548 (D.C. Cir. 2003), in which the government conducted the requisite background investigation and "found that Mr. Zaid was trustworthy."

publications and trade organizations for his accomplishments in his chosen field.  *Id.* ¶¶ 31(c)-(e). His work providing legal advice to whistleblowers inspired him to found a successful non-profit foundation as an extension of his passion.  *Id.* ¶ 31(g).  He serves as legal counsel for that non-profit, while also sitting on the boards of various private organizations related to his specialty fields.  *Id.*  In addition to his advocacy work, he also draws income from serving as an expert on national security matters.  *Id.* ¶ 31(j).  Mr. Zaid earns an income principally from his work as a lawyer and expert in this field, and both his income and identity are at stake in this case.  Zaid Decl. ¶ 15.

### *Mr. Zaid's Clients*

Mr. Zaid has represented clients from across the political spectrum and under every Presidential administration since 1993.  Zaid Decl. ¶ 24.  Through his law firm, Mark Zaid, P.C., he currently represents a number of active clients that have been impacted by Defendants' summary revocation of his security clearance.  *Id.* ¶¶ 42–46.  For example, at the time of the March 22, 2025 Memorandum, Mr. Zaid was retained by individuals employed by multiple federal agencies, including Defendants CIA and ODNI.  *Id.* ¶¶ 43–44.  As discussed in further detail herein, Defendants have significantly and adversely impacted those relationships. A representative sample of Mr. Zaid's clients follows.

- John Doe-1 is employed within the Intelligence Community.  Mr. Zaid's representation of him involves handling classified whistleblower complaints on Anomalous Health Incidents ("AHI").  *Id.* ¶ 43.

- Marc Polymeropolous was previously employed by Defendant CIA.  Declaration of Marc Polymeropolous ("M.P. Decl.") ¶ 2.  He hired Mr. Zaid because of his well-known reputation as an attorney uniquely experienced in representing individuals impacted by

AHIs.  *Id.* ¶ 10.

- Mr. Zaid's past clients involving classified information have included military members charged with war crimes, former CIA case officers charged with criminal offenses, and government officials who have had their own clearances revoked.  Zaid Decl. ¶ 40.

Moreover, because of his prominence in this field, Mr. Zaid routinely receives referrals and other requests for assistance on a recurring basis.  *Id.* ¶ 46.  The events at issue have undoubtedly affected the tempo of referrals he would normally receive and accept.  Ever since the February 8, 2025 *New York Post* article about President Trump's targeting of his clearance, Compl. ¶ 39, and continuing through the present day, Mr. Zaid regularly hears from colleagues, adversaries, clients, friends, and family, raising concerns about President Trump's fixation on his past representations.  Zaid Decl. ¶ 37.  His restricted ability to represent clients has been widely publicized by the White House, along with other federal officials and their allies.

Additionally, over the past decade, Mr. Zaid has served as counsel in the esoteric area of law governing the claims of former and current government officials afflicted by, and suffering from, AHIs, colloquially referred to as Havana Syndrome.  *Id.* ¶ 42; M.P. Decl. ¶ 8.  These matters often require Mr. Zaid to review and handle classified information, and in some cases, file classified whistleblower complaints.  Zaid Decl. ¶ 43.  However, President Trump's directive now has a devastating effect on Mr. Zaid's ability to represent those current and future AHI clients, including by utilizing classified information he previously learned through authorized representations and which benefits victims of AHIs whom he has represented, such as lawful whistleblowers.  *Id.* ¶ 44; M.P. Decl. ¶¶ 16–17.

### *The Trump Administration's Targeting of Mr. Zaid*

As he has done countless times before in his career, in September 2019, Mr. Zaid began representing a whistleblower from within the Intelligence Community ("IC Whistleblower"). Compl. ¶ 34; Zaid Decl. ¶ 23.  This particular whistleblower had five weeks earlier filed a classified complaint with the ODNI's Office of Inspector General related to President Trump's telephone conversation with Ukrainian President Volodymyr Zelensky on July 25, 2019.  *Id.*  The complaint ultimately led to the first impeachment of President Trump.  Mr. Zaid's representation of the IC Whistleblower continued throughout that process.  *Id.*  Mr. Zaid's legal representation of the IC Whistleblower did not involve advocating for any specific outcome.  *Id.*  His work had three objectives: (1) ensure the IC Whistleblower's complaint reached the proper oversight authorities; (2) protect the anonymity of the IC Whistleblower; and (3) shield the IC Whistleblower from retaliation.  Zaid Decl. ¶ 23.  Each objective was successfully achieved. Notably, impeaching President Trump was never part of nor an objective of Mr. Zaid's representation.

Over the past three decades, Mr. Zaid has represented whistleblowers who have provided information that proved embarrassing to the federal government under many different presidential administrations.  *Id.* ¶ 24.  However, it was not until his representation of the IC Whistleblower that a President of the United States responded directly.  *Id.*  After learning that Mr. Zaid represented the IC Whistleblower, President Trump publicly called Mr. Zaid a "sleazeball" at a televised political rally in Louisiana in November 2019.  *Id.* ¶ 25.  That was the first time in Mr. Zaid's entire legal career that an American President had ever publicly commented about him or his representation of a client, let alone vilified him.  *Id.*  Days after the Louisiana rally, President Trump again referenced Mr. Zaid's representation of the IC Whistleblower while speaking with

reporters at the White House, stating, "The whistleblower, because of that, should be revealed. And his lawyer, who said the worst things possible two years ago, he should be sued and maybe for treason. Maybe for treason, but he should be sued. His lawyer is a disgrace." *Id.* ¶ 26.

Nevertheless, the first Trump Administration never initiated any investigation, suspension, revocation, denial, or any other adverse action related to Mr. Zaid's security clearance, and he continued to represent a wide variety of clients. *Id.* ¶ 27. In fact, in 2020, Mr. Zaid's access was *increased* to Top Secret/Sensitive Compartmented Information ("TS/SCI")—a higher security clearance level than he held in 2019 while representing the IC Whistleblower—for his representation of a client in another high-profile whistleblower case. *Id.* Mr. Zaid continued to utilize his TS/SCI clearance, unquestioned and uninterrupted, for various cases up through November 2024. Compl. ¶ 38. He also consistently accumulated and advised new clients seeking assistance during this time period. Zaid Decl. ¶¶ 21, 41.

After the second Trump inauguration, on January 20, 2025, Mr. Zaid continued his as-yet unbroken representation of federal employees and contractors. On February 4, 2025, he filed a lawsuit against the Department of Justice and United States on behalf of a group of FBI employees alleging unlawful targeting based on their work on the January 6th insurrection cases. Compl. ¶ 40. Four days after Mr. Zaid filed that lawsuit, the *New York Post* reported that he and one of his co-counsel in that case were included among a group of individuals targeted by President Trump for a mass revocation of their security clearances. *Id.* ¶ 39. Approximately one month later, on March 10, 2025, Director of National Intelligence ("DNI") Tulsi Gabbard published the following statement on her X social media account:

> Per @POTUS directive, I have revoked security clearances and barred access to classified information for Antony Blinken, Jake Sullivan, Lisa Monaco, Mark Zaid, Norman Eisen, Letitia James, Alvin Bragg, and Andrew Weissman, along with the 51 signers of the Hunter Biden 'disinformation' letter. The President's Daily Brief

is no longer being provided to former President Biden.

*Id.* ¶ 41; *see also* Plaintiff's Exhibit ("Ex.") 1 (DNI Gabbard X Post from March 10, 2025).

The post does not identify the "@POTUS directive" to which Director Gabbard was referring. As of the date of the filing of this lawsuit, the post has been viewed more than 8.4 million times. *Id.*; Compl. ¶ 42 n.8. Less than two weeks later, on March 22, 2025, President Trump published a four-paragraph Presidential Memorandum on the publicly accessible website "www.whitehouse.gov" addressed to "the heads of executive departments and agencies." *Id.* ¶ 43. The Memorandum is titled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals" (hereinafter the "Rescinding Security Clearances Memorandum" or the "Memorandum"). It states:

> I have determined that it is no longer in the national interest for the following individuals to access classified information: Antony Blinken, Jacob Sullivan, Lisa Monaco, Mark Zaid, Norman Eisen, Letitia James, Alvin Bragg, Andrew Weissmann, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam Kinzinger, Fiona Hill, Alexander Vindman, Joseph R. Biden Jr., and any other member of Joseph R. Biden Jr.'s family. Therefore, I hereby direct every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by the aforementioned individuals and to immediately rescind their access to classified information. I also direct all executive department and agency heads to revoke unescorted access to secure United States Government facilities from these individuals.

> This action includes, but is not limited to, receipt of classified briefings, such as the President's Daily Brief, and access to classified information held by any member of the Intelligence Community by virtue of the named individuals' previous tenure in the Congress.

> In the event that any of the named individuals received a security clearance by virtue of their employment with a private entity, the United States Government entity that granted the security clearance should inform the private entity that these individuals' ability to access classified information has been revoked.

> This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

*Id.* ¶ 44; Ex. 2 (Rescinding Security Clearances Memorandum).

Shortly following publication of the Rescinding Security Clearances Memorandum, on or about April 3, 2025, Mr. Zaid received a one-page, three-paragraph memorandum from Defendant DCSA with the subject line "Revocation of Personnel Security Clearance Eligibility." It states:

> The [Rescinding Security Clearances Memorandum] directs every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by you, and by other individuals identified or described in the [Memorandum].
>
> Pursuant to that direction, DCSA has revoked the security clearance held by you. The revocation action has been annotated in our system of record for personnel clearances.

*Id.* ¶ 47; Ex. 3 (April 3, 2025 DCSA letter).

A few days later, on or about April 9, 2025, Mr. Zaid received a one-page, one-paragraph letter from the Defendant CIA's Office of General Counsel which stated:

> I am writing regarding the Presidential Memorandum entitled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals," *available at* https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals. As you are aware, you were specifically identified by the White House in this memo. Pursuant to this memo, the Agency is required to "revoke any active security clearances ... and to immediately rescind [] access to classified information" for the named individuals. Accordingly, you are no longer personally permitted access to classified information in any ongoing matters that you are currently involved in with the Agency. You may continue to represent any current or future clients as you deem appropriate, but you cannot gain access to or make use of classified information in connection with such representations. To the extent necessary and appropriate, you are still permitted escorted access to Agency facilities and may review unclassified materials.

*Id.* ¶ 49; Ex. 4 (April 9, 2025 CIA letter).

On April 23, 2025, Mr. Zaid received an e-mail from ODNI's Office of Inspector General denying him access to John Doe-1's classified complaint that he had previously filed with the agency, which Mr. Zaid has previously accessed and remains a critical part of an ongoing case. Compl. ¶ 51.  The e-mail stated that ODNI Security had determined "(U) Pursuant to Presidential direction issued on 22 March 2025 (attached), the individuals listed therein, no longer have a security clearance, are not authorized for access to classified information, and do not have unescorted access to ODNI facilities."  Ex. 5 (April 23, 2025 ODNI e-mail); Compl. ¶ 51.

On May 1, 2025, Director Gabbard discussed her revocation of Mr. Zaid's security clearance during a sit-down interview with reporter Megyn Kelly on *The Megyn Kelly Show*, which was broadcast and is available on YouTube/SiriusXM.  *Id.* ¶ 52; Ex. 6 (May 1, 2025, video clip from *The Megyn Kelly Show*).  At the time of this filing, Ms. Kelly's YouTube channel has 3.59 million subscribers, and this interview has been viewed over 317,000 times.[2]  Director Gabbard referenced Mr. Zaid by name as among "a number of other people" whose clearances have been revoked, while laughing about it with Ms. Kelly.  Ex. 6.  Director Gabbard agreed that revoking clearances was "fun" and that she "smiled" while revoking the clearances of another individual listed in the Memorandum.  *Id.*  The next day, Director Gabbard published an ODNI press release promoting the summary, group revocation of security clearances, including Mr. Zaid's, which the release described as a group "who abused public trust for political purposes." Compl. ¶ 53; Ex. 7 (ODNI Press Release No. 08-25, May 2, 2025).  She also posted substantially the same message on social media the same day.  Compl. ¶ 53 n.15; Ex. 8 (Gabbard X Post from May 2, 2025).  As of the approximate date of this filing, it has been viewed over 114,000 times. Ex. 8.

---

[2] *See* https://www.youtube.com/watch?v=6tFyUP0TgrM (last visited May 20, 2025).

Mr. Zaid filed the Complaint in this case on May 5, 2025.  ECF No. 1.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  When, as here, the government is a defendant, the third and fourth factors merge.  *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).  Plaintiff satisfies all four factors required for seeking a preliminary injunction.[3]

## I.    PLAINTIFF HAS STANDING TO BRING HIS CLAIMS.

As an initial matter, Mr. Zaid has standing to bring his claims and this Motion for a Preliminary Injunction.  To establish Article III standing, a plaintiff must first allege "'an injury-in-fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Second, he must show "a causal connection between the injury and the conduct complained of[.]"  *Id*.  Third, he must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id*. at 561 (internal quotations omitted); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

### A.    Injury-in-Fact

Mr. Zaid has established a clear injury-in-fact that existed both at the filing of the complaint and continues to exist.  *Garcia v. U.S. Citizenship & Immigr. Servs.*, 168 F. Supp. 3d 50, 65 (D.D.C. 2016).  He has been publicly accused of being untrustworthy on issues involving classified

---

[3] Plaintiff bases this Motion on **Count One** through **Count Five** of the Complaint.  ECF 1.  **Count Six** (Bill of Attainder) will be briefed on the merits in a subsequent filing.

information and cut off from active cases, a concrete and particularized harm.  Multiple denials of

access have already occurred and paid hours that would have been spent working clients' cases

have been lost.  *See* Exs. 3 – 5; Zaid Decl. ¶¶ 34, 43.  If Mr. Zaid is unable to continue his chosen

career as a national security attorney, his entire livelihood is the injury.  That is reality, not

hypothesis or conjecture.  *Lujan*, 504 U.S. at 560.  He requires a security clearance to competently

and ethically represent any clients on matters where that representation requires, in whole or in

part, access to classified information.  Without that security clearances, he loses his lifelong, well-

cultivated career as competent "cleared counsel."  Zaid Decl. ¶¶ 41–42.

In addition to the direct, non-speculative harm to Mr. Zaid's livelihood and reputation, "[i]t

has long been established that the loss of constitutional freedoms, 'for even minimal periods of

time, unquestionably constitutes irreparable injury.'"  *Mills v. District of Columbia*, 571 F.3d 1304,

1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); s*ee also Roman Cath.*

*Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms,

for even minimal periods of time, unquestionably constitutes irreparable injury.") (internal

quotations omitted); *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) ("violation of Fifth

Amendment due process rights" is "harm" that "support[s] injunctive relief.").

Mr. Zaid also has standing to bring claims related to the constitutional injuries suffered by

his clients based on his special relationship with them as their attorney.  *See Ctr. for Democracy*

*& Tech. v. Trump*, 507 F. Supp. 3d 213, 223–24 (D.D.C. 2020); *Caplin & Drysdale, Chartered v.*

*United States*, 491 U.S. 617, 623 n.3 (1989); *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720–21

(1990); *Kowalski v. Tesmer*, 543 U.S. 125, 130–31 (2004).  A litigant can assert standing on behalf

of a third party when "(1) the litigant . . .  suffered an injury in fact, thus giving him or her a

sufficiently concrete interest in the outcome of the issue in dispute; (2) the litigant [has] a close

relation to the third party; and (3) there . . . exist[s] some hindrance to the third party's ability to protect his or her own interests." *Ctr. for Democracy & Tech.* 507 F. Supp. 3d at 223–24 (D.D.C. 2020). All three of these criteria are met here. Mr. Zaid himself has suffered, and continues to suffer, injuries to his reputation and practice because of Defendants' actions. Zaid Decl. ¶¶ 44– 48. He has a special attorney-client relationship with many individuals, including but not limited to John Doe-1 and Marc Polymeropolous, who continue to feel the adverse consequences to their own legal rights resulting from Defendants' harms. *Id.* ¶¶ 43–44; M.P. Decl. ¶¶ 16–17. There are many other clients in the same circumstance but who are not at liberty to publicly raise these claims themselves because either their identity and relationship to the U.S. government is classified, or they remain employed by the Trump Administration and would likely face immediate repercussions. Zaid Decl. ¶ 45. Moreover, for some of the cases, the legal concerns they have brought to Mr. Zaid are confidential and privileged. *Id.* In other words, forcing clients to reveal their relationships and communications with Mr. Zaid in order to appear as plaintiffs in this lawsuit would undermine the very purpose for which they sought legal advice in the first place. This is unnecessary when Mr. Zaid can bring claims on their behalf while preserving their ongoing, confidential communications.

### B.    Causal Connection

The cause of Mr. Zaid's injuries is plainly President Trump's March 22, 2025 Rescinding Security Clearances Memorandum. It is cited in the Agency Defendants' letters and e-mails informing him of the revocations. Exs. 3 – 5. It is also referenced by ODNI Direct Gabbard in her multiple public statements on the matter. Exs. 6 – 8. The Rescinding Security Clearances Memorandum was directive in nature. *See* Ex. 2 ("Therefore, I hereby direct every executive department and agency head to take all additional action as necessary and consistent with existing

law to revoke any active security clearances held by the aforementioned individuals and to immediately rescind their access to classified information.").

It cannot be seriously contested that the Rescinding Security Clearances Memorandum and the Agency Defendants' blind implementation of it caused Mr. Zaid's injuries. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *6–7 (D.D.C. Feb. 25, 2025) (rejecting defendants' arguments that federal agencies had any discretion in implementing a memorandum that contained express directives); *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996) (causation where challenged rulemaking "actually threatens the plaintiff's particular interests"). The directives of the Executive Office of the President control the Agency Defendants, and the Agency Defendants control Mr. Zaid's access, directly revoking his continued access and causing the unavoidable attendant consequences. *Cf. Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005) (causation established when "alleged injury [is] 'fairly traceable to' the final agency rules 'and not the result of the independent action'" of a third party).

###        C.      **Redressability**

The relief requested here is specifically tailored to redress the harms that have already befallen Mr. Zaid and his clients. By declaring the Executive Order unconstitutional both facially and as applied to Mr. Zaid, and by ordering the reinstatement of his clearance, the Court can mitigate the future harm caused by Defendants both to Mr. Zaid, his clients, and to future injured parties. *See Friends of the Earth, Inc.*, 528 U.S. at 174 (2000) (recognizing deterrence of future violations as a form of redress).

It bears noting here that redress is available to Mr. Zaid notwithstanding the longstanding deference to Executive Branch security clearance determinations. *See Lee v. Garland*, 120 F.4th 880, 886–87 (D.C. Cir. 2024) (citing *Dep't of Navy v. Egan*, 484 U.S. 518 (1988)). This string of

cases, which preclude judicial review of security clearance determinations, are readily distinguishable from the instant case. First, *Egan* and *Lee* involved claimants who raised such challenges *after* being legally afforded the basic procedural protections that are required as part of due process. *See, e.g.*, *Lee*, 880 at 885–86 (final revocation following multiple polygraphs and an appeal) and *Egan*, 484 U.S. at 521–22 (final revocation following an agency's letter of intent, claimant's response, and failed appeal). Second, neither case involved attorney-client constitutional issues as exist here. Finally, neither *Egan* nor *Lee* involved the openly acknowledged vengeance by a vindictive Executive against his perceived political enemies.

The justiciability of a security clearance adjudication in a similar context was recently discussed at length following the Trump Administration's blanket suspension of clearances for employees of certain law firms disfavored by the President. *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. CV 25-716 (BAH), 2025 WL 1276857, at *20 (D.D.C. May 2, 2025) (citing *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993), to note that "[i]t is simply not the case that all security-clearance decisions are immune from judicial review."). In *Perkins Coie*, Judge Beryl A. Howell explained that in circumstances where security clearance decisions "are made by experts based on information specific to the individual . . . courts have no basis on which to redo the analysis or second-guess the decisions." *Perkins Coie* at *21; *see* Expert Report of J. William Leonard ("Leonard Rpt.") ¶ 39 (Opinion 1: "a blanket revocation of security clearances of a diverse and unrelated group of individuals was—prior to March 2025—unprecedented in its scope and fundamentally inconsistent with existing authority addressing the processing, granting, and revocation of security clearances."). However, in circumstances where, like here, "no such process or apparent expertise was involved, and where the allegation is that a pervasive, class-wide discriminatory policy exists against some group of individuals, the questions

involved do not create any need for courts to second-guess experts or weigh unmanageable standards." *Perkins Coie* at *21. Instead, a court can proceed to analyzing a plaintiff's constitutional challenges to agencies' methods and process or lack thereof—"the heartland of the judicial ken." *Id.* (internal quotations omitted).

Moreover, *Perkins Coie* addressed just the *suspension* of security clearances pending further review.[4] Despite the language of the Rescinding Security Clearances Memorandum explicitly requiring that agencies take action "consistent with existing law," Ex. 2, Defendants in this case bypassed any level of due process, gleefully reporting that the *final revocation* of Mr. Zaid's clearance was "fun" and swiftly accomplished. Exs. 6 – 7. Agency Defendants' summary revocation here failed to meet even the most cursory standards of their own regulations, and Mr. Zaid is entitled to challenge this insolvency. The government conceded decades ago that even in national security cases involving classified information legal challenges under the Administrative Procedure Act ("APA") are permitted to ensure an agency follows its own regulations. *Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988).

The Supreme Court's decisions in *Service v. Dulles*, 354 U.S. 363 (1957) and *Vitarelli v. Seaton*, 359 U.S. 535 (1959), make clear that federal employees may challenge an agency's compliance with its regulations governing revocation of security clearances. *Service*, 354 U.S. at 373–74; *Vitarelli*, 359 U.S. at 539–40. Nothing in *Egan* overrules those cases, and in fact the principles underpinning those cases has been applied to post-*Egan* cases involving federal employee security clearance litigation. *See Palmieri v. United States*, 72 F. Supp. 3d 191, 207 (D.C. Cir. 2014) ("Here, this Court's review is limited to consideration of whether [the

---

[4] Even then, Judge Howell found that where "clearances have been suspended pending 'a further security clearance determination,'" the matter was ripe for review. *Perkins Coie* at *22.

government] complied with its own regulations during the security clearance administrative hearing."); *Wonders v. Dep't of the Army*, 659 Fed. Appx. 646, 648 (Fed. Cir. 2016)( "Inquiry is limited to determining whether a security clearance was denied . . . and whether the applicable procedural guarantees were followed." (internal quotations and modifications omitted); *Duane v. U.S. Dep't of Def.*, 275 F.3d 988, 993 (10th Cir. 2002) ("We are not, however, precluded from reviewing a claim that an agency violated its own procedural regulations when revoking or denying a security clearance, and we may relatedly compel an agency to follow its own regulations."); *Reinbold v. Evers*, 187 F.3d 348, 359 n.10 (4th Cir. 1999) (same); *see also Rattigan v. Holder*, 689 F.3d 764, 768 (D.C. Cir. 2012) ("We adhere to our holding that *Egan's* absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions" outside of this context.)

Perhaps the most informative language on this point comes from *Egan* itself, where the government asserted in its own briefing:

> We agree with the Board that it may examine whether the agency *made* such a determination [to revoke a security clearance], that is, whether the agency had procedures for denying or revoking clearances and whether the procedures were followed. The Board also could, in an appropriate case, find that a determination was not validly made because the employee was not afforded procedural protections guaranteed to him by the agency's regulations (such as notice, a statement of reasons for the proposed denial or revocation, and an opportunity to respond).

Brief for the Petitioner, *Dep't of the Navy v. Egan*, 484 U.S. 518 (1988), 1987 WL 880362, at *24–25 (emphasis in original); *see also Romero v. DoD*, 527 F.3d 1324, 1329 (Fed. Cir. 2008) (quoting from the government's brief in *Egan*).

## II.    PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.

### A.    Plaintiff Is Likely to Succeed on the Merits of His Administrative Procedure Act Claim (Count One).

Under the APA, a court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . contrary to constitutional right, power, privilege, or immunity . . . [or] . . . without observance of procedure required by law."  5 U.S.C. § 706(1) and (2)(A), (B) and (D).   "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   In this sense, "the question is not what [the Court] would have done, nor whether [the Court] agree[s] with the agency action," but "whether the agency action was reasonable and reasonably explained."  *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 726 (D.C. Cir. 2017)  (internal quotations omitted).   Agency action will be arbitrary and capricious "if it has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### 1.    Agency Defendants Failed to Follow the Law and Their Own Policies.

Agency Defendants were bound by several decades' worth of required procedures at the time of Mr. Zaid's security clearance revocation, absolutely none of which they followed.

For example, Executive Order ("EO") 10865, published in 1960, states that classified access "may not be finally denied or revoked" without a "comprehensive and detailed" written statement of reasons, an "opportunity to reply," "an opportunity to appear" before the revoking

authority, and a right to cross-examine adverse witnesses.  Ex. 9 (EO 10865), Sec. 3.  Similarly, EO 12968, enacted in 1995, guarantees similar due process protections and requires formal certification by an agency head when those procedures are not followed.  Ex. 10 (EO 12968), Sec. 5.2.  In 2008, EO 13467 left these due process protections unchanged, while noting that agencies "may not establish additional investigative or adjudicative requirements" beyond the "aligned system" in place.  Ex. 11 (EO 13467), Sec. 2.1.  It further appointed the Director of National Intelligence as the Security Executive Agent.  *Id.* at Sec. 2.3  The Security Executive Agent, in turn, published its own Directive, "SEAD-4," which establishes the "single, common adjudicate criteria" for clearance eligibility.  Ex. 12 (SEAD-4), Part B.  SEAD-4 again memorializes the due process protections owed to individuals facing denial or revocation.  *Id.* at Part E, ¶ 6 ("When an adjudicative determination is made to deny or revoke eligibility for access to classified information or eligibility to hold a sensitive position, review proceedings, to the extent they are made available in EO 12968, as amended, Part 5, shall be afforded covered individuals at a minimum.").  The Intelligence Community Policy Guidance 704-3, applicable to all Agency Defendants here, reflects the prior authorities' guarantees of "written notice," the "right to be represented by counsel," "an opportunity to respond," and "an opportunity to appeal," among others.  Ex. 13 (IC Policy Guidance 704-3, Sec. D ("Process")).  Finally, Department of Defense Directive 5220.6 governs the Defense Industrial Personnel Security Clearance Review Program and guarantees that "a final unfavorable clearance decision shall not be made without first providing the applicant with" a laundry list of due process protections, including "[n]otice of specific reasons" for the decision, "[a]n opportunity to respond," "a hearing," the right to be "represented by counsel" and "present evidence" on one's own behalf.  Ex. 14 (DoDD 5200.6), Sec. 4 ("Policy").

Defendants followed exactly *none* of their own established procedures, nor any authoritative Executive Orders that speak to the issue. Instead, they blundered straight into final agency action that immediately caused significant, adverse legal consequences. *See* 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (describing final agency action as "the consummation of the agency's decision making process" from which "legal consequences will flow") (internal quotations omitted).

### 2. Agency Defendants' Actions Were Arbitrary and Capricious.

Defendants' have engaged in textbook "arbitrary and capricious" conduct. *See* 5 U.S.C. § 706(2)(A). Defendants have given no reasoned or legitimate explanation for the sudden revocation of Mr. Zaid's authorized access to classified information. Indeed, the scant record afforded to Mr. Zaid—which might explain Defendants' actions—contains only:

- A reference to an undefined "national interest," Ex. 2.;

- The fact that the Director of National Intelligence found summary security clearance revocation to be "fun," Ex. 6; and

- An ODNI press release that cryptically referenced a group of "numerous individuals who abused public trust for political purposes," Ex. 7.

The formal correspondence Plaintiff received from individual agencies did little more than link directly to the Rescinding Security Clearances Memorandum itself before informing him of their final actions. Exs. 3 – 5.

A summary revocation of a security clearance cannot be done under the justification of the "national interest." Ex. 2; Leonard Rpt. ¶¶ 26, 42. Of the six authoritative documents outlined above (three EOs, the IC Policy Guide, SEAD-4, and DoDD 5200.6), only two reference "national interest" in the context of an individual's eligibility (as opposed to a national interest in

maintaining a cohesive clearance process, generally).  The first is EO 10865, issued more than six decades ago, which references a "national interest" evaluation as part and parcel of the due process itself.  Ex. 9.  The second is DoDD 5200.6, which references that a suspension—not a final revocation—can be made when there is an "imminent threat" to the national interest.  Even then, substantial process is due.  Ex. 14, Sec. 6.4.  Judge Howell aptly noted the incalculable delta between "national security" and "national interest" when it comes to justifying security clearance decisions, noting "the national interest" is "a concept seemingly *far broader and more nebulous than threats to national security*" and simply invoking "'the national interest' . . . represent[s] a breathtaking expansion of executive power[.]"  *Perkins Coie* at *21 (emphasis added).  The phrase "national interest"—if it can even be categorized as a "justification"—is intentionally opaque and primed for abuse.  *See* Leonard Rpt. ¶ 42 (Opinion 2).

"An agency acts arbitrarily and capriciously in violation of the APA when it makes a decision that is not based on a consideration of the relevant factors or fails to follow the necessary procedural requirements."  *Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 182 (D.D.C. 2020).  "[D]issimilar treatment of evidently identical cases is the quintessence of arbitrariness and caprice."  *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (internal quotations omitted).  Here, Agency Defendants flouted decades' worth of established procedures, treating Mr. Zaid and the other named individuals boldly dissimilar from virtually every other person in history whose clearance has been questioned.  To Mr. Zaid's knowledge, no sitting Director of National Intelligence, since the inception of such a position a quarter century ago, has ever laughed giddily on national television about how she "smiled" during the "fun" summary revocation of someone's longstanding security clearance.  Ex. 6.  Nor does the ODNI press release reference to "abusing public trust for political purposes"—whatever that could

possibly mean as to Mr. Zaid, a private citizen—identify any recognized basis for evaluating eligibility.  Ex. 7; *cf.* Ex. 12, Appendix A (outlining the 13 SEAD-4 Adjudicative Guidelines, none of which contain any reference "abusing public trust for political purposes").

Based on the Agency Defendants' decisive rejection of binding rules, regulations and laws that apply to security clearance revocations, Mr. Zaid is likely to succeed on the merits of his claim in **Count One** that the Agency Defendants have failed to provide him with the necessary process underlying the revocation of his security clearance and that the Agency Defendants' actions were "arbitrary and capricious" in violation of the APA.  5 U.S.C. § 706(1) and (2)(a).

**B.    Plaintiff Is Likely to Succeed on His Fifth Amendment Procedural Due Process (Count Two) and Vagueness (Count Four) Claims.**

**1.    Defendants' Actions Violate the Fifth Amendment's Guarantee of Procedural Due Process.**

The Due Process Clause of the Fifth Amendment states that "[n]o person shall … be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "A procedural due process claim consists of two elements: (i) deprivation by [government] action of a protected interest in life, liberty, or property, and (ii) inadequate [] process."  *Reed v. Goertz*, 598 U.S. 230, 236 (2023) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("At the outset, then, we are faced with what has become a familiar two-part inquiry: we must determine whether [Plaintiff] was deprived of a protected interest, and, if so, what process was his due.").  Such a claim is ripe not when the deprivation of liberty occurred, but rather when the due process has been denied.  *Reed*, 598 U.S. at 236.  The Rescinding Security Clearances Memorandum and Defendants' subsequent actions provide two independent bases for finding a deprivation of liberty interests.

First, it is well established that when an individual is unlawfully denied access to classified information necessary for his job, he is deprived of the liberty to practice one's chosen profession.

*Greene v. McElroy*, 360 U.S. 474, 492 (1959); *see also O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998) ("The Constitution protects an individual's 'right to follow a chosen trade or profession' without governmental interference."). The government intrudes on this right to pursue one's chosen profession when it "formally or automatically exclude[s]" someone from opportunities, or when its actions have "the broad effect of largely precluding" someone from pursuing a "chosen career." *Id.* (quoting *Kartseva v. Dep't of State*, 37 F.3d 1524, 1528 (D.C. Cir. 1994)). *See* D.C. R. Prof'l Conduct l .3(a) (requiring a lawyer to "represent a client zealously and diligently within the bounds of the law") *and* D.C. R. Prof'l Conduct 1.3, cmt. [l] ("The duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law, including the Rules of Professional Conduct and other enforceable professional regulations, such as agency regulations applicable to lawyers practicing before the agency.").

Defendants' actions here do both. The summary revocation of Mr. Zaid's security clearance and access to classified information has automatically excluded him from representing government clients whose cases involve classified information. Zaid Decl. ¶¶ 44–46. He could not possibly continue to ethically, zealously represent his clients while knowing that he cannot access, discuss, or review basic facts about their cases. *Id.* By severing his ability to contract with clients whose issues involve classified matters, Defendants' actions also have the "broad effect of largely precluding" Mr. Zaid from continuing his decades-long cultivation of a successful career in national security law. *O'Donnell*, 148 F.3d at 1141.

Second, the immensely public nature of the Rescinding Security Clearances Memorandum and subsequent agency action deprives Mr. Zaid of his "good name, reputation, honor, [and] integrity." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). When these values are jeopardized by government action, "notice and an opportunity to be heard are essential." *Id.* Mr.

Zaid's case establishes all the elements of a "reputation-plus" claim under the Fifth Amendment. "A plaintiff makes out a reputation-plus claim when the government takes certain adverse actions *and* defames the plaintiff." *Campbell v. D.C.*, 894 F.3d 281, 284 (D.C. Cir. 2018) (emphasis in original). Here, the government's adverse action of revoking Mr. Zaid's security clearance without process was combined with a conclusory statement that it was against the "national interest" for he, a national security lawyer, to handle classified information. Similarly, Director Gabbard's widely-viewed social media posts on the revocations, and ODNI's press release, describe Mr. Zaid as belonging to a group "who abused public trust for political purposes" without any explanation of what that means. Ex. 7. Defendants have yet to provide even the patina of a legitimate basis for Mr. Zaid's clearance revocation, after-the-fact or otherwise, and the pretextual allegations they have tendered are decisively refuted by Mr. Zaid's declaration. Zaid Decl. ¶¶ 14, 17–19, 22. For obvious reasons, a national security lawyer who has been declared incapable of safeguarding national security information will experience reputational harm. Combined with his loss of property interest, Mr. Zaid has a valid reputation-plus claim under the Fifth Amendment. *O'Donnell*, 148 F.3d at 1140 (observing that "official criticism will carry much more weight if the person criticized" loses his property interest "at the same time").

The revocation of a security clearance may give rise to a due process claim for injury to a liberty interest. *See Doe v. Austin*, 2024 WL 864270, at *12 (D.D.C. Feb. 29, 2024), citing *Doe v. Casey*, 796 F.2d 1508, 1522 (D.C. Cir. 1986); *see also Ranger v. Tenet*, 274 F. Supp. 2d 1, 9 (D.D.C. 2003) (finding plaintiff had liberty interest where alleging CIA did not afford meaningful opportunity to contest revocation). While the mere revocation of a security clearance, in and of itself, does not constitute stigmatizing of reputation, it can be stigmatizing if that action parallels public factual accusations referenced as the basis for the revocation, which are pretextual at best,

and which damages the individual's standing and associations in the community.  *Doe v. Cheney*, 885 F. 2d 898, 910 (D.C. Cir. 1989).

### 2. The March 22, 2025 Rescinding Security Clearances Memorandum is Unconstitutionally Vague.

A federal law is unconstitutionally vague in the context of the Fifth Amendment Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015).  This doctrine applies in both the civil and criminal context.  *See, e.g.*, *Boutilier v. INS*, 387 U.S. 118, 123 (1967).

The March 22, 2025 Rescinding Security Clearances Memorandum is unconstitutionally vague.  It provides no explanation for the revocation of security clearances, other than asserting that the revocations were in the "national interest."  As explained *infra*, this term is all but meaningless in the context of security clearance revocations.  *See* Leonard Rpt. ¶¶ 41–42.  The intentionally obscure language does not provide Mr. Zaid—to say nothing of the other named individuals—with any information on either the purpose or process behind the revocation.  Further, it does not provide any other security clearance holders across the U.S. Government with any way to ascertain how to avoid such a summary revocation, setting the stage for arbitrary enforcement.  "Words which are vague and fluid may be as much of a trap for the innocent as the ancient laws of Caligula."  *See Cramp v. Bd. of Pub. Instruction of Orange Cnty., Fla.*, 368 U.S. 278, 287 (1961) (citing *United States v. Cardiff*, 344 U.S. 174, 176 (1952)).  On this point, the language of the Rescinding Security Clearances Memorandum is facially incoherent in that is directs process-less revocations while simultaneously requiring that agencies take action "consistent with existing law."  Ex. 2.  As discussed above, these two concepts are mutually exclusive.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Where that regulation relates to speech, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54. A vague regulation of speech "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. Am. C.L. Union*, 521 U.S. 844, 871–72 (1997). "[S]tandards of permissible statutory vagueness are strict in the area of free expression." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 432 (1963) (collecting cases). As discussed in further detail *infra*, Defendants' actions have impermissibly restricted the First Amendment Rights of both Plaintiff and his clients. Their utterly insufficient explanations for their actions and unconstitutionally vague language of the Rescinding Security Clearance Memorandum do not come close to meeting the applicable standards for fair notice.

Defendants have openly and unapologetically deprived Mr. Zaid of liberty and property interests in violation of the Due Process Clause of the Fifth Amendment. Moreover, they have done so by relying on a vague and internally conflicting Presidential Memorandum which does not provide even a modicum of "fair notice." For these reasons, Mr. Zaid is likely to succeed on his claims for **Count Two** and **Count Four**.

### C.    Plaintiff Is Likely to Succeed on His First Amendment Claim (Count Three).

### 1.    Defendants' Actions Violate the Right to Petition Clause.

The Presidential Memorandum and its compulsory consequences infringe on Mr. Zaid's First Amendment right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The Supreme Court has recognized the right to petition the government "extends to all departments of the Government" and, crucially, includes "[t]he right of access to the courts" as well as administrative agencies. *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002) (quoting

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).  As such, the Court has consistently treated the act of filing a lawsuit as a form of "petition" protected by the Petition Clause.  *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 390 (2011); *see also id.* at 387 (citing cases affirming that the Petition Clause safeguards the right to seek resolution of legal disputes in courts and other governmental forums).  Mr. Zaid has standing both to assert First Amendment rights on his own behalf and on behalf of his clients through an attorney-client relationship.  *Kowalski*, 543 U.S., at 130–31.

As Judge Howell found in a similar context as applied to law firms, the violation of the right to petition the government "is straightforward" in this instance: "retaliation based on the exercise of the right to petition the government via access to the courts violates that right, and the associated liberty interest, in the same way that retaliation based on protected speech violates the First Amendment."  *Perkins Coie* at *43–44 (citing *Guarnieri*, 564 U.S. at 387–93).

Here, the President's retaliatory directive to rescind a group of clearances, including that of Mr. Zaid in the name of the "national interest" violates this doctrine by sanctioning Mr. Zaid for providing good-faith—and in many cases, nationally significant—representations of clients, particularly of lawful whistleblowers.  Most notably, President Trump has expressed disdain for, and outright targeted, Mr. Zaid ever since learning he represented of the IC Whistleblower in 2019—calling Mr. Zaid a "disgrace," a "sleazeball," and for him to "be sued and maybe for treason."  Zaid Decl. ¶¶ 25–26.  Simply put, the Petition Clause does not allow the President to punish Mr. Zaid for filing lawsuits or representing whistleblowers whom President Trump did or does not like.  The Supreme Court has long accepted "the proposition that when a person petitions the government for redress"—e.g., by filing a lawsuit or appearing before an official forum on behalf of a client—"the First Amendment prohibits any sanction on that action … so long as the

petition was in good faith." *Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 696 (D.C. Cir. 2009). Mr. Zaid's petitions on behalf of whistleblowers and other clients have never been anything other than in complete good faith, and the President's statements about Mr. Zaid reveal a motivation grounded in sheer retribution.

Accordingly, the retaliatory action taken by President Trump with a stroke of the pen, based quite obviously in retaliation for Mr. Zaid's past representation of lawful whistleblowers before Congress and the judiciary, has decisively "deprived plaintiff of [his] liberty interest in petitioning the government," *Perkins Coie* at *44. The negative effects span across branches of government for Mr. Zaid and his clients, all without any prior notice or opportunity to be heard.

### 2.    Defendants' Actions Violate Freedom of Speech and Association.

When a lawyer associates with a client and vice versa, the relationship and ensuing legal advocacy is protected speech under the First Amendment's freedom of speech and association clauses. *Perkins Coie* at *38 (collecting cases); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) ("[T]he Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties."). Mr. Zaid has both direct standing to challenge Defendants' intrusion into his own First Amendments as well as the rights of clients with whom he currently associates with via an attorney-client relationship. *See Kowalski*, 543 U.S. at 130–31. This third-party standing is particularly apt where the existence of that relationship and "association" is protected by privilege in the first place.

Any infringements by the Executive Branch on these foundational protections needs to be promptly checked, as "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602

U.S. 175, 180 (2024).  And yet that is exactly what Defendants do here.  By summarily revoking Mr. Zaid's security clearance without due process, and consequently depriving him of the ability to review and prosecute his clients' cases, Defendants have unilaterally extinguished Plaintiff's clients' First Amendment rights to continue to associate with him and benefit from his advocacy. Even more troubling is Defendants' election to broadcast the security clearance revocation through no less public a manner than a Presidential Memorandum posted to the White House's official website.  The intended chilling effect for all who observe this case is immediately obvious.  Mr. Zaid is widely known as an attorney accomplished in the practice of advising whistleblowers and advocating for their rights.  Compl. ¶¶ 31–32; Zaid Decl. ¶ 9; M.P. Decl. ¶ 13.  Defendants' message to whistleblowers is clear: blow the whistle and lose your attorney.  Their message to lawyers is just as disturbing: represent someone we disfavor and lose your practice.

An analysis of whether Defendants' actions were sufficiently tailored to a compelling interest is nearly farcical at this point: there was no discernable interest alleged, and no tailoring was done.  "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—'because First Amendment freedoms need breathing space to survive.'"  *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 609 (2021) (quoting *Nat'l Ass'n for Advancement of Colored People*, 371 U.S. at 433).  No tailoring whatsoever was done here, and any "national interest" discussed above is unconstitutionally vague.  There is no First Amendment framework where Defendants' transgressing of Mr. Zaid's and his clients' constitutional guarantees of speech and association survives any level of scrutiny.

For the reasons outlined above, there is a substantial likelihood that Plaintiff will succeed on the merits of **Count Three**.  As was the case under a Fifth Amendment analysis, a facial challenge to the Rescinding Security Clearances Memorandum is appropriate here because the

nationally-publicized and chilling nature of the Memorandum renders it unconstitutional. Additionally, the Memorandum's lack of tailoring to any government interest is true to each name on the list, as is the absence of any discernable government interest. Additionally, as applied to Mr. Zaid—the only named individual on the list who had no recent formal affiliation with state or federal government—his inclusion is linked inextricably to his exercise of First Amendment rights on behalf of himself and his clients. "[T]he First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468 (2022).

### D.    Plaintiff Is Likely to Succeed on His Fifth Amendment Right to Counsel Claim.

"While the First Amendment's free speech and association protections safeguard a client's rights to hire and consult with an attorney . . . separate constitutional problems are posed under the Fifth and Sixth Amendments when the government interferes with a client's right to choose counsel." *Perkins Coie* at *43. Mr. Zaid has prudential, third-party standing to challenge restrictions on his clients' access to him as counsel. *See Caplin & Drysdale*, 491 U.S., at 623 n.3; *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990). That includes both interference with a client's right to counsel of choice, *Caplin & Drysdale*, 491 U.S. at 623 n.3, as well as government action that "interferes with [counsel's] professional obligation to his client," *Wounded Knee Legal Def./Offense Comm. v. FBI*, 507 F.2d 1281, 1284 (8th Cir. 1974).

In many of Mr. Zaid's current cases, he is advising clients as they navigate their own due process rights within their federal employment. Zaid Decl. ¶¶ 40–42. But as stated above, he cannot fulfill his own professional and ethical obligations to his clients when he is being ordered by the government to disregard classified information he has already learned through lawful access previously afforded by the U.S. Government. *Id.* ¶¶ 43–44. His clients' due process rights will

be "of little avail" if they do not also include " a right to be heard by counsel." *Powell v. State of Ala.*, 287 U.S. 45, 68–69 (1932). And although a civil litigant may not always have a constitutional right to *appointed* counsel, Defendants' effective severance of active attorney-client agreements for *chosen* counsel is still an egregious violation of due process rights. *Powell*, 287 U.S. at 69 ("If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense."); *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873-74 (D.C. Cir. 1984).

Defendants' actions amount to unconstitutional interference of the right to counsel as contemplated under the Fifth Amendment. By revoking Mr. Zaid's security clearance and access to classified information without due process, Defendants have forced litigants to proceed in active cases *pending against the Defendants themselves* without the litigants' chosen counsel. Zaid Decl. ¶ 43 (John Doe-1); M.P. Decl. ¶ 17. The government's abusive leveraging of its power to kneecap its legal adversaries in active court proceedings would have been abhorrent to the Framers of the Constitution. *See Legal Svcs. Corp. v. Velazquez*, 531 U.S. 533, 537–49 (2001) (rejecting government action that "distorts the legal system by altering the traditional role of attorneys" as advocates for their clients and "insulate[s] the Government's interpretation of the Constitution from judicial challenge").

Defendants' actions have constructively severed attorney-client relationships and deprived Mr. Zaid's clients of their zealous advocate of choice. Having offered no remotely legitimate reason for their actions, and without a second thought as to the implications of using government power to pluck opposing lawyers off of active litigation, Defendants have directly offended the Fifth Amendment's guarantees to counsel of choice. *See Muniz v. Meese*, 115 F.R.D. 63, 66 n.11

(D.D.C. 1987) (noting "violation of civil liberties that is implied by a government intrusion into [citizens'] right to select and to be represented by counsel of their choice").

Accordingly, Defendants have unlawfully violated the right to counsel as envisioned under the Fifth Amendment and Plaintiff is likely to succeed on the merits of **Count Five**.

## III.   PLAINTIFF WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF.

Mr. Zaid's irreparable injury is "both certain and great" and "actual and not theoretical," and the injury is "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Absent preliminary injunctive relief, Mr. Zaid will continue to suffer severe and irreparable harm because of the Defendants' unlawful actions.

"The loss of First Amendment freedoms"—here, the freedoms of association, speech, and the right to petition the courts—"for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 301–03. As outlined in the Declarations accompanying this filing, Mr. Zaid and his clients are currently suffering a loss of their First Amendment freedoms. Zaid. Decl. ¶¶ 44–45; M.P. ¶ 17.

"[E]conomic loss that threatens the survival of the movant's business can amount to irreparable harm." *Nat'l Mining Ass'n v. Jackson*, 768 F.Supp.2d 34, 50 (D.D.C. 2011). Significant economic injuries can constitute irreparable harm even where they do not threaten to destroy the entire business, if "no 'adequate compensatory or other corrective relief will be available at a later date.'" *NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022); *see Air Transp. Ass'n of Am. v. Exp.-Imp. Bank of U.S.*, 840 F.Supp.2d 327, 335 (D.D.C. 2012) ("significant" economic harm constitutes irreparable injury "where it is irretrievable because a defendant has sovereign immunity"). *See* Zaid Decl. ¶¶ 15, 48.

Because reputational harm and the loss of goodwill are "not easily measurable in monetary terms," they, too, generally constitute irreparable harm. *Xiaomi Corp. v. Dep't of Def.*, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018); *Patriot, Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997). Using the reach and prestige of the White House and Executive Branch agencies, Defendant have irreparably tarnished Mr. Zaid's reputation as an accomplished national security lawyer by publicly labeling him as insufficiently trustworthy to handle classified information without affording him the requisite due process. Ex. 7; Zaid Decl. ¶¶ 37–38. Indeed, even if the Presidential Memorandum is rescinded, its delirious consequences will likely linger. For the remainder of Mr. Zaid's career, he will be plagued by Defendants' actions, as he likely will have to disclose the existence of this revocation on any future security clearance application(s). Zaid Decl. ¶ 47; Leonard Rpt. ¶ 43.

The unconstitutional Presidential Memorandum will continue to harm Mr. Zaid and his clients until it is preliminarily, then permanently, enjoined, and the illegal and unconstitutional bases of the action declared.

## IV.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING PLAINTIFF'S INJUNCTIVE RELIEF.

When preliminary injunctive relief is sought against the government, the balance of the equities and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The balance of harms and the public interest here weigh strongly in favor of granting a preliminary injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (explaining the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief").

In contrast to the irreparable injury facing Mr. Zaid, Defendants will be unable to identify any harm resulting from an injunction, or of any "adverse impact on the public interest" resulting from the injunction. *Winter*, 555 U.S. at 24. The government "cannot suffer harm from an injunction that merely ends an unlawful practice," and any contrived hardship would be "not legally relevant." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021) (quoting *R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); *see League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). There is, however, a "substantial public interest" in ensuring that the government abides by the law. *League of Women Voters*, 838 F.3d at 12. In fact, Defendants' overt violations of Mr. Zaid's and others' constitutional rights through arbitrary and capricious security clearance revocations provide further support for an injunction. *See Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) ("There is generally no public interest in the perpetuation of unlawful agency action."); *Perkins Coie* at *49 ("The balance of the equities and the public interest also favor the issuance of an injunction for a simple reason: enforcement of an unconstitutional law is always contrary to the public interest.") (internal quotations omitted).

Mr. Zaid, his current clients, and his prospective clients within the national security community each have a strong interest in protecting the bedrock constitutional guarantees of the First and Fifth Amendments. The public interest will be served by an injunction that refuses to countenance retributive attacks by the government against an adversarial attorney "simply for doing the job of a lawyer." *Id.*

## V.   THIS COURT SHOULD EXERCISE ITS DISCRETION TO WAIVE FEDERAL RULE OF CIVIL PROCEDURE 65(C)'S SECURITY REQUIREMENT.

Mr. Zaid respectfully requests that the Court waive Fed. R. Civ. P. 65(c)'s security requirement pursuant to its "wide discretion" to require no bond. *Am. First Legal Found. v.*

*Becerra*, 2024 WL 3741402, at *16 n.11 (D.D.C. Aug. 9, 2024).  In matters such as this one, "where the restraint will do the defendant no material damage" and "where there has been no proof of likelihood of harm," it is wholly appropriate for the district court to "dispense with any security requirement whatsoever."  *Id.* (internal quotations and citations omitted).

## CONCLUSION

For the foregoing reasons, Plaintiff Mark Zaid requests that the Court grant this Motion for Preliminary Injunctive Relief while the case proceeds on the merits, and respectfully requests an oral hearing on this application within 21 days pursuant to Local Civil Rule 65.1(d).

Dated: May 21, 2025                          Respectfully submitted,

*/s/ Abbe David Lowell*
Abbe David Lowell (D.C. Bar #358651)
David A. Kolansky (NY Bar #5887765)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., 2nd Fl.
Washington, DC 20005
Tel: (202) 964-6110
Fax: (202) 964-6116
alowellpublicoutreach@lowellandassociates.com
dkolansky@lowellandassociates.com

*/s/ Norman L. Eisen*
Norman L. Eisen (D.C. Bar # 435051)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue, SE, #15180
Washington, D.C. 20003
Tel: (202) 594-9958
norman@statedemocracydefenders.org

*/s/ Margaret M. Donovan*
Margaret M. Donovan (D.C. Bar #CT0026)
Christopher M. Mattei (*pro hac vice forthcoming*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com
cmattei@koskoff.com

*/s/ Kevin T. Carroll*
Kevin T. Carroll (D.C. Bar #1021479)
1751 Pinnacle Drive
Tysons, VA 22102
Tel: (718) 791-5761
kevintcarroll@hotmail.com

*/s/ George W. Croner*
George W. Croner (*pro hac vice forthcoming*)
KOHN, SWIFT & GRAF, P.C.
1600 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 238-1700
gcroner@kohnswift.com

*/s/ D.E. Wilson, Jr.*
D.E. Wilson, Jr. (D.C. Bar #932178)
LANKFORD & REED, PLLC
120 North St. Asaph Street
Alexandria, VA 22314
Tel: (703) 299-5000
ewilson@LRfirm.net

*/s/ Eugene R. Fidell*
Eugene R. Fidell (D.C. Bar #112003)
FELDESMAN LEIFER LLP
1129 20th Street NW, Ste. 400
Washington, D.C., 20036
Tel: (202) 466-8960
efidell@feldesman.com

*Counsel for Plaintiff Mark S. Zaid*