**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARK S. ZAID, ESQ.<br><br>                    Plaintiff,<br><br>        v.<br><br>EXECUTIVE OFFICE OF THE<br>PRESIDENT, *et al*.<br><br>                    Defendants. | Civil Action No.: 1:25-cv-1365-AHA |

**<u>EXPERT REPORT OF J. WILLIAM LEONARD</u>**

I, J. WILLIAM LEONARD, declare as follows:

1.        I have agreed to testify *pro bono* as an expert witness in the above matter based upon the expertise I developed during the course of a 34-year career as a Federal public servant in the national security arena and more than 50 continuous years of experience as a cleared individual.

**I.        BACKGROUND AND CREDENTIALS**

2.        I was employed by the Department of Defense ("DoD") from 1973 to 2002.  My entire tenure involved the area of Personnel Security.  For the first 23 years of my career, I served in various roles of increasing responsibility at the Defense Investigative Service, which was the precursor to today's Defense Counterintelligence and Security Agency.  *See* https://www.dcsa.mil/. In these roles I had operational responsibilities in the DoD's program providing oversight to private sector entities, to include defense contractors and law firms, and their employees who required access to classified national security information.  From 1992 to 1996, I served as the Assistant Deputy Director at the Defense Investigative Service, where I was responsible for a wide range of policy and operational matters pertaining to the DoD's administration of the National Industrial Security Program ("NISP").  *See*  https://www.dcsa.mil/Industrial-Security/National-Industrial-

Security-Program-Oversight.  The NISP is the federal program that manages the access of private industry to classified information.  Among other things, I was responsible in that role for the Field Services Division, the Counterintelligence Office, and all overseas operations of the Defense Investigative Service in Europe, the Middle East, Central and South America, and the Far East. My responsibilities included reviewing submittals to the Office of the Secretary of Defense recommending the suspension of personnel security clearances of private sector individuals when appropriate.

3.       From 1996 to 1998, I served as the Director of Security Programs for the DoD, and from 1999 to 2002, I served at times as the Deputy Assistant Secretary of Defense ("DASD") responsible for security and information operations, and at other times as the Principal Director in that office.   As the DASD, I was the most senior official in the DoD responsible for all security, counterintelligence, computer security, infrastructure protection, and information operations programs within the DoD.   Part of my responsibility at the Pentagon was to develop and oversee policies to ensure the proper protection of classified information within the entirety of the DoD as well as within private sector entities that did business with the DoD.   These policies included the granting, revocation, and suspension of personnel security clearances for military and civilian members of the DoD and for employees of DoD-affiliated private sector entities, to include law firms, that required access to classified national security information.   As DASD, I was the final authority resolving matters relating to security clearance issues.   In 2002, I was a recipient of the Presidential Meritorious Rank, an award that recognizes a select group of career members of the Senior Executive Service ("SES") for exceptional performance over an extended period of time.

4.       From 2002 to January 2008, I served as the Director of the Information Security Oversight Office ("ISOO") during the Administration of President George W. Bush.    ISOO

receives its policy and program guidance from the National Security Council and is an administrative component of the National Archives and Records Administration. *See* https://www.archives.gov/isoo. The Director of ISOO is known colloquially as the "Classification Czar" because the Director is responsible for oversight of the government-wide classification system and aspects of the security clearance process. I was appointed to this position with the approval of President Bush, and in this role I oversaw the entire Executive Branch's classification and handling of classified national security information.

5. The Director of ISOO has authority to access more classified information than anyone in the government other than the President and Vice President. As the Director of ISOO, I was the primary official charged with the responsibility to ensure that all Executive Branch agencies properly classified and declassified national security information and appropriately granted and restricted access to classified national security information in accordance with established policy. To that end, I had a primary role in the drafting, editing, and issuance by President George W. Bush of Executive Order 13292 (2003), which amended Executive Order 12958 (1995), and established the Federal government's policies with respect to classifying, safeguarding, and declassifying national security information.

6. As the Director of ISOO, I was also the primary official charged with the responsibility to ensure that Executive Branch agencies appropriately implemented the NISP. The NISP policies that I oversaw included policies around the granting, revocation, and suspension of personnel security clearances for employees of private sector firms that required access to classified national security information in support of Executive Branch agencies or in working with other cleared private sector entities.

7.      In my various capacities with the Federal government, it was my responsibility on a regular basis to recommend and/or determine whether security clearances should be granted, suspended, or revoked, and whether information which an agency sought to classify or keep classified met the appropriate classification criteria.

8.      Between 2008 and 2010, I served as the principal of my own consulting firm advising on security issues related to national defense, homeland security, and counterintelligence. My area of expertise included the investigation and adjudication of personnel security clearances; assessments of the foreign ownership, control, and influence of cleared U.S. defense industry; and the protection of critical infrastructures.  I also served as an adjunct professor of political science at St. Mary's College of Maryland.

9.      Between 2010 and 2019, I served as the Chief Operating Officer of the National Endowment for Democracy, a nongovernmental, nonprofit foundation dedicated to the growth and strengthening of democratic institutions around the world.

10.      While I am retired from full-time employment, I currently serve as a member of the board of directors for a company cleared by the DoD under the terms of a special security agreement.   In this capacity, I am required to retain a personnel security clearance, and my responsibilities include ensuring that the cleared firm and its personnel properly safeguard classified information as well as ensuring that the firm's foreign-owned parent is precluded from accessing classified and other sensitive U.S. Government information.   As such, I have remained abreast of all official policy and requirements for the protection of classified national security information, as well as the standards for approving, suspending, denying, or revoking security clearances.  I have been continuously cleared (i.e., have held an active security clearance) at all times between 1973 and the present.

11.    I hold a Master of Arts degree in International Relations from Boston University and a Bachelor of Arts degree in History from Saint John's University.

## II.    RETENTION IN THIS MATTER AND RELATED DISCLOSURES

12.    In May 2025, I was approached by counsel to Mark Zaid to discuss this case, which relates to a Presidential Memorandum dated March 22, 2025, entitled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals," DCPD-202500388 ("Clearance Recission Memorandum").  More specifically, I was asked to address the purported determination by the President set forth in the Clearance Recission Memorandum that "it was no longer in the national interest" for Mark Zaid, among others, to access classified information.  The Memorandum directed the revocation of any active security clearances held by Mark Zaid, among others, and to immediately rescind his access to classified information.  The Memorandum further directed all executive department and agency heads to revoke unescorted access to secure United States Government facilities from Mark Zaid, among others.  After reviewing the Clearance Recission Memorandum, I agreed to offer the opinions in this report in the capacity of an expert witness based on my experience and credentials above.  I am doing so without compensation, as my sole motivation for involvement in this present matter is my concern for the integrity of the processes around security clearances, a key tool intended to safeguard the security of our nation and the American people.   I have devoted the great majority of my professional career to the protection of our national security through rigorous application of fair criteria determining (1) what information should be classified and (2) which individuals are entitled to access to such information, and on what terms.

13.    In the years since my retirement from public service, I have served as a *pro bono* expert in several prior court proceedings, including in the parallel litigation against Executive Order 14230, entitled "Addressing Risks from Perkins Coie LLP," 90 Fed. Reg. 11781, *see Perkins*

*Coie LLP v. U.S. Department of Justice*, Dkt. 39-8, No. 1:25-cv-716-BAH (D.D.C. Apr. 2, 2025), and against Executive Order 14250 entitled "Addressing Risks from WilmerHale," 90 Fed. Reg. 14549 (March 27, 2025), *see Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the President, et al.*, Dkt. 16-5, No. 1:25-cv-917-RJL (D.D.C. Apr. 8, 2025). In all such instances, as in this case, I have made it clear to the counsel that I would become involved in their case not as an advocate for a party but rather as an advocate for the integrity of the national security classification and clearance systems.

14.    A list of publications that I have authored in the last ten years is attached as Exhibit 1. I have not testified in any case as an expert at trial or by deposition in the last four years. The facts or data I considered in forming my opinions are set forth in Section III below.

## III.    SUMMARY OF RELEVANT FACTS

### A.    Presidential Memorandum Dated March 22, 2025 and Related Events

15.    On February 8, 2025, the *New York Post* reported on President Trump's alleged intent to conduct a mass revocation of security clearances for a wide-ranging set of current and former government employees, and referenced Mr. Zaid, a lawyer, who was identified in the article in connection with one of his past whistleblower clients. Zaid Compl. ¶ 39. The article is available online. *See* https://nypost.com/2025/02/08/us-news/trump-stripping-the-security-clearances-from-a-new-hit-list-of-antagonists-including-ny-ag-letitia-james-da-alvin-bragg/ (Feb. 8, 2025).

16.    On March 10, 2025, Director of National Intelligence Tulsi Gabbard posted on social media platform X a statement that "Per @POTUS directive," she had "revoked security clearances and barred access to classified information for Antony Blinken, Jake Sullivan, Lisa Monaco, **Mark Zaid**, Norman Eisen, Letitia James, Alvin Bragg, and Andrew Weissman, along with the 51 signers of the Hunter Biden 'disinformation' letter." Zaid Compl. ¶¶ 41-42 (emphasis

added). This blanket revocation included revoking Mr. Zaid's clearance, who maintained an active security clearance in the context of fulfilling his obligation as a lawyer to represent his clients.

17.     Twelve days later, on March 22, 2025, the Trump White House published a Presidential Memorandum online addressed to "the heads of executive departments and agencies," entitled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals." *See* https://www.whitehouse.gov/presidential-actions/2025/03/rescinding-security-clearances-and-access-to-classified-information-from-specified-individuals/.        The    following points contained in the Presidential Memorandum are relevant to this report.

18.     The Presidential Memorandum is directed to "the heads of executive departments and agencies" and directs the summary revocation of the security clearances of a group of individuals. The Memorandum reads, in relevant part, "I have determined that it is no longer in the national interest for the following individuals to access classified information: Antony Blinken, Jacob Sullivan, Lisa Monaco, **Mark Zaid**, Norman Eisen, Letitia James, Alvin Bragg, Andrew Weissmann, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam Kinzinger, Fiona Hill, Alexander Vindman, Joseph R. Biden Jr., and any other member of Joseph R. Biden Jr.'s family. Therefore, I hereby direct every executive department and agency head to take all additional action as necessary and consistent with existing law **to revoke any active security clearances** held by the aforementioned individuals and **to immediately rescind their access to classified information**. I also direct all executive department and agency heads to revoke unescorted access to secure United States Government facilities from these individuals." *Id.* (emphasis added).

19.     Shortly after publication of the Presidential Memorandum, on or about April 3, 2025, Mr. Zaid received a one-page, three-paragraph memorandum from the Defense of

Counterintelligence and Security Agency with the subject line, "Revocation of Personnel Security Clearance Eligibility."  It stated: "The [March 22, 2025 Rescinding Security Clearances Memorandum] directs every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by you, and by other individuals identified or described in the [Memorandum].  Pursuant to that direction, DCSA has revoked the security clearance held by you. The revocation action has been annotated in our system of record for personnel clearances."  Zaid Compl. ¶ 47.

20.    Then, on or about April 9, 2025, Mr. Zaid received a one-page, one-paragraph letter from the Central Intelligence Agency's Office of General Counsel, which stated, in relevant part, as follows: ". . .  As you are aware, you were specifically identified by the White House in this [March 22, 2025 Presidential Memorandum].  Pursuant to this memo, the Agency is required to 'revoke any active security clearances ... and to immediately rescind [] access to classified information' for the named individuals. Accordingly, you are no longer personally permitted access to classified information in any ongoing matters that you are currently involved in with the Agency." *Id.* ¶ 49.  The "you" referenced in the April 9 correspondence refers to Mr. Zaid.  The letter is signed by the CIA's Deputy General Counsel for Litigation and Investigations. *Id.* ¶ 50.

21.    On April 23, 2025, Mr. Zaid received an email from the Office of the Director of National Intelligence ("ODNI")'s Office of Inspector General that stated he was denied access to a client's classified complaint, which he has previously accessed, because ODNI Security determined "(U) Pursuant to Presidential direction issued on 22 March 2025 (attached), the individuals listed therein, no longer have a security clearance, are not authorized for access to classified information, and do not have unescorted access to ODNI facilities." *Id.* ¶ 51.  Mr. Zaid had maintained a TS/SCI clearance, for which information classified at that level carries a greater exposure to details that implicitly or explicitly implicate intelligence sources or methods.

**B.    Public Commentary by Director Gabbard and Social Media Postings**

22.    On May 1, 2025, DNI Director Gabbard publicly discussed the government's revocation of Mr. Zaid's security clearance during a sit-down interview with reporter Megyn Kelly. Director Gabbard referenced Mr. Zaid by name directly as among "a number of other people" whose clearances have been revoked.  The hour-long interview is available on YouTube.  *See* "Tulsi Gabbard on Investigating the Leaks, Fighting the Deep State, and Whether She'll Run in 2028," *The Megyn Kelly Show* (May 1, 2025), https://www.youtube.com/watch?v=6tFyUP0TgrM.

23.    The next day, on May 2, 2025, ODNI issued an official press release which noted that Director Gabbard had revoked security clearances of "numerous individuals who abused public trust for political purposes."  The press release is available online.  *See* ODNI News Release No. 08-25,   https://www.dni.gov/index.php/newsroom/press-releases/press-releases-2025/4069-pr-08-25 (May 2, 2025).

24.    Director Gabbard also posted a copy of the press release on her official X page, which contains a hyperlink directing back to Director Gabbard's original March 10, 2025 tweet identifying Mr. Zaid as one of the targeted individuals, among others who are named.  *See* https://x.com/DNIGabbard/status/1918333364970365134?s=19 (May 2, 2025).

**IV.    BACKGROUND PRINCIPLES ON SECURITY CLEARANCES**

**A.    The Rules And Principles Governing The Security Clearance Review Process**

25.    Executive Order 12968, which established the protocols governing access to classified information to include provisions for due process, has remained in effect since it was issued nearly thirty years ago by President Bill Clinton.  *Access to Classified Information*, 60 Fed. Reg. 40245 (Aug. 2, 1995).   The protocols in Executive Order 12968 have been subject to minor amendments since then, the most substantive ones being the designation of the Director of National Intelligence as the "Security Executive Agent" by virtue of Executive Order 13467, *Reforming*

*Processes Related to Suitability for Government Employment, Fitness for Contractor Employees,*
*and Eligibility for Access to Classified National Security Information*, which was issued by
President George W. Bush on June 30, 2008, and the initiation of continuous vetting procedures
through Executive Order 13764 that President Barack Obama signed on January 17, 2017.   None
of the subsequent amendments or policy modifications have impacted the core principles of due
process that were created in Executive Order 12968.

26.    The protocols established by Executive Order 12968 are aimed at ensuring that the
protection of the nation's classified information is consistent with "providing fair and equitable
treatment to those Americans upon whom we rely to guard our national security."   60 Fed. Reg. at
40245.   A hallmark of the process, therefore, is that it is an *individualized* one.   The touchstone of
that individualized review is whether clearance is consistent with the "national security interest"
of the United States.    "National security," meanwhile, is defined both in the United States Code
and in Executive Order 13526, *Classified National Security Information* (Dec. 29, 2009), as "the
national defense and foreign relations of the United States."   10 U.S.C. §801(16); 75 Fed. Reg.
707, 729 (Jan. 5, 2010) (identical definition in Executive Order 13526, except using the disjunctive
"or").[1]

27.    Pursuant to Executive Order 12968, an individual may not access classified
information unless (1) that individual has been "determined to be eligible" for access, (2) that
individual has signed a nondisclosure agreement, and (3) that individual has a "demonstrated need-

---

[1] Mark Zaid's due process rights are derived from Executive Order 12968.    There are other
executive orders and subordinate directives and regulations that touch upon personnel vetting that
are not discussed here.   While some of these may reference "national interest" instead of "national
security interest," the governing executive order (12968) and the national adjudicative guidelines
for security clearances, which are discussed in more detail below, explicitly rely upon the term
"national security interests."

to-know" for the information at issue.   60 Fed. Reg. at 40246.   Access to classified information is generally granted (with limited and defined exceptions) only to individuals "who are United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment, as well as freedom from conflicting allegiances and potential for coercion, and willingness and ability to abide by regulations governing the use, handling, and protection of classified information." *Id.* at 40250. The determination of eligibility for access to such information is to be "based on judgments by appropriately trained adjudicative personnel." *Id.*

28.    The security clearance process is a critical tool in keeping our nation and its citizens safe.  For it to be effective, it is to be implemented in a "fair and equitable" manner and through a "uniform … program."  *Id.* at 40245.

29.    To ensure that this national security tool (i.e., the individualized security clearance process) is implemented in a fair and equitable manner and through a uniform program, the Director of National Intelligence ("DNI"), under the authority of Executive Order 13467 referenced above and in furtherance of Executive Order 12968, issued DNI Security Executive Agent Directive 4 ("SEAD-4"), *National Security Adjudicative Guidelines*, on June 8, 2017, during the prior Administration of President Donald Trump.   This Directive establishes the criteria to be used by all Federal government agencies authorized to render a determination for initial or continued eligibility of an individual to access classified information.  Off. of the Dir. of Nat'l Intel., *Security Executive Agent Directive 4: National Security Adjudicative Guidelines* (2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf.

30.    Pursuant to SEAD-4, an individual's eligibility for a security clearance turns on whether that individual's access to classified information is "clearly consistent with the national security interests" of the United States.    *Id.* at 5.    The adjudicative process is intended to be an examination of the "whole person," meaning an examination of "a sufficient period and careful weighing of a number of variables of an individual's life," in order to make an affirmative determination that the individual is an acceptable security risk.    *Id.* at 6 ("the whole-person concept").    The adjudicative policy states unambiguously that for every individual seeking a security clearance, each such individual "case must be judged on its own merits."    *Id.*    To perform that adjudication, an individual's personal conduct in the following thirteen areas are taken into account:  allegiance to the United States (Guideline A), foreign influence (Guideline B), foreign preference (Guideline C), sexual behavior (Guideline D), personal conduct (Guideline E), financial considerations (Guideline F), alcohol consumption (Guideline G), drug involvement and substance misuse (Guideline H), psychological conditions (Guideline I), criminal conduct (Guideline J), handling protected information (Guideline K), outside activities (Guideline L), and use of information technology (Guideline M).    *Id.*    The guidelines also state that in evaluating the relevance of an individual's conduct with respect to any of the above guidelines, the recency of that conduct is a key element to be taken into account.  *Id.*

31.    In light of the above, the granting, suspending, and revoking of security clearances is a highly individualized process that involves a close and detailed factual analysis of the individual in question and provides any individual subject to this analysis with significant due process protections.  Before any security clearance is granted, denied, or revoked, the appropriate investigative agency must conduct an investigation of the individual to the required scope.   This

investigation addresses the factors outlined in the above adjudicative guidelines outlined in Directive 4, pursuant to Executive Order 12968.

32.    Following the appropriate investigation, should an applicant be denied a clearance or should a cleared individual's clearance be revoked, that individual is entitled to the due process considerations set forth in Executive Order 12968.   The standard due process provisions that are followed within the Executive Branch whenever an individual's security clearance is denied or revoked include the following: (1) a comprehensive and detailed written explanation for the denial or revocation; (2) appropriate access to documents, records, and reports upon which the denial or revocation is based; (3) the right to be represented by counsel; (4) the opportunity to respond in writing; (5) a written notice of and the reasons for the results of the review, the identity of the deciding authority, and written notice of the appeal; and (5) the opportunity to appeal in writing and in some instances in person to a higher level of review.   *See* 60 Fed. Reg. at 40252-53 (Part 5—Review of Access Determinations).

**B.    Relevant History Regarding The Security Clearance Review Process.**

33.    The above-described security-clearance processes set out by Executive Order 12968 and expanded through SEAD-4, and the due process protections afforded individuals as part of the same, are an outgrowth of an earlier period of our nation's history when such rights were not present and the security clearance process was abused.   As illustrated by the well-known case of Robert Oppenheimer, it was not unusual in the immediate aftermath of World War II for groups of persons to have their security clearances denied, revoked or suspended solely based upon their membership in disfavored organizations or upon their association with other known members of such organizations.

34.    In 1947, then-Attorney General Tom Clark released the "Attorney General's List of Subversive Organizations."   As its name implies, this list was intended to compile organizations

deemed to be subversive by the U.S. government. The list included 50 organizations ranging from Communist Party USA and the Ku Klux Klan to organizations such as the National Negro Congress and the Washington Book Shop Association. Many Americans had signed petitions or become members of such groups, often not understanding their true nature or the consequences of affiliation. The Attorney General's List was eventually incorporated by then-President Harry Truman into Executive Order 9835, which established the first federal employee loyalty program. *See* 12 Fed. Reg. 1935 (Mar. 25, 1947). Executive Order 9835 was in turn superseded by President Dwight Eisenhower's Executive Order 10450 in 1953, which updated the Attorney General's List and expanded the criteria for determining trustworthiness and reliability for purposes of a security clearance. Security Requirements for Government Employment, 18 Fed. Reg. 2489 (Apr. 27, 1953). In 1959, the Supreme Court decided the landmark case *Greene v. McElroy*, holding in relevant part that the revocation of the plaintiff's security clearance as a defense contractor on the grounds of alleged Communist associations and sympathies was unlawful in that the plaintiff "was not afforded the safeguards of confrontation and cross-examination." 360 U.S. 474, 508 (1959).[2]

35. It was the Supreme Court's decision in *Greene* that led to the establishment of due process provisions for the individualized granting, denial, or revocation of security clearances for contractors, which due process provisions continue to this day. Due process provisions were first adopted for defense contractors through President Eisenhower's Executive Order 10865 in 1960, and similar due process provisions were codified in 1995 by President Clinton in Executive Order 12968 ("Access to Classified Information") to cover civil servants and military personnel. These

---

[2] *Greene* stands for the proposition that due process applies to security clearances. 360 U.S. 474. There, neither Congress nor the President authorized the constitutionally deficient procedures. *Id.* at 508. The Court declined to opine on the constitutionality of those procedures had they been set out in legislation or an executive order. *Id.*

protections have remained unchanged through five successive administrations, including President Trump's prior Administration between 2017 and 2021.   Executive Orders 10865 and 12968 as well as SEAD-4 remain the current governing policy for granting, denying, and revoking personnel security clearances.[3]   There is no language within the Clearance Recission Memorandum that indicates it is superseding, revoking or modifying the protections set forth in any of the prior Executive Orders or governing due process requirements.

> **C.      The Process For Revoking A Security Clearance**

36.      Importantly, whenever it is proposed that an individual's security clearance be revoked, the government entity that granted the clearance is obligated to notify the individual in writing and to provide that individual with a statement of reasons as to why access to classified information will be revoked.   The proposed revocation is then to be followed by the established processes and due process protections outlined above.

## V.    OPINIONS

> **A.      Opinion 1: The Blanket Approach Of The Clearance Recission Memorandum Is Inconsistent With Governing Policy Requiring Individualized Assessments.**

37.      As described above in Section IV, in order to ensure that clearance procedures "provid[e] fair and equitable treatment to those Americans upon whom we rely to guard our national security," 60 Fed. Reg. at 40245,  the process is always based upon the personal conduct

---

[3] Executive Order 12968 allows for narrow instances when due process may be limited because the required procedure cannot occur "without damaging the national security interests of the United States by revealing classified information."  60 Fed. Reg. at 40252.   This provision might be invoked, for example, when a government employee or contractor is charged with espionage for a foreign power.   But this limited due process section is inapplicable here, including because the required certification has not been made and because there has been no determination that full due process would itself compromise national security by revealing classified information.

of the relevant individual.    That is one of the fundamental hallmarks of the security-clearance review process.

38.    The Clearance Recission Memorandum violates these bedrock principles of the security-clearance review process because it provides no individualized assessment of personal conduct in the revocation of clearances.  The memorandum contains no mention of, let alone any individualized assessment of the named personnel who currently hold security clearances.  And while the Clearance Recission Memorandum does technically list names, it culminates with a vague, blanket reference to "any other member of Joseph R. Biden Jr.'s family" and lacks any individualized assessment.  Indeed, it is just as "blanket" of a revocation as is Executive Order 14230, which would have the exact same effect if it had listed the approximately 1,200 employees of the subject law firm.

39.    Simply put, a blanket revocation of security clearances of a diverse and unrelated group of individuals was—prior to March 2025—unprecedented in its scope and fundamentally inconsistent with existing authority addressing the processing, granting, and revocation of security clearances.    The *ad hoc* directive in this case harkens back to the repudiated and discredited programs that existed before *Greene v. McElroy*, including during the Red Scare.    The arbitrary and ad hoc directive of immediate revocation of security clearances not for any personal conduct by any clearance holder is no different analytically than if a directive were issued to immediately suspend the security clearances of all Jews or Muslims, all members of the LGBTQ+ community, all women, or all registered Democrats or Republicans.

40.    These types of non-individualized, mass revocations of security clearances targeted at groups of individuals threaten to harm our national security efforts.    Should individuals who otherwise meet the standards be summarily denied or stripped of their security clearance through

these types of sweeping, blanket decrees, the resulting uncertainty that would spread throughout the system may severely impact the effectiveness of our military, intelligence and diplomatic capabilities to deter or otherwise respond to our nation's adversaries.

**B.    Opinion 2: The Clearance Recission Memorandum Is Unprecedented In Its Invocation of Conduct Unrelated To National Security.**

41.    The Clearance Recission Memorandum is also contrary to the foundational principles surrounding the granting, suspension, denial, or revocation of security clearances, as set forth in existing and operative policy documentation that have existed for decades, in that it devoid of a statement of reasons with a nexus to national security concerns.    As I explained in Section IV, the touchstone of the individualized security-clearance review is whether clearance is consistent with the "national security interest" of the United States, which is defined as "the national defense and foreign relations of the United States."

42.    Here, however, the Clearance Recission Memorandum makes clear it has nothing to do with national security but rather makes an undefined reference to the "national interest."  I understand that Mark Zaid represented a client in a whistleblower case involving President Trump during his first administration.  In my more than three decades of service culminating as the most senior public servant focused professionally on the protection of United States classified information, I have never seen any security clearance determination that was based on the fact that an attorney represented client in a whistleblower case and I can see no reasonable construction of such activity as being a matter of "national security" as that term is defined and understood.

**C.    Opinion 3: The Clearance Recission Memorandum's Directive Amounts To A Revocation Of Security Clearances Without Due Process.**

43.    The Clearance Recission Memorandum functionally plays the role of judge, jury, and executioner.  Even if the subjects of the Memorandum had been provided with the requisite due process (they were not), for the revocation to be reversed it requires a professional adjudicator

to make findings expressly contradictory to the President's determination. Further, I believe that Mr. Zaid would have to disclose this revocation—senseless as it is—on any future security clearance application, making the harm he will experience from the lack of due process effectively irreparable. The approach of the Clearance Recission Memorandum, especially as it pertains to Mark Zaid, is unprecedented and inconsistent with governing guidance and policy documentation.

I declare under penalty of perjury that the foregoing is true and correct.


Date: May 20, 2025

J. William Leonard

# EXHIBIT 1

Authored Publications in Past Ten Years

J. William Leonard, *Congress Must Stop the Weaponization of Personnel Security Clearances*, Just Sec. (Mar. 11, 2025), https://www.justsecurity.org/108657/congress-stop-weaponization- security-clearances/.

J. William Leonard, *Vice Presidents and Rules Governing Classified National Security Information*, Just Sec. (Jan. 17, 2023), https://www.justsecurity.org/84774/vice-presidents-and- rules-governing-classified-national-security-information/.

J. William Leonard, *Myths and Misunderstandings Relating to Mar-a-Lago Documents Investigation*, Just Sec. (Mar. 16, 2022), https://www.justsecurity.org/82706/myths-misunderstandings-relating-to-mar-a-lago-documents-investigation/.

J. William Leonard, *Why Joe Biden Should Pardon Reality Winner*, Wash. Post (Dec. 20, 2019), https://www.washingtonpost.com/opinions/why-joe-biden-should-pardon-reality-winner/2020/12/21/9e6f4094-4162-11eb-8db8-395dedaaa036_story.html.

J. William Leonard, *Barr's Personal Ad Hoc Declassification Authority and the Role of Congress*, Just Sec. (Dec. 9, 2019), https://www.justsecurity.org/67663/barrs-personal-ad-hoc- declassification-authority-and-the-role-of-congress/.

J. William Leonard, *Trump Repudiates a Century of U.S. Policy*, Just Sec. (Nov. 15, 2019), https://www.justsecurity.org/67255/trump-repudiates-a-century-of-u-s-policy/.