**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MARK ZAID, ESQ.** ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. 1:25-cv-1365-AHA |
| ) | |
| **EXECUTIVE OFFICE** ) | |
| **OF THE PRESIDENT** ) | |
| **et al.,** ) | |
| *Defendants*. ) | |

**BRIEF OF
FORMER PRESDENTS OF THE DISTRICT OF COLUMBIA BAR,
FORMER OFFICERS AND GOVERNORS OF THE DISTRICT OF COLUMBIA BAR,
PAST AND PRESENT LEADERS OF VOLUNTARY BAR ASSOCIATIONS,
AND
VOLUNTARY BAR ASSOCIATIONS IN THE DISTRICT OF COLUMBIA
AS *AMICI CURIAE*
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## STATEMENT OF INTEREST

We tender this brief in order to put in context the enormous risk to the legal system posed by the actions that the President has directed against Plaintiff and other lawyers and law firms. Because Plaintiff has a substantial prospect of success in securing final relief from the President's unconstitutional order, and for the other reasons escribed in Plaintiff's motion, *amici curiae* urge that the Court grant a preliminary injunction and, in due course, grant further relief that Plaintiff subsequently seeks on the ultimate merits of his claim.

The *amici curiae* consist of three categories of leadership of the legal profession in the District of Columbia.

The first category includes former Presidents of The District of Columbia Bar, which is the "mandatory" or "unified" bar that was formed in 1972 as an official arm of the District of Columbia Court of Appeals. The DC Bar is responsible for licensing lawyers and regulating the practice of law in Washington. The DC Bar is the second largest unified bar in the United States, with over 120,000 members. As these statistics suggest, while headquartered in our Nation's Capital, the DC Bar's members span the world, practicing in all 50 states and more than 80 countries. These *amici* were elected at various points over the past fifty years by the tens of thousands of lawyers authorized to practice law in the Nation's Capital wherever they principally practice.

Other *amici* in this category served in senior executive positions with the DC Bar over a period of thirty-five years or as former Officers and Governors of the DC Bar.

In addition, the District of Columbia is the venue for private organizations of lawyers called "voluntary bars" or "voluntary bar associations," which focus on specialized professional development and advocacy but do not regulate the practice of law or discipline lawyers. The second category of *amici* who join in this brief are former presidents of a number of those voluntary bar associations, including the Women's Bar Association, the Bar Association of the District of Columbia, National Bar Association, Washington Bar Association, and Trial Lawyers Association of Metropolitan Washington, DC.

Finally, following their own procedures for determining when to take public positions on important matters of interest to the legal community and the larger society, the following voluntary bar associations also have decided to appear as *amici* in their institutional capacities: Bar Association of the District of Columbia, Women's Bar Association of the District of Columbia, Hispanic Bar Association of the District of Columbia, Trial Lawyers Association of Metropolitan Washington, DC, and Metropolitan Washington Employment Lawyers Association.

The list of *amici* and their affiliations is attached as an Appendix.

## SUMMARY

The President's action being challenged in this litigation is not merely an attack on a single lawyer (or small handful of individual lawyers) but an assault on the vital underpinnings of the American legal process itself.   Leaders of the bar elsewhere, such as the American Bar Association and dozens of state and local bar associations, have condemned these attacks on the Rule of Law.

This assault is of special concern, though, to the vitality of the Rule of Law in the seat of government, where we and others have served as leaders of the bar.

It would be hard to imagine any action that poses a graver danger to the Rule of Law than allowing a President to blackball a lawyer, summarily, by preventing the lawyer from having the necessary clearance to represent the interests of clients before government agencies and by imposing draconian sanctions on clients who exercise their right to choose their own trusted counsel in challenging government actions or in pursuing their interests in dealing with government agencies.

This conduct is patently unlawful.

The *amici* tender this brief to explain the following points.

First, the adversary system is an essential element of the legal order established by the Constitution, and the system depends on the effective functioning of an independent bar.

Second, the right to select counsel of one's own choice is an indispensable corollary of this constitutional order.

Third, under this constitutional order, no government official may punish or blackball a lawyer (or law firm) simply for vigorously representing a client or cause that the official dislikes.

Fourth, the President may not use the power to grant or withhold security clearances for the purpose of punishing lawyers or law firms whom he considers his political enemies, and the federal courts have the authority to decide whether this power over security clearances is being used in violation of the Constitution.

Fifth, the President's retaliation against lawyers and law firms distorts the system of pro bono representation that is vital to the functioning of the system of justice administered by Article III courts.

## <u>ARGUMENT</u>

## I.    THE ADVERSARY SYSTEM IS AN ESSENTIAL ELEMENT OF THE RULE OF LAW IN THE AMERICAN CONSTITUTIONAL SYSTEM

The President's relentless campaign of weaponizing the Oval Office against his perceived personal enemies is brutally sweeping.

The President is using purported power to govern by "Executive Order" of "Presidential Memorandum" to weaponize the force of the national government to retaliate against perceived political opponents. This inference is evident from the group of targets of presidential wrath included in the Presidential Memorandum banning Plaintiff from continuing to hold a security clearance for the purpose of representing clients dealing with the government on national security matters. Without any individualized explanation, the President's fiat stripping and banning such clearances simply declares:

> Having determined that it is no longer in the national interest for the following individuals to access classified information: Antony Blinken, Jacob Sullivan, Lisa Monaco, **Mark Zaid**, Norman Eisen, Letitia James, Alvin Bragg, Andrew Weissmann, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam Kinzinger, Fiona Hill, Alexander Vindman, Joseph R. Biden Jr., and any other member of Joseph R. Biden Jr.'s family. Therefore, I hereby direct every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by the aforementioned individuals and to immediately rescind their access

to classified information. I also direct all executive department and agency heads to revoke unescorted access to secure United States Government facilities from these individuals.

Each of the persons listed, including Plaintiff, either served as counsel in litigation or criminal investigations adverse to Donald Trump, often in his personal capacity, or was affiliated with his personal political adversaries.

In his Complaint and motion papers, Plaintiff lays out in detail the evident motive of the President in punishing him for serving as a lawyer in matters adverse to the President's personal interests.

In this case, as well as in other similar instances targeting Covington & Burling, Perkins Coie, Paul Weiss Rifkind Wharton & Garrison, Jenner & Block, WilmerHale, and Susman Godfrey, the President of the United States has chosen to retaliate against lawyers and law firms that – as he unilaterally declares – engaged in representing clients or causes with which he disagrees, especially cases in which he himself had a personal interest.

This use of purported presidential power to punish lawyers and law firms for perceived personal grievances is part of an astonishingly blatant pattern of misuse of the office of Chief Executive to settle personal scores.

For example, the President issued an Executive Order targeting the Susman Godfrey firm, because (among the President's other personal grievances), the firm successfully represented clients who sued the President's favored network, FOX, and one of his campaign advisors, Rudy Giuliani, for falsely claiming that the clients had helped "steal" the 2020 presidential election from candidate Trump.

In addition, in sanctioning the WilmerHale firm, for example, the President acted because the firm had taken in as a partner former FBI Director Robert Mueller, whom the Attorney General had appointed as Independent Counsel to investigate Russian influence in connection with Mr.

Trump's 2016 presidential campaign.  See *Wilmer Cutler Pickering Hale and Dorr LLP* v. *Executive Office of the President* (D.D.C. 1:25-cv-917 (RJL) (TRO granted in relevant part, March 28, 2025 [ECF Doc. 10]).

The President imposed an interdict on Jenner & Block simply because one of its *former* partners, Andrew Weissmann, had earned a place as a *bete noir* on the long list of the President's perceived personal enemies.  See *Jenner & Block LLP* v. *United States Department of Justice* (D.D.C. 1-25-cv-916 (JDB) (TRO granted March 28, 2025 [ECF Doc. 9]).

After the Perkins Coie firm filed the first legal challenge to the President's unconstitutional actions, the President upped the stakes by promulgating still another Executive Order targeting an additional firm, Elias Law Group, and seeking "to cow the legal profession" by weaponizing both the Justice Department and the Department of Homeland Security, directing them to seek out and punish firms that have brought suits against the government over the past eight years or do so in the future, if Trump Administration officials consider those suits "vexatious."

There is no doubt that, in all of the limited recitals of pretexts for the President's grievances, the firms or their individual partners were acting as counsel representing clients in connection with legal proceedings.  Indeed, the President's principal grievance appears to be, on the face of his stream of Executive Orders, that lawyers in these firms represented candidates for public office who were running against Mr. Trump in his personal capacity or were involved in official investigations into his own possibly criminal conduct.

Other law firms that the President dislikes are being forced to negotiate for "protection" from his threatened retaliation.  As discussed in Point IV below, some already have succumbed to the threats.

The adversary system is a basic element of the Rule of Law on which our constitutional structure rests.  Any constraints on that system, therefore, could only be justified by the clearest constitutional authorization and only in the most extreme factual context.  Neither requirement is satisfied in the current setting.

What Judge Howell observed at the beginning of her opinion granting a permanent injunction against a similar Executive Order in the *Perkins Coie* case [Case 1:25-cv-00716-BAH; Document 185; filed 05/02/25], applies equally to the unilateral decree issued by the President such as the one at issue in this case:

> The importance of independent lawyers to ensuring the American judicial system's fair and impartial administration of justice has been recognized in this country since its founding era. [Op. at 1]

In understanding the constitutional order that the President is flouting, let us begin with the Separation of Powers, a crucial part of the constitutional structure.  Article III of the Constitution creates a Supreme Court and authorizes Congress to establish lower federal courts, which it has done since the earliest days.  See 28 U.S.C. Sections §§ 43 and 132.  Under Article III, the federal courts have jurisdiction to adjudicate "cases or controversies."  As the Supreme Court has emphasized, the essence of a "case or controversy" that federal courts are to adjudicate is the presence of adverse parties genuinely contesting issues of law and fact.  See, *e.g.*, *TransUnion v. Ramirez*, 594 U.S ___ (2021).

As long ago as *Marbury* v *Madison*, 5 U.S. (1 Cranch) 137 (1803), the Supreme Court declared: "It is emphatically the duty of the Judicial Department to say what the law is."  Under the "case or controversy" principle, the federal courts can function and perform their constitutional function to determine what the law is only when adverse parties appear before them in a genuine dispute.

An essential corollary of the *adversary system of justice* in this country is the right of parties *to be represented by counsel* in those proceedings.  In criminal cases, the Sixth Amendment makes this right to counsel explicit.  Over time, the Supreme Court has stressed the vital importance of legal representation in order to enable the justice system to function fairly and reliably.  This principle even requires the government to pay for counsel to be appointed to represent defendants whom the government itself is prosecuting.  See, *e.g.*, Gideon v. Wainwright, 372 U.S. 335 (1963).

This constitutional principle is codified in Rule 44 of the Federal Rules of Criminal Procedure:

> **Rule 44. Right to and Appointment of Counsel**
> **(a)  Right to Appointed Counsel**. A defendant who is unable to obtain counsel is entitled to have counsel appointed to represent the defendant at every stage of the proceeding from initial appearance through appeal, unless the defendant waives this right.

Implicit in this Rule, of course, is the constitutional guarantee that those defendants who are *financially able to hire counsel* of their choice are at least equally entitled to be represented throughout the proceedings by their chosen counsel.

Although the Constitution does not expressly guarantee a similar right to have counsel *appointed* to provide *free* representation in all civil proceedings, see, *e.g.*, Turner v. Rogers, 564 U.S. 431 (2011), the adversary system that is the predicate for constitutional "case or controversy" jurisdiction under Article III presupposes a civil litigant's right to hire counsel to represent the client in the case.

For example, cases such as Mine Workers v. Illinois State Bar Assn., 389 U. S. 217 (1967), and Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U. S. 1 (1964), long ago established for individuals and organizations a right to ensure "meaningful access to courts" for

themselves or their members by retaining or recommending counsel. As the Court explained in

*Railroad Trainmen*:

> A State could not, by invoking the power to regulate the professional conduct of
> attorneys, infringe in any way the right of individuals and the public to be fairly represented
> in lawsuits authorized by Congress to effectuate a basic public interest. Laymen cannot be
> expected to know how to protect their rights when dealing with practiced and carefully
> counseled adversaries, cf. *Gideon* v. *Wainwright*. . . .

As the Court explained there, this right to be able to retain counsel of one's own choosing rests on

the interplay of several constitutional principles, including the First Amendment rights of free

speech, petition, and association, and the Due Process clause.

This right is especially important in adversary proceedings in court. Compare *Walters* v.

*Radiation Survivors*, 473 U.S. 305, 333-334 (1985); *Caplin & Drysdale* v. *United States*, 491 U.S.

617, 626 (1989) (referring to "the individual's right to spend his own money to obtain the advice

and assistance of . . . counsel.").

Not surprisingly, therefore, the Federal Rules of Civil Procedure assume that a party has a

right to be represented in civil litigation, if the party so chooses and is able to hire counsel of the

party's choosing. Thus, for example, Rule 11 establishes the core predicate for the proper

functioning of federal courts in the adjudication of civil "cases or controversies":

**Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court;
Sanctions**

(a)  SIGNATURE. Every pleading, written motion, and other paper *must be signed by at
*least one attorney of record* in the attorney's name—or by a party personally *if* the
party is unrepresented. The paper must state the signer's address, e-mail address, and
telephone number. Unless a rule or statute specifically states otherwise, a pleading need
not be verified or accompanied by an affidavit. The court must strike an unsigned paper
unless the omission is promptly corrected after being called to the attorney's or party's
attention. [Emphasis added].

As explained, these principles apply to the adversary system for litigation in federal courts

under Article III. But the Constitution also presupposes a similar process for adversary

presentation in other forums, especially where the government is involved. Thus, the First Amendment enshrines the right of every person in the United States to "petition for redress of grievances," a right that extends to lobbying Congress or appearing before government agencies. *Eastern R.R. Presidents Conf. v. Noerr Motor Freight,* 365 U.S. 127, 137 (1961); *United States v. Harriss*, 347 U.S. 612, 617 (1954) (upholding lobbying disclosure statute, because Congress legitimately "wants only to know who is being hired, who is putting up the money, and how much) cf. "). *NAACP v. Button*, 371 U.S. 415, 429 (1963) (holding that NAACP-initiated litigation was protected by the First Amendment as "a form of political expression").

The right to petition assumes that the government may be reluctant to extend the protection or benefit being sought, and thus a convincing case must be made to a skeptical or sometimes hostile official. In practice, this often means that the petitioner must be able to speak through the medium of a qualified lawyer familiar with often arcane principles and procedures.

Congress recognized this real-world imperative when it included in the Administrative Procedure Act a guarantee that anyone required to appear before a federal agency "is entitled to be accompanied, represented, and advised by counsel." 5 U.S.C. § 555(b).

The role of an independent bar free from government hamstringing – or retaliation – is a constitutional imperative. The Supreme Court has been quite clear that the government may not put its official thumb on the scales of justice by, for example, prohibiting lawyers, including federally funded lawyers providing pro bono services, from pursuing claims or making arguments that the government disapproves. The courts cannot perform their constitutional function if lawyers face political restrictions on arguments and theories that the government "finds unacceptable but which by their nature are within the province of the courts to consider." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546 (2001).

In *LSC*, the Court struck down statutory restrictions on the kinds of programs that federally funded lawyers could attack or the arguments that they could make in challenging statutes or regulations. The Court explained that government restrictions on "advising their clients and in presenting arguments and analyses to the courts distorts the legal system by altering the traditional role of the attorneys." (531 U.S at 544-545). Such government constraints conflict with the principle of *Marbury* v *Madison* that it is the province of the courts to say what the law is:

> Interpretation of the law and the Constitution is the primary mission of the judiciary when it acts within the sphere of its authority to resolve a case or controversy. *Marbury* v. Madison, 1 Cranch 137, 177 (1803) ("It is emphatically the province and the duty of the judicial department to say what the law is"). An informed, independent judiciary presumes an informed, *independent* bar.
> [531 U.S. at 545 (emphasis added)]

When clients hire their own counsel, as in all the instances to which President Trump's Executive Orders react, the government has even less room under the Constitution to threaten, punish, or anathematize lawyers who represent disfavored clients, advance disfavored goals of those clients, or advance disfavored arguments in favor of those clients and goals.

Accordingly, any action by anyone, including especially the head of the Executive Branch, that undermines the proper functioning of the adversary system is fundamentally anti-constitutional.

Yet, among the blunderbuss penalties summarily imposed on Plaintiff without any evidentiary support, much less even the pretense of a hearing, the Presidential Memorandum requires federal agencies to exclude Plaintiff from any representation that requires a security clearance, because it is supposedly not in "the national interest" for Plaintiff (and numerous others) to the eligible to act in that capacity.

Indeed, this *diktat* is a particularly ironic misuse of alleged presidential power. One of the President's core constitutional obligations is, under Article II, Section 3, to "take Care that the

Laws be faithfully executed."  Any intervention by a President that demonstrably obstructs the functioning of the legal process is nothing short of a betrayal of this solemn constitutional duty.

## II.    THE RIGHT TO SELECT ONE'S OWN CHOSEN COUNSEL IS AN ESSENTIAL ELEMENT OF THE RIGHT TO REPRESENTATION

The right to representation would be hollow indeed if someone else, such as the opposing party, including the government itself, could forbid a party in court or in dealings with the government to select counsel in whom the client has confidence.  A lawyer acts as a fiduciary for the client and undertakes special obligations to advance the client's interests.  The legal system rests on the principle that (except in extraordinary circumstances) the client gets to select the lawyer who will be trusted to serve most faithfully and effectively in this role of trust and confidence.

Thus, for example, the Rules of Professional Conduct for members of the District of Columbia Bar make clear that the selection and retention of counsel are the prerogative of the client, and the client decides when to hire counsel, what objectives to assign the lawyer to pursue, and when to terminate the representation.  See, *e.g.*, Rules 1.2, 1.16, 2.1. 3.1.  Thus, Rule 1.2 states:

> **Rule 1.2: Scope of Representation**
> (a)      A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d), and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial, and whether the client will testify.

Of course, neither this case nor the other matters in which the President has chosen to blackball law firms have anything to do with the power of the *courts* to supervise the conduct of lawyers appearing before them or with the authority of Bar authorities to assure professional competence and integrity.  In the District of Columbia, as in most States, that kind of supervision

over the professional conduct of lawyers comes within the ambit of the judiciary, not the Executive, especially a self-interested Chief Executive.

Federal courts have ample authority under Rule 11 of the Federal Rules of Civil Procedure to deal with "vexatious" lawsuits. Moreover, if ethical violations are properly alleged, the District of Columbia Bar has a comprehensive and well-regarded system for adjudicating and sanctioning such violations through the filing of a disciplinary complaint.

Against the backdrop, this Court will search in vain for any legitimate basis for sustaining *presidential* intervention in these affairs.

Rather, in this case and the others, the President has manifested personal pique because of the clients whom the firms represented or the causes, including "diversity, equity and inclusion" policies, that they chose to pursue on behalf of their clients or their own professional autonomy. Although the Presidential Memorandum  purported to invoke generic powers "as President of the United States" and unspecified "laws of the United States," he did not  articulate any specific Article II power or any particular federal statute that supposedly confers on the President any authority to determine the qualifications of lawyers otherwise licensed to practice law or to superintend the choice of counsel by otherwise competent clients.

The President's stated grounds for issuing these decrees appear to reflect his unilateral hostility toward lawyers who undertook to represent his political opponents. For more than 400 years, however, it has been a bedrock principle of the Anglo-American legal system that, as  Chief Justice Sir Edward Coke put it in 1610 (*Dr. Bonham's Case*), "no man should be judge in his own cause." See, *e.g.*, *Caperton* v. *A. T. Massey Coal Co*., 556 U.S. 868 (2009). That principle bars the exercise of what otherwise might be some implicit presidential power in order to settle personal grudges with opposing counsel.

Moreover, the Constitution bars "bills of attainder." As the Supreme Court explained in _United States_ v. _Brown_, 381 U.S. 437 (1965),  bills of attainder are _non-judicial_ declarations directly imposing "pains and penalties," including deprivations of rights, that "named the parties to whom they were to apply" or "simply described them."  The prohibition of bills of attainder is "an implementation of the separation of powers," since it confines each branch within its authorized functions, and was "looked to as a bulwark against tyranny."  381 U.S. at 442-444.

_Brown_ makes clear why this principle also must apply to Executive Branch actions that impinge on the judicial function, even though (for reasons the Court explained) the Framers only considered it necessary to add it to the explicit limits on _legislative_ powers:

> Thus the Bill of Attainder Clause not only was intended as one implementation of the general principle of fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited _as politically independent judges and juries_ to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons.
> [381 U.S.at 445 (emphasis added)].

If any of the targets of the President's summary banishment were guilty of any misconduct and were properly subject to some sanctions, the constitutional Separation of Powers would entrust such a determination to the _judicial_ function under Article III (see, _e.g._, D.D.C. Local Rules LCrR 57.27(d) [governing complaints of misconduct filed in this Court.]), not to some undiscovered, inherent power of a President under Article II simply to decree guilt.  See also _United States_ v. _Lovett_, 328 U.S. 303 (1946).  As former judge J. Michael Luttig aptly opined recently, President Trump's persistent and deliberate attacks on the institutions of the law manifest that "the president wants to assume the role of judge."

Finally, the Due Process Clause expressly prevents any officials of the government from depriving any person of liberty or property without due process of law.  The long-settled standards for according procedural due process are, at a minimum, (1) notice; (2) an opportunity to be heard;

and (3) an impartial tribunal. See., *e.g.*, Mullane v. Central Hanover Bank & Trust Co, 339 U.S. 306 (1950). Against this backdrop, it is not surprising the federal government has an elaborate process for determining, after due notice and an opportunity to be heard, whether a person should be "suspended" or "debarred" from eligibility to contract with the government.

Nothing in any of President Trump's spate of Executive Orders attainting a growing list of disfavored lawyers and law firms purports to have afforded any of the President's targets *any* process at all. A late-night *ukase* signed by a presidential Sharpie without notice or an opportunity to be heard cannot be treated as a valid exercise of whatever powers the President *may* have had in mind when he acted. On the face of the various Orders, moreover, the President has made clear that he has hardly been acting as an "impartial tribunal."

## III.    BLACKBALLING OR PUNISHING A LAWYER OR LAW FIRM BECAUSE OF VIGOROUS (AND LAWFUL) REPRESENTATION OF A CLIENT CONFLICTS WITH BASIC PRINCIPLES OF THE RULE OF LAW

It is essential to the functioning of the legal system under our constitutional order that lawyers must be able to represent clients who may be unpopular or even reviled in the eyes of others. As this Court is well aware, that is, indeed, the proudest and most honorable characteristic of the legal profession.

This principle distinguishing the client's identity and interests from the lawyer's own personal views is enshrined in the DC Rules of Professional Conduct. Rule 1.2 declares:

> (b)    A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social, or moral views or activities.

The American Bar Association Model Rules of Professional Conduct codify this same principle as reflecting the prevailing American tradition.

This vital feature of the legal profession has played a long and courageous part in American history.  For example, lawyer James Hamilton risked retaliatory disbarment for daring to represent publisher John Peter Zenger in his 1735 criminal trial for seditious libel for publishing (truthful) articles criticizing the colonial governor of New York for wrongfully sacking the colony's chief justice.  Similarly heroic and professional was the willingness of colonial patriot (and later President) John Adams to represent the British soldiers ("Redcoats") charged with murder of American protestors in the infamous 1770 Boston Massacre.

And so on down through our subsequent constitutional history.

The challenge is that someone or some group is inevitably going to be demonized by someone else or some other group –

- Catholics, Jews, evangelical Protestants, Muslims, Hare Krishna, or Scientologists, etc.
- Fundamentalists or evolutionists
- Alleged rapists, murderers, pederasts, or white-collar fraudsters
- Black Panthers or KKK
- Pacificists and draft resisters or alleged terrorist detainees
- Anarchists, communists, socialists, or libertarians
- Conservatives or Liberals; Republicans or Democrats
- Impeached office holders (such as President Trump) or members of Congress evaluating impeachment

The point is that *each* has the right to effective and diligent representation by counsel, regardless of any hostility to the particular client or the client's conduct or affiliation.  As renowned Washington lawyer Edward Bennett Williams noted many years ago, of the major civil liberties cases that reached the Supreme Court over the years, most of the defendants "have been accused of murder, rape, arson, narcotics offenses, bootlegging and membership in the Communist Party."

The Court can easily imagine where our country would be today, if lawyers who undertook to represent those unpopular clients had been browbeaten or threatened into withdrawing from the cases – or had been too fearful of recrimination and retaliation even to have undertaken the cases.

Is this the kind of neutered legal system that any court would tolerate in response to the whim of any President wishing to deconstruct the Rule of Law some 228 years into our constitutional history?

Thus, various law firms and organizations such as the ACLU, for example, take professional pride in having represented such unpopular groups as antisemite marchers and White Supremacist organizers in asserting their constitutional rights, despite the contrary personal beliefs of the lawyers undertaking the representation.

In 1968, a Black civil rights lawyer, Eleanor Holmes Norton, appeared before the Supreme Court to argue on behalf of a white supremacist group that had been barred from holding a rally in Maryland, and in another case she went into a local New York City court to defend the right of segregationist Alabama governor George Wallace to hold a rally at Shea Stadium, after City authorities had barred this controversial figure from appearing.

During the height of the Red Scare, a fledgling law firm, Arnold, Fortas & Porter, was

> "well known around the capital for representing federal employees accused of disloyalty by the Truman administration — as many as 200 a year, almost all pro bono."

They took it as a badge of honor when a friend sneered, "I understand your firm is engaged in defending communists and homosexuals."

Similarly, one of the most respected partners in the Paul Weiss firm, one of the recent targets of President Trump's petulance, was another such defender of unpopular civil-liberties cause – Lloyd K. Garrison. With Supreme Court Bar leader John W. Davis, he represented Dr. J. Robert Oppenheimer before a panel of the Atomic Energy Commission in 1954, when Oppenheimer was falsely accused of disloyalty in supposedly aiding the Soviet Union. Then, along with another stalwart of the District of Columbia Bar, Joseph L. Rauh, Jr., Garrison also

represented playwright Arthur Miller before the House Un-American Activities Committee in 1956 and in Miller's fight against his contempt of Congress conviction in 1957.

History has properly lauded lawyers such as these men and women for zealously seeking to protect the rights of their clients in the face of public opprobrium.

One more example should suffice. During the 1950s, at the height of anti-communist fervor, it was courageous for a lawyer to represent an alleged communist. In pursuing his "anti-communist" campaign, Senator Joseph McCarthy was aided by "no holds barred" lawyer Roy Cohn (who later served as Donald Trump's self-professed model of his ideal lawyer). During Senate hearings, Cohn and McCarthy were hounding defense lawyer Joseph Welch, asserting that a young lawyer in Welch's firm was a communist himself  As a Senate report later summarized:

> Welch responded with the immortal lines that ultimately ended McCarthy's career: "Until this moment, Senator, I think I never really gauged your cruelty or your recklessness." When McCarthy tried to continue his attack, Welch angrily interrupted, "Let us not assassinate this lad further, senator. You have done enough. *Have you no sense of decency?*" [Emphasis added].

While the Plaintiff in this matter or the other lawyers and law firms that have pricked the President's ire may not be entirely defenseless "lads," it may not go too far to substitute "President" for "Senator," and let Welch's words summarize what this case is all about. It is reckless and indecent to use the aegis of the Oval Office to smear the reputation of respected lawyers and law firms simply to punish them for having had the temerity to represent clients who promote policies that the President personally does not like.

## IV.    ACCESS TO SECURITY CLEARANCES MAY NOT BE USED TO PUNISH LAWYERS BECAUSE OF A PRESIDENT'S PERSONAL POLITICAL HOSTILITY, AND THIS ISSUE IS JUSTICIABLE

As three other judges in this District have recently held, the Court has ample power to prevent the President from using his general authority over access to national defense information

as a mechanism for accomplishing an otherwise unconstitutional objective or in an otherwise unconstitutional process.

As Commander in Chief, the President is responsible for protecting the national security of the people of the United States. Implicit in that power is the authority to withhold security clearances from persons who may be found to pose a risk to national security, because they may mishandle classified information. (We do not dwell on the patent irony here, beyond noting that Donald Trump himself was indicted for mishandling highly classified information.)

But a President's personal pique with lawyers or political opponents is not itself a legitimate basis for denying or revoking such access. Unlike a royal prerogative such as conferring a knighthood, which the British King may grant or withhold solely as a matter of the Crown's grace, the American Chief Executive must rest security-clearance determinations on a *bona fide* determination whether a particular person poses a genuine risk of mishandling the restricted information to the detriment of the *Nation's* security. Such determinations are not a legitimate part of a President's arsenal for retaliating against lawyers whom he views as his own personal political adversaries.

Moreover, the Court has ample power to resolve Plaintiff's challenge to the President's action. In recently granting a permanent injunction (*supra*) invalidating the revocation of security clearances of any lawyers affiliated with the Perkins Coie firm, Judge Howell discussed at length four reasons why President Trump's actions in using this mechanism to punish lawyers and law firms may be reviewed by the federal courts for constitutional validity. [Op. at 36-43]. As Judge Howell concluded:

> Finding any such government actions judicially unreviewable simply because the Executive branch invoked "the national interest" would represent a breathtaking expansion of executive power at the expense of the constitutionally mandated role of the judicial branch and the concomitant safeguards for the individual rights of Americans. [Op. at 41]

Those reasons apply equally here.

As Judge Howell explained, the decision in *Lee* v. *Garland*, 120 F.4th 880 (D.C. Cir. 2024), leaves ample room for judicial review in cases like this one.

First, unlike *Lee*, Zaid alleges he received no "substantive basis" for the revocation of his clearance. Zaid alleges the revocation was merely announced by *ipse dixit*, and derived from private, personal pique, and not from any alleged violation of published standards for receiving and maintaining a security clearance. See Complaint, ¶¶ 2-4, 15, 21, 36-37, 39-54. There is thus no "substantive basis" to which the court must defer.

Second, unlike *Lee*, Zaid alleges that he received no hearing or other elements of due process before his clearance was revoked. See Complaint, ¶¶ 3, 39-53.

Third, unlike the circumstances surrounding the underlying determination challenged in *Lee*, here there are "judicially manageable standards for resolving" Zaid's claim. Courts are well equipped to determine what process is "due" before a person may be aggrieved by government action.

Fourth, as the *Lee* court recognized, "the Supreme Court [has] stressed that it would present a 'serious constitutional question' to deny a plaintiff any judicial forum in which to raise colorable constitutional challenges to agency action." Zaid's complaint alleges that the President's decision to blackball him (like the others grouped in similar Executive Orders) rests on unconstitutional grounds. (Complaint, ¶¶ 9, 15, 21-22, 39-54). In light of the "nature and posture" of this case, and the "possible consequences of judicial action" or inaction, the government has no legitimate basis to deny that the Court may examine the constitutionality of the President's action.

Even if the merits were more complex or "difficult" than they are, judicial review would be available to examine summary revocation of a security clearance arising solely from personal,

vindictive whim or caprice.  See *Lee*, 120 F.4th 887-88.  The President is no more entitled under the Constitution to unreviewable use of his general authority over security clearances, when he petulantly decides to attaint disfavored lawyers, than he is to unreviewable use of any other official power for similarly impermissible reasons.  See also *Trump* v. *United States*, 603 U.S. 593, 608 (2024) ("If the President claims authority to act but in fact exercises mere 'individual will' and 'authority without law,' the courts may say so.").

Reaching the same conclusion, Judge Bates recently granted a permanent injunction barring compliance with the President's directive summarily suspending the security clearances of Jenner & Block lawyers.

> "In short, while the merits of any individual security clearance decision are unreviewable, courts may hear "constitutional claims arising from the clearance revocation process." * * * Reviewing this process raises none of the concerns that make individual security clearance determinations nonjusticiable. * * * The Constitution does not tolerate such judicial abdication.  So Jenner's claim does not ask a political question; it asks a legal one." (Case 1:25-cv-00916-JDB Document 138 Filed 05/23/25. [pp.21-23])

Most recently, Judge Leon joined this chorus of invalidating the President's unconstitutional misuse of power over security clearances, enjoining the President's political retaliation against the WilmerHale law firm.  After examining the context of these blunderbuss Executive actions, Judge Leon concluded that "the extraordinary nature of this case easily distinguishes it from *Lee* and supports judicial review."  (Case 1:25-cv-00917-RJL Document 110 Filed 05/27/25 [p. 29])


## V.    THE PRESIDENT'S ATTEMPT TO BLACKBALL LAWYERS AND LAW FIRMS BECAUSE OF PERSONAL DISAGREEMENTS THREATENS TO DISTORT THE PROVISION OF PROFESSIONAL LEGAL SERVICES, INCLUDING PRO BONO SERVICES

Finally, in weighing the "public interest" issues involved in considering requests for injunctive relief, the Court should evaluate the deleterious effect that the President's campaign

against disfavored lawyers and law firms has on the provision of pro bono legal services.  This subject is of special concern to these *amici curiae*.

In this context, we take note of the recent "capitulation" by a series of law firms that the President has targeted for "retribution."  First was the Paul Weiss firm.  That firm's response illustrates the unwarranted distortion of the legal process that the President's unlawful intervention creates, especially regarding provision of pro bono services.  As the *Washington Post* summarized:

> The firm will provide $40 million in pro bono legal services *to support Trump's agenda* after the president threatened to rescind some government contracts with the firm and its clients.
> [Emphasis added].

The firm also was forced to revamp its historic commitment to minority recruitment, because of the President's personal opposition to "DEI" programs.

One of the hallmarks of the legal profession is the understanding that lawyers have an ethical obligation to undertake pro bono representation of persons and organizations who cannot afford such representation.  This principle is stated in Rule 6.1 ("Pro Bono Public Service") of the DC Bar Rules:

> A lawyer should participate in serving those persons, or groups of persons, who are unable to pay all or a portion of reasonable attorney's fees or who are otherwise unable to obtain counsel.

 As explained in the Comment to the Rule:

> The rule incorporates the legal profession's historical commitment to the principle that all persons in our society should be able to obtain necessary legal services. The rule also recognizes that the rights and responsibilities of individuals and groups in the United States are increasingly defined in legal terms and that, as a consequence, legal assistance in coping with the web of statutes, rules, and regulations is imperative for persons of modest and limited means, as well as for the relatively well-to-do.

The President has made it explicit in the various Executive Orders punishing law firms that he does not like that he is holding against them what he regards as their "harmful activity through

their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes."

The President is seeking to discourage this pro bono work both by directly imposing sanctions on lawyers and law firms and by limiting their ability to be retained by paying clients. By banning disfavored firms from representing clients in dealing with the federal government, the President's Executive Orders threaten to erode the availability of pro bono services. Lawyers and firms depend on the revenue from paying clients to enable them to represent pro bono clients and contribute to the support of a broad range of human rights organizations.

A consequence of the Executive Orders, therefore, is not just to punish lawyers for pro bono work the Chief Executive finds objectionable, but also to degrade their financial capacity to take on the routine pro bono work of representing indigent clients, a service on which our courts depend to contribute to the efficient administration of justice.

In the District of Columbia, as throughout the rest of the country, the availability of pro bono legal service has been essential to the effective participation of many non-profit organizations in the advocacy process, including advocacy before Article III courts and Congress. This pro bono service extends to organizations that pursue programs and objectives that may be at odds with the policies and preferences of a particular national Administration.

According to the latest data from the Pro Bono Institute, law firms with at least fifty lawyers throughout the country devoted more than 5,000,000 hours of professional time to pro bono work in 2023. One of the major categories of such professional commitment is "racial justice initiatives" in the following areas:

> Criminal Justice
> Economic Empowerment
> Education
> Healthcare

~ 23 ~

> Housing
> Police Reform
> Voting Rights

In the District of Columbia alone, major firms devoted nearly 914,000 hours to comparable pro bono services.

As is evident, many of these professional commitments involve challenging government programs and policies or pressing governments at all levels for reform.

The current President has been disturbingly candid in highlighting that a central motive for his retaliation against Plaintiff and various law firms is his disagreement with such causes they pursued on behalf of their pro bono clients.

For example, the "deal" that Paul Weiss accepted, with a loaded gun to its head, involves a massive redirection of the firm's pro bono activities, so that at least $40 million in professional services will be redirected away from clients and organizations that the firm otherwise would be assisting and instead provided to those clients and causes that are compatible with the Chief Executive's personal "agenda."

In a March 23 memorandum to his colleagues at Paul Weiss, the chairman of the firm explained that the President's decree had presented the firm with an "existential crisis," because the President's "executive order could easily have destroyed our firm." Accordingly, the chairman explained, "in the face of an unprecedented threat," the firm "settled" with the Administration and "agreed to commit substantial pro bono resources" to what were euphemistically described as "areas of shared interest."

In the wake of the Paul Weiss "settlement," a second major firm, Skadden Arps, was forced to fork over to the President's favored causes an even greater volume of purported pro bono work in the face of the mere *threat* of being added to his law-firm hit list. Under that euphemistically

~ 24 ~

characterized "settlement" the firm decided "to provide the equivalent of $100 million in free legal work to causes supported by the administration."

The next firm to succumb was Willkie Farr & Gallagher.  On April 1, the President announced that the firm is not only abandoning its DEI policies but also "will provide the equivalent of $100 million in pro bono legal services for causes the administration supports." Willkie's crimes?  It is the firm (i) where the husband (Douglas Emhoff) of the President's 2024 electoral opponent, Vice President Kamala Harris, practices law, (ii) where an investigator who worked for a House of Representative committee probing the pro-Trump January 6 attack on the Capitol, is employed, and (iii) which represented two Georgia election workers who successfully sued presidential friend Rudy Giuliani for defamation when he falsely accused them of helping to "steal" the 2020 election from Mr. Trump.

The next firm to pay for protection was Milbank, which came within the President's cross-hairs because it chose to hire former Obama Administration Acting Solicitor General Neal Katyal, who had been critical of Mr. Trump's conduct in and out of office.  Milbank apparently was willing to pay the new going rate for protection from the President's wrath, $100 million in supposed pro bono services directed to the President's preferred causes.

Other firms that subsequently made deals for as much as $125 million in "pro bono" services for the President's pet causes include Latham & Watkins; Cadwalader, Wickersham & Taft; A & O Shearman; Kirkland & Ellis; and Simpson Thacher & Bartlett.

Perversely, the President has coerced once-proud law firms to agree to divert almost a billion dollars in free legal services away from representing the poor and oppressed to such things as implementing his tariff programs and broadening coal mining; and some White House officials "believe that some of the pro bono legal work could even be used toward representing Mr. Trump

or his allies if they became ensnared in investigations."  Thus, a legal commentator has noted, "the president has spent the last several weeks reminding Paul, Weiss and the others that their escape from sanctions came with a price: They work for him now."

As one professor of legal ethics recently explained in an article in The New York Times, the law firms that the President has targeted had regularly topped the national lists of major providers of volunteered pro bono hours:

> These firms now top a different list: law firms targeted by the Trump administration's executive orders. This is no accident. These orders use the pretense of punishing Mr. Trump's perceived enemies to pursue the far more comprehensive goal of controlling pro bono work, the lifeblood of legal aid and public-interest law organizations, which depend on pro bono support to promote access to justice and defend the values of liberal democracy. This targeting replaces the ideal of pro bono publico, literally "for the public good," with pro bono Trump.

As a consequence of the President's campaign of threats to injure law firms that undertake to represent pro bono causes that the President dislikes, some amici have observed that many firms have become reluctant to undertake pro bono matters that might get them cross-wise with the President,

Respect for the Rule of Law, however, must mean that members of the legal profession are free to exercise their own personal and professional judgment in determining which pro bono clients to represent and which causes to pursue.  No government official, especially a President, may legitimately commandeer those professional services and impress lawyers into the service of his own personal "agenda."  See, *e.g.*, 18 U.S.C. §§ 872, 1951(b)(2).  Distinguished former federal appellate judge J. Michael Luttig put the matter crisply in a May 14 feature article exploring the President's threat to the Rule of Law posed by these Executive Orders (and other assertions of power):

> Some of the firms—Paul Weiss; Latham & Watkins; Skadden, Arps, Slate, Meagher & Flom; Kirkland & Ellis; and Simpson Thacher & Bartlett—cut "deals" to avoid the

president's persecution.  In doing so, they shamefully sold out their own lawyers, clients, and the entire legal profession, including the handful of courageous law firms—such as WilmerHale, Perkins Coie, Jenner & Block, and Susman Godfrey—that rightly and righteously decided to fight the president instead. It is the sworn duty of all American lawyers to denounce the president's lawlessness, not to ingratiate themselves to him.

In dealing with a fictional book and film, we can simply watch passively when a powerful man confronts a citizen and "makes him an offer that he can't refuse."   But when the integrity of the American legal system is at stake, any such man, even the President, must be told that he has gone too far.

Who will deliver this message, when even major law firms are cowed, corporate clients are silenced, universities are threatened, and Congress remains complicit?  The clear answer: Only an Article III court responsible for saying "what the law is."

<b>CONCLUSION</b>

Plaintiff's Motion for a Preliminary Injunction should be granted.

Dated: May 28, 2025                    Respectfully submitted.

_____
Andrea C. Ferster*
Law Offices of Andrea C Ferster
DC Bar #384658
68 Beebe Pond Road
Canaan, NY 12029
Phone: 202-669-6311
Email: Andreaferster@gmail.com

*Of Counsel*
Philip Allen Lacovara
(DC Bar #194472)
4552 West Gulf Drive
Sanibel, FL 33957-5106
Phone: 239-472-2992
Email: placovara@gmail.com

---

*Pursuant to Local Civil Rule 7(o)(5), counsel for Amici certifies that no counsel for a party authored this brief in whole or in part, and no person other than Amici, their members, or their counsel made a monetary contribution to the brief's preparation or submission.