**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARK S. ZAID, ESQ.<br><br>               Plaintiff,<br><br>    v.<br><br>EXECUTIVE OFFICE OF THE<br>PRESIDENT, *et al*.<br><br>               Defendants. | Civil Action No. 1:25-cv-01365-AHA |

**BRIEF OF *AMICI CURIAE* FIRST AMENDMENT SCHOLARS**
**IN SUPPORT OF PLAINTIFF'S PRELIMINARY INJUNCTION MOTION**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTEREST OF *AMICI* ................................................................................................ 1

SUMMARY OF ARGUMENT ..................................................................................... 4

ARGUMENT ................................................................................................................ 6

I.  SUMMARY REVOCATIONS OF ATTORNEY SECURITY CLEARANCES
    MOTIVATED BY RETALIATION AND VIEWPOINT DISCRIMINATION
    VIOLATE THE FIRST AMENDMENT............................................................... 6

    A.  The First Amendment Fully Protects an Attorney's Advocacy................... 6

    B.  The First Amendment Bars Retaliatory and Viewpoint-Based Restrictions
        on Lawyers' Advocacy for Their Clients.................................................... 8

    C.  These Longstanding First Amendment Protections Apply to Summary
        Revocations of the Security Clearances of a Whistleblower Attorney...... 10

II.  THE REVOCATION OF PLAINTIFF'S SECURITY CLEARANCE IS A
     VIOLATION OF HIS FIRST AMENDMENT RIGHTS.................................... 18

III. RELIEF IS NEEDED BECAUSE THE REVOCATION OF PLAINTIFF'S
     SECURITY CLEARANCE HAS IMPACTS FAR BEYOND THIS CASE ...... 21

CONCLUSION........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Cases*

*ACLU v. Office of Dir. of Nat'l Intelligence*,
  2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011) ....................................................... 12

*Agency for Int'l Dev. v. Alliance for Open Society*,
  570 U.S. 205 (2013) ................................................................................................ 25

*Am. Airways Charters, Inc. v. Regan*,
  746 F.2d 865 (D.C. Cir. 1984) ............................................................................... 15

*Am. Ass'n of Univ. Professors v. Rubio*,
  2025 WL 1235084 (D. Mass. Apr. 29, 2025) ................................................... 20, 23

*Am. Foreign Serv. Ass'n v. Trump*,
  2025 WL 1387331 (D.D.C. May 14, 2025) ............................................................ 20

*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ............................................................................... 18

*Associated Press v. Budowich*,
  2025 WL 1039572 (D.D.C. Apr. 8, 2025) ........................................................ 10, 20

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ............................................................................. 9, 21, 22, 25

*BE & K Constr. Co. v. NLRB*,
  536 U.S. 516 (2002) .................................................................................................. 7

*Borough of Duryea v. Guarnieri*,
  564 U.S. 379 (2011) ............................................................................................. 7, 8

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988) ................................................................................................ 14

*De Jonge v. Oregon*,
  299 U.S. 353 (1937) .................................................................................................. 8

*Denius v. Dunlap*,
  209 F.3d 944 (7th Cir. 2000) ................................................................................... 6

*First Nat'l Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978) .................................................................................................. 9

*Frederick Douglass Found., Inc. v. District of Columbia,*
  82 F.4th 1122 (D.C. Cir. 2023) ................................................................. 9

*Holder v. Humanitarian L. Project,*
  561 U.S. 1 (2010) ................................................................................... 17

*Jacobs v. Schiffer,*
  204 F.3d 259 (D.C. Cir. 2000) .................................................................. 6

*Jenner & Block LLP v. U.S. Dep't of Just.,*
  No. 25-cv-916-JDB, 2025 WL 1482021 (D.D.C. May 23, 2025) ..................... *passim*

*Joint Anti-Fascist Refugee Comm. v. McGrath,*
  341 U.S. 123 (1951) ................................................................................ 12

*Lathram v. Snow,*
  336 F.3d 1085 (D.C. Cir. 2003) ................................................................ 20

*Lee v. Garland,*
  120 F.4th 880 (D.C. Cir. 2024) ..................................................... 14, 15, 16

*Legal Servs. Corp. v. Velazquez,*
  531 U.S. 533 (2001) ............................................................................ *passim*

*Lozman v. City of Riviera Beach,*
  585 U.S. 87 (2018) .................................................................................. 8

*NAACP v. Ala. ex rel. Patterson,*
  357 U.S. 449 (1958) ................................................................................ 7

*NAACP v. Button,*
  371 U.S. 415 (1963) ......................................................................... 6, 9, 22

*Nat'l Fed'n of Fed. Emps. v. Greenberg,*
  983 F.2d 286 (D.C. Cir. 1993) ................................................................. 16

*Nat'l Rifle Ass'n of Am. v. Vullo,*
  602 U.S. 175 (2024) ............................................................................ *passim*

*Nat'l Treasury Emps. Union v. Trump,*
  2025 WL 1218044 (D.D.C. Apr. 28, 2025) ................................................ 19

*New York Times Co. v. U.S. Dep't of Just.,*
  756 F.3d 100 (2d Cir. 2014) .................................................................... 12

*New York Times Co. v. United States,*
  403 U.S. 713 (1971) ............................................................................ *passim*

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ................................................................................... 19

*O'Donnell v. Yanchulis*,
    875 F.2d 1059 (3d Cir. 1989) ................................................................... 12

*Pen Am. Ctr., Inc. v. Trump*,
    448 F. Supp. 3d 309 (S.D.N.Y. 2020) ...................................................... 23

*Perkins Coie LLP v. U.S. Dep't of Just.*,
    No. 25-cv-716-BAH, 2025 WL 1276857 (D.D.C. May 2, 2025) ................... *passim*

*Perry v. Sindermann*,
    408 U.S. 593, 597 (1972) ...................................................................... 8, 9

*Rattigan v. Holder*,
    689 F.3d 764 (D.C. Cir. 2012) ................................................................. 16

*Ray v. Turner*,
    587 F.2d 1187 (D.C. Cir. 1978) ............................................................... 11

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .............................................................................. 4, 8

*Schware v. Board of Bar Exam. of State of N.M.*,
    353 U.S. 232 (1957) ................................................................................ 17

*Singletary v. District of Columbia*,
    351 F.3d 519 (D.C. Cir. 2005) ................................................................. 19

*Speiser v. Randall*,
    357 U.S. 513 (1958) ........................................................................... 14, 15

*Thomas v. Collins*,
    323 U.S. 516 (1945) .................................................................................. 7

*Thornhill v. Alabama*,
    310 U.S. 88 (1940) .................................................................................. 14

*ABA v. U.S. Dep't of Just.*,
    No. 25-cv-1263-CRC, 2025 WL 1388891 (D.D.C. May 14, 2025) ........... 19, 20

*United Mine Workers of Am. v. Ill. State Bar Ass'n*,
    389 U.S. 217 (1967) .................................................................................. 6

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) .................................................................................. 5

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President (WilmerHale)*,
No. 25-cv-917-RJL, 2025 WL 1502329 (D.D.C. May 27, 2025) ....................................*passim*

**Statutes**

50 U.S.C. § 3341(j) .............................................................................................................. 13

**Other Authorities**

Elizabeth Goitein, *The Original Sin Is We Classify Too Much*, Brennan Center for Justice
(Jan. 26, 2023) .................................................................................................................. 11

Erwin N. Griswold, *Secrets Not Worth Keeping*, Wash. Post (Feb. 15, 1989) ............................ 11

*Examining the Costs of Overclassification on Transparency and Security*, *Hearing
before Comm. on Oversight and Gov't Reform*, 114th Cong. (2016) ....................................... 11

Genevieve Lakier, *Enforcing the First Amendment in an Era of Jawboning*,
93 U. Chicago L. Rev. (forthcoming 2026) ................................................................................. 22

Heidi Kitrosser, *Classified Information Leaks and Free Speech*,
2008 U. Ill. L. Rev. 881 (2008) .................................................................................................... 10

Henry P. Monaghan, *First Amendment "Due Process*,"
83 Harv. L. Rev. 518 (1970) ........................................................................................................ 15

Jack M. Balkin, Old-School/New-School Speech Regulation,
127 Harv. L. Rev. 2296, 2309 (2014) .......................................................................................... 22

Mary-Rose Papandrea, *Leaker Traitor Whistleblower Spy:
National Security Leaks and the First Amendment*,
94 B.U. L. Rev. 449 (2014) ................................................................................................. 11, 13

Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His
Attacks*, Wash. Post (Mar. 25, 2025) ........................................................................................ 25

Miranda Devine, *Trump stripping the security clearances of numerous antagonists —
including NY AG Letitia James, DA Alvin Bragg*, N.Y. Post (Feb. 8, 2025) ........................... 19

Natalie K. Orpett & James Pearce, *The Law Firms' Deals with Trump Are Even Riskier Than
They Seem*, Lawfare (May 16, 2025) ......................................................................................... 24

Paul R. Verkuil, *Jawboning Administrative Agencies: Ex Parte Contacts by the White House*,
80 Colum. L. Rev. 943 (1980) ...................................................................................................... 23

Seth F. Kreimer, *The Freedom of Information Act and the Ecology of Transparency*,
10 U. Pa. J. Const. L. 1011 (2008) .............................................................................................. 12

Source Book: Legislative History, Texts and Other Documents (Comm. Print 1975)................. 12

Thomas I. Emerson, *Toward a General Theory of the First Amendment*,
 72 Yale L.J. 877, 896 (1963) ............................................................................................. 7

*Too Many Secrets: Overclassification as a Barrier to Critical Info. Sharing, Hearing before the
 Subcomm. on Nat'l Sec., Emerging Threats, and Int'l Relations of the Comm. on Gov't
 Reform*, 108th Cong. 82-83 (2004) ...................................................................................... 11

William G. Weaver & Robert M. Pallitto, *State Secrets and Executive Power*,
 120 Pol. Sci. Q. 85, 90 (2005) ............................................................................................ 17

## INTEREST OF *AMICI* [1]

*Amici* are scholars whose research and teaching primarily focus on constitutional law and the First Amendment.  The scholars have a particular interest in ensuring that the First Amendment protections for legal advocacy and petitioning activity are upheld.  *Amici* submit this brief to assist the Court in deciding the important First Amendment issues presented by the exercise of Executive power at issue in this case.  Biographical information on the *amici*, who are participating in their individual capacities and not as representative of the institutions with which they are affiliated, appear below:

Heidi Kitrosser
William W. Gurley Professor of Law
Northwestern, Pritzker School of Law

Floyd Abrams
Visiting Lecturer in Law at Columbia Law School
Senior Counsel, Cahill Gordon & Reindel LLP

Jonathan Askin
Professor of Clinical Law
Brooklyn Law School

Jack M. Balkin
Knight Professor of Constitutional Law and the First Amendment
Yale Law School

Erwin Chemerinsky
Dean and Jesse H. Choper Distinguished Professor of Law
University of California, Berkeley, School of Law

Catherine Crump
Robert Glushko Clinical Professor of Practice in Technology Law
University of California, Berkeley, School of Law

---

[1] No party or its counsel had any role in authoring this brief. No person or entity—other than amici curiae and their counsel—contributed money to fund the preparation of this brief. Plaintiff consents to the filing of this brief and Defendants have no objection to the filing of this brief.

Eric B. Easton
Professor of Law Emeritus
University of Baltimore School of Law

Aziz Huq
Frank and Bernice J. Greenberg Professor of Law
University of Chicago Law School

Jane E. Kirtley
Silha Professor of Media Ethics and Law
University of Minnesota, Hubbard School of Journalism and Mass Communication
University of Minnesota Law School (affiliated faculty)

Christina Koningisor
Associate Professor of Law
UC School of Law, San Francisco

Genevieve Lakier
Professor of Law and Herbert & Marjorie Fried Teaching Scholar
The University of Chicago Law School

Gregg P. Leslie
Professor of Practice and Director, First Amendment Clinic
Sandra Day O'Connor College of Law, Arizona State University

Gregory P. Magarian
Thomas and Karole Green Professor of Law
Washington University in St. Louis School of Law

Alan B. Morrison
Associate Dean for Public Interest and Public Service Law
George Washington University Law School

Helen Norton
University Distinguished Professor and Rothgerber Chair in Constitutional Law
University of Colorado School of Law

Mary-Rose Papandrea
Samuel Ashe Distinguished Professor of Constitutional Law
University of North Carolina School of Law

James D. Redwood
Professor of Law
Albany Law School

Susan E. Seager
Adjunct Professor of Clinical Law
University of California, Irvine, School of Law

Geoffrey R. Stone
Edward H. Levi Distinguished Service Professor of Law
The University of Chicago Law School

## SUMMARY OF ARGUMENT

The freedom to seek legal counsel, to provide legal counsel, and to petition the government through litigation without fear of governmental retribution is foundational to our system of civil rights and the rule of law. The First Amendment rights of speech, petition, and association safeguard these freedoms. In protecting legal advocacy, the First Amendment prohibits the government from directly suppressing or punishing lawyers for the views they express in support of their clients—even when those views are inimical to the government's interests. *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The First Amendment equally prohibits the government from indirectly suppressing or punishing viewpoints expressed through legal advocacy by threatening lawyers who facilitate that expression. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024).

The March 22, 2025, Presidential Memorandum rescinding the security clearance of Plaintiff Mark Zaid[2] violates these core First Amendment principles. The recission of Plaintiff's security clearance is part of an unprecedented campaign by the current Administration to retaliate against and punish lawyers who advocate for causes or clients the President disfavors. *See Perkins Coie LLP v. U.S. Dep't of Just.*, No. 25-cv-716-BAH, 2025 WL 1276857, at *37 (D.D.C. May 2, 2025) (recounting threats to revoke security clearances from attorneys at prominent law firms); *Jenner & Block LLP v. U.S. Dep't of Just.*, No. 25-cv-916-JDB, 2025 WL 1482021, at *4 (D.D.C. May 23, 2025) (same); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President* (*WilmerHale*), No. 25-cv-917-RJL, 2025 WL 1502329, at *2-3 (D.D.C. May 27, 2025) (same). Plaintiff is one of the few counsel with the expertise—and, prior to their recission, the security

---

[2] Memorandum For the Heads of Executive Departments and Agencies, *Rescinding Security Clearances and Access to Classified Information* (March 22, 2025), https://perma.cc/K5Z8-DGGH (hereinafter, the "Presidential Memorandum" or "Memorandum").

clearances—required to represent whistleblowers in the opaque national security environment. The Executive's significant authority over issues of national security does not alter the traditional First Amendment analysis when a security clearance is summarily revoked based on an attorney's perceived viewpoint or that of his clients.

Here, Defendants' revocation of Plaintiff's security clearances took place outside the established process for such revocations, which requires an individualized determination by security experts based on a factual record to guard against arbitrary decisions. Remarkably, national security interests were never even invoked as a reason for the revocation.

Left unchecked, Defendants' actions will have far-reaching consequences for any attorney with a security clearance. The unprecedented, abrupt, and broadly publicized revocation of Plaintiff's security clearance is plainly intended to send a coercive message to lawyers and potential litigants: oppose the President or his Administration and you will lose your security clearance. The effect is a dramatic chill on lawful whistleblowing and legal representation for whistleblowers.

The government could not achieve such ends by directly prohibiting lawyers from taking on clients or causes adverse to the Executive. Nor can the Executive achieve these ends indirectly via threat of retribution, as the Supreme Court affirmed just last term. *See Vullo*, 602 U.S. at 190. The manner and basis of the revocations are a patent violation of established First Amendment principles. Permitting the clearance revocations to stand would permit the government to stray far from the "fixed star of our constitutional constellation," "that no official, high or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

## ARGUMENT

I.    **SUMMARY REVOCATIONS OF ATTORNEY SECURITY CLEARANCES MOTIVATED BY RETALIATION AND VIEWPOINT DISCRIMINATION VIOLATE THE FIRST AMENDMENT**

Well-established First Amendment precedent prohibits the government from suppressing advocacy, association, or speech based on its viewpoint.  This same principle applies fully in the national security context.

### A.  The First Amendment Fully Protects an Attorney's Advocacy

The First Amendment rights of speech, association, and petition protect the pursuit of justice and the use of counsel in that pursuit.  *See United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 221-22 (1967) (holding "that the freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments" protect a union's "right to hire attorneys on a salary basis to assist its members in the assertion of their legal rights"); *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) (holding that the "right to hire and consult an attorney" is protected by the First Amendment).  These separate and distinct First Amendment rights overlap to safeguard both a client's right to seek legal counsel and an attorney's right to provide that counsel and advocate on that client's behalf:

- The Speech Clause protects lawyers' freedom to advise their clients and to advocate on their behalf.  *Velazquez*, 531 U.S. at 544; *see also Jacobs v. Schiffer*, 204 F.3d 259, 266 (D.C. Cir. 2000) (emphasizing that in the whistleblower context a government employee has a particularly strong First Amendment "interest in communicating with his attorney").

- The First Amendment right of association ensures the ability of lawyers and clients to "associat[e] for litigation."  *NAACP v. Button*, 371 U.S. 415, 431-33 (1963) (rejecting limits on advising individuals "to seek the assistance

6

of particular attorneys"); *see also NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958) (noting that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association").

- The Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011); *see also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524-25 (2002) (explaining that freedom to petition extends to all departments of government, including redress before courts).

*See Thomas v. Collins*, 323 U.S. 516, 530 (1945) (the rights of speech, press, assembly, and petition, while "not identical," are "cognate rights").

These safeguards for legal advocacy are key to our system of constitutional checks and balances, where an "informed, independent judiciary presumes an informed, independent bar." *Velazquez*, 531 U.S. at 545. Indeed, the existence of an "independent bar" able to pursue litigation without fear or favor is a foundation upon which all our civil rights depend. *See* Thomas I. Emerson, *Toward a General Theory of the First Amendment*, 72 Yale L.J. 877, 896 (1963) (explaining the essential role of an independent bar in "implementing the principles of free expression"). As Judge Howell emphasized recently in finding that retaliatory threats to remove lawyers' security clearances violated the First Amendment, the independence of lawyers is key "to ensuring the American judicial system's fair and impartial administration of justice." *Perkins Coie*, 2025 WL 1276857, at *1; *see also Jenner & Block*, 2025 WL 1482021, at *8-9 ("[L]imitations on lawyers' speech must be examined with care, as such limitations threaten not

only the lawyers and their clients but also the ability of a coequal branch of government to function."); *WilmerHale*, 2025 WL 1502329, at \*18 (explaining that the "right to petition 'is integral to the democratic process'" (quoting *Borough of Duryea*, 564 U.S. at 388)).

This principle has been "recognized in this country since its founding era," *id.*, and these rights are so fundamental that they inhere in the "very idea of a government, republican in form." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) (the right to petition "cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions"). Efforts to interfere with a client's right to select a lawyer and a lawyer's right to advocate for clients undermine the administration of justice and strike at the very foundation of the rule of law.

## B. The First Amendment Bars Retaliatory and Viewpoint-Based Restrictions on Lawyers' Advocacy for Their Clients

The First Amendment prohibits the government from suppressing lawyers' speech, association, and petitioning activities based on viewpoints they express through that protected activity. *Rosenberger*, 515 U.S. at 828; *Vullo*, 602 U.S. at 187. It equally prohibits the government from retaliating against a lawyer for engaging in constitutionally protected advocacy activities. *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

The government may not regulate lawful petitioning activity based on "the message it conveys," *Rosenberger*, 515 U.S. at 828. In *Velazquez*, the Supreme Court struck down a law limiting the arguments that government-funded attorneys were permitted to make, declaring unconstitutional the attempt "to exclude from litigation those arguments and theories Congress finds unacceptable but which by their nature are within the province of the courts to consider." *Velazquez*, 531 U.S. at 546. Restrictions on the subject matter of litigation to "insulate" the

government's view of the law from legal challenge are a potent form of viewpoint discrimination. *Id.* at 548.  Such interference threatens the primary "lawful means to achieve legitimate political ends"—what in many cases "may well be the sole practicable avenue open . . . to petition for redress of grievances." *Button*, 371 U.S. at 430.  Nor may the government implement a system of prior restraint on petitioning activity to suppress views it disfavors. *See Bantam Books*, *Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (prior restraints on expression bear "a heavy presumption against" their constitutional validity); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (same).

Simply put, the First Amendment prohibits the government from "confin[ing] litigants and their attorneys" in ways that prevent them from pursuing legitimate challenges to government action—even if those challenges are "inimical to the Government's own interest." *Velazquez*, 531 U.S. at 548-49.  Such viewpoint discrimination gives "one side of a debatable public question an advantage in expressing its views," "is antithetical to a free society," and presumptively unconstitutional. *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785 (1978); *see also Vullo*, 602 U.S. at 188.

The First Amendment also prohibits government from "subjecting individuals to retaliatory actions after the fact for having engaged in protected speech." *Perkins Coie*, 2025 WL 1276857, at *26 (cleaned up).  Retaliation to effectuate viewpoint discrimination is "uniquely harmful to a free and democratic society." *Id.* (quoting *Vullo*, 602 U.S. at 187).  Denying a benefit "on the basis of 'constitutionally protected speech or associations'" is unconstitutional retaliation. *Id.* (quoting *Perry*, 408 U.S. at 597).  These First Amendment protections apply "even though a person has no 'right' to a valuable government benefit," including a security clearance. *See Perry*, 408 U.S. at

597. The government may not deny a benefit, even a discretionary benefit, for impermissible reasons—including retaliatory or viewpoint-discriminatory ones. "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly." *Id.* (cleaned up); *see also Associated Press v. Budowich,* No. 25-cv-00532-TNM, 2025 WL 1039572, at *15 (D.D.C. Apr. 8, 2025) (same).

### C. These Longstanding First Amendment Protections Apply to Summary Revocations of the Security Clearances of a Whistleblower Attorney

Traditional legal principles barring retaliatory, viewpoint-based limitations on expression extend to judicial review of the Executive's process-devoid revocation of security clearances that restricts a lawyer's ability to advocate for whistleblowers in the national security context. Indeed, careful judicial enforcement of First Amendment rights is particularly needed in this context. Whistleblowers, with assistance from counsel, provide a key restraint on Executive overreach and abuse in the opaque realm of national security. For this very reason, the Executive has palpable incentives to engage in viewpoint discrimination and retaliation against attorneys who advocate for such whistleblowers.

### 1. Whistleblowing provides a critical check on government abuse in the national security context.

As Justice Douglas noted over fifty years ago, the "dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information." *New York Times*, 403 U.S. at 723-24 (Douglas, J., concurring). In a national security environment where the classification system is bloated and abused, lawful whistleblowing is an essential tool to combat such suppression.

It is beyond peradventure that the Executive's broad discretion over the classification of information "breeds rampant overclassification" that impedes meaningful public oversight. Heidi

Kitrosser, *Classified Information Leaks and Free Speech*, 2008 U. Ill. L. Rev. 881, 894-96 (2008); *see also* Mary-Rose Papandrea, *Leaker Traitor Whistleblower Spy: National Security Leaks and the First Amendment*, 94 B.U. L. Rev. 449, 465 (2014) (underscoring how tight Executive control over national security information makes oversight difficult). Indeed, Dean Erwin Griswold, who served as President Nixon's Solicitor General and represented the government in *New York Times v. United States*, later acknowledged that "there is massive overclassification and that the principle concern of the classifiers is not with national security, but rather with governmental embarrassment of one sort or another."[3] Multiple studies similarly have concluded that the government routinely classifies information whose disclosure would be entirely harmless; anywhere between 50% and 90% of classification may be improper.[4]

More than 50 years ago, the "proclivity for overclassification" so concerned Congress that it mandated *de novo* judicial review of classification decisions under the Freedom of Information Act—over the veto of President Ford—to guard "against the potential for mischief and criminal activity under the cloak of secrecy" when national security is asserted as the basis to keep information from the public. *Ray v. Turner*, 587 F.2d 1187, 1209 (D.C. Cir. 1978) (Wright, C.J.,

---

[3] Erwin N. Griswold, *Secrets Not Worth Keeping*, Wash. Post (Feb. 15, 1989), https://www.washingtonpost.com/archive/opinions/1989/02/15/secrets-not-worth-keeping/a115a154-4c6f-41fd-816a-112dd9908115/.

[4] *See* Elizabeth Goitein, *The Original Sin Is We Classify Too Much*, Brennan Center for Justice (Jan. 26, 2023), https://perma.cc/JUN9-KU84; *Examining the Costs of Overclassification on Transparency and Security*, *Hearing before Comm. on Oversight and Gov't Reform*, 114th Cong. (2016) (statement of Rep. Jason Chaffetz referring to estimates that between 50% and 90% of classified material is not properly designated); *Too Many Secrets: Overclassification as a Barrier to Critical Info. Sharing, Hearing before the Subcomm. on Nat'l Sec., Emerging Threats, and Int'l Relations of the Comm. on Gov't Reform*, 108th Cong. 82-83 (2004) (statement of J.W. Leonard, Director, Information Security Oversight Office, National Archives and Records Administration); *see also id.* (statement of Rep. C. Shays), http://www.gpo.gov/fdsys/pkg/CHRG-108hhrg98291/html/CHRG-108hhrg98291.htm (estimating that between 10% and 90% of classified information should never have been classified).

concurring) (quoting Source Book: Legislative History, Texts and Other Documents, at 460-61 (Comm. Print 1975)).  Instances of classification made in excess of authority to conceal unlawful behavior or prevent embarrassment have been well-documented over time.  *See, e.g.*, *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 139-40 (1951) (Attorney General exceeded authority to make classification designations); *ACLU v. Office of Dir. of Nat'l Intelligence*, 2011 WL 5563520, at *5-6, *12 (S.D.N.Y. Nov. 15, 2011) (explaining that classification to conceal embarrassment is improper).  Equally well-documented are past examples of public debate being thwarted by the classification of information vital to those debates.  *See, e.g.*, *New York Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 104-08 (2d Cir. 2014) (surveying government efforts to shield the legal justifications relied upon in carrying out targeted killing).

Whistleblowing provides a lawful and critical check against such abuse because government agents subject to the confidentiality obligations that come with a security clearance will often be the only ones who know when abuse occurs.  *See* Seth F. Kreimer, *The Freedom of Information Act and the Ecology of Transparency*, 10 U. Pa. J. Const. L. 1011, 1037-45 (2008); *see also O'Donnell v. Yanchulis*, 875 F.2d 1059, 1062 (3d Cir. 1989) (noting the "significant interest in encouraging legitimate whistleblowing" where information about alleged illicit activity is not otherwise available to the public).  Whistleblowing and legal counsel for national security whistleblowers thus serve an essential function.  As Justice Stewart observed in the Pentagon Papers case, in the arenas of national defense and international affairs an "informed and critical public opinion" may be "the only effective restraint upon executive policy and power."  *New York Times*, 403 U.S. at 728 (Stewart, J., concurring).  Suppressing legal advocacy for national security whistleblowers has significant consequences for the rule of law and for the courts' role in guarding against Executive overreach.

12

### 2. Because attorney security clearances are integral to the exercise of First Amendment rights, the Constitution requires procedural safeguards for revocations.

A security clearance is often a prerequisite to a lawyer's ability to represent a whistleblower. *See Jenner & Block*, 2025 WL 1482021, at *10; *WilmerHale*, 2025 WL 1502329, at *19; Pl.'s Mem. of Law in Supp. of Mot. for Prelim. Inj., at 13, ECF 9-1 ("Pl.'s Mem."). Revoking a lawyer's clearance impedes vital First Amendment-protected advocacy on behalf of whistleblowers and thus calls for strong procedural protections.

Although lawful whistleblowers possess statutory protections,[5] those protections cannot fully be realized absent access to qualified counsel. Lawyers help whistleblowers navigate the complex and intersecting webs of statutory, criminal, and administrative laws that regulate disclosure. *See* Papandrea, 94 B.U. L. Rev. at 490. Such legal guidance enables national security personnel to determine what information they may share, to whom, and how they may lawfully do so. *See* Zaid Decl. ¶ 44, ECF No. 9-2 (attesting to the importance of legal counsel to clients holding classified meetings with congressional oversight committees). Yet such qualified counsel are not readily available. For example, Central Intelligence Agency (CIA) employees whose identities are classified require government approval to retain an attorney, and they can only retain attorneys holding a CIA-granted security clearance. *See, e.g.*, Cent. Intel. Agency, Security Guidance for Representatives (2009), https://perma.cc/XN32-L9AM (rules and non-disclosure agreements for attorneys who the CIA has granted clearances to know an employee's classified association with the CIA); Zaid Decl. ¶ 41. Extensive procedures exist for both granting and withdrawing attorneys' security clearances, and for good reason: limiting the pool of cleared attorneys impedes national security whistleblowers from lawfully revealing wrongdoing and from vindicating their

---

[5] 50 U.S.C. § 3341(j) (prohibiting security clearance retaliation for lawful employee reporting of waste, fraud, and abuse).

legal rights when they are retaliated against for doing so.

Given the transcendent First Amendment values at stake when a whistleblower lawyer's security clearance is terminated, the Constitution imposes substantive and procedural safeguards on such a step. The government must deploy "sensitive tools," with enough process to guard against official abuses and to avoid deterring individuals from exercising their First Amendment rights. *See Speiser v. Randall*, 357 U.S. 513, 525 (1958). The First Amendment prohibits regimes that grant any official "unbridled discretion" to infringe First Amendment rights, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988), not merely because of "the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion," *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940).

To be sure, the president has significant discretion to revoke security clearances for national security reasons after an individualized review of a person's fitness for a clearance. *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024). But even in the national security context where some consideration of speech to keep classified information secure may be necessary, that discretion is subject to First Amendment limitations. *Jenner & Block*, 2025 WL 1482021, at *12 (explaining that the Executive cannot use control over security clearances to extinguish disfavored speech). Nowhere else, perhaps, is a blunter application of decision-making procedures permissible under the First Amendment. *Id.* The procedures required are the same ones the Executive Branch has always used in this context: notice of the potential revocation, a right to respond, a right to be represented by counsel, a statement of the reasons for the revocation, and a right to appeal. *See Perkins Coie*, 2025 WL 1276857, at *32 (summarizing undisputed explanation of revocation process by Plaintiff's expert); *see also* Pl.'s Mem. at 19-20; Expert Report of J. William Leonard, ¶ 32, ECF No. 9-4.

Where some knowable process is followed and individualized review is conducted by security experts, the D.C. Circuit has held that courts should avoid second guessing that authority and no justiciable First Amendment retaliation claim will lie. *Lee*, 120 F.4th at 893. But where the Executive adopts a retaliatory policy and revokes clearances without any individualized review, it violates the procedural protections required by the constitution and is subject to judicial review. *See* Henry P. Monaghan, *First Amendment "Due Process*,*"* 83 Harv. L. Rev. 518, 519 (1970) ("Like the substantive rules themselves, insensitive procedures can 'chill' the right of free expression. Accordingly, wherever First Amendment claims are involved, sensitive procedural devices are necessary."). To hold otherwise would be to permit a licensing scheme, akin to a prior restraint, over the core First Amendment freedoms of speech, association, and petition. *See Speiser*, 357 U.S. at 526 (finding that "a constitutional prohibition cannot be transgressed indirectly" by deploying blunt procedural mechanisms); *see also Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 867 (D.C. Cir. 1984) ("[T]he controlling legislation, were we to read it as contemplating a government license prior to obtaining counsel, would trench on a right of constitutional dimension.").

### 3. The summary revocation of security clearances pursuant to a viewpoint-discriminatory policy without individualized review is justiciable.

The President's outsized authority over security clearances does not extend unbridled discretion to publicly punish individuals for protected First Amendment activity by summarily revoking security clearances. Nothing in the holding in *Lee v. Garland* concerning judicial review of an agency's denial or revocation of a security clearance, imposes any barrier to judicial review of a retaliatory policy that results in the revocation of a lawyer's security clearance done with no fact finding and no demonstrated national security justifications. To the contrary, when no individualized review has been conducted and "the allegation is that a pervasive, class-wide

discriminatory policy exists against some group of individuals, the questions involved do not create any need for courts to second-guess experts or weigh unmanageable standards," and they are therefore justiciable. *Perkins Coie*, 2025 WL 1276857, at *21; *accord Jenner & Block*, 2025 WL 1482021, at *11; *WilmerHale*, 2025 WL 1502329, at *12-13.

To hold otherwise would convert the government's national security power into a cudgel for speech suppression, allowing the Executive to kill cases that stand to expose government wrongdoing by systematically revoking the security clearance of any attorney that agrees to represent the whistleblower seeking to bring that wrongdoing to light.  If this Court were to interpret *Lee* to cover the circumstances here, it would work "a breathtaking expansion of executive power at the expense of the constitutionally mandated role of the judicial branch and the concomitant safeguards for the individual rights of Americans." *Perkins Coie*, 2025 WL 1276857, at *19-21; *accord Jenner & Block*, 2025 WL 1482021, at *11.

In the particular context of security clearance revocations, the precedent of this Circuit limits *Lee* to situations involving "expert, predictive judgment[s]" made on individualized bases by "appropriately trained personnel."  *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012);[6] *see also Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 289 (D.C. Cir. 1993) (finding challenge to the process for making clearance determinations was justiciable).  When the detailed processes that govern security clearances are not followed, when "no . . . apparent expertise [is] involved, and where the allegation is that a pervasive, class-wide discriminatory policy exists against some group of individuals," *Lee*'s justifications have no force. *Perkins Coie*, 2025 WL

---

[6] *Lee* does nothing to abrogate the decision in *Rattigan*. *Lee* itself dealt with a routine clearance decision made (after conducting three polygraph examinations and following all the provided-for procedures) by the appropriately trained, adjudicative personnel. *See Lee*, 120 F.4th at 884. The decision does not mention *Ratigan*, much less overrule it.

1276857, at *21.  Courts consistently make clear that decisionmakers are not entitled to deference when they make arbitrary or discriminatory determinations.  *See Sch ware v. Board of Bar Exam. of State of N.M.*, 353 U.S. 232, 238 n.5 (1957) ("[A] person cannot be prevented from practicing [law] except for valid reasons. Certainly the practice of law is not a matter of the State's grace."); *Perkins Coie*, 2025 WL 1276857, at *20.  While courts sometimes absent themselves from review of a "particular result" of the procedures established for exercising discretionary powers, they can and must intervene in the rare case that the decision to exclude, "even in an individual case, may have been based on avowed considerations" that are unconstitutional. *Schware*, 353 U.S. at 248-49 (Frankfurter, J., concurring).

Even when the government invokes national security as the basis for its decisions (which it has not done here), the Supreme Court has declined to embrace notions of national security so broad as to result in complete judicial abdication, including in situations raising serious national security concerns.  As the Court instructed in *Holder v. Humanitarian L. Project*:

> Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role.  We do not defer to the Government's reading of the First Amendment, even when such interests are at stake.

561 U.S. 1, 34 (2010); *see also New York Times*, 403 U.S. at 719 (explaining that national security interests should not be invoked to abrogate fundamental First Amendment rights) (Black, J., concurring); William G. Weaver & Robert M. Pallitto, *State Secrets and Executive Power*, 120 Pol. Sci. Q.  85, 90 (2005).  The First Amendment prohibits "speech manipulation by the government, even in an arguably national security-related setting."  *Jenner & Block*, 2025 WL 1482021, at *12.

17

## II.    THE REVOCATION OF PLAINTIFF'S SECURITY CLEARANCE IS A VIOLATION OF HIS FIRST AMENDMENT RIGHTS

The two primary issues here are whether the revocation of Mr. Zaid's security clearance is justiciable because it was devoid of the required individualized review, and, if so, whether that non-individualized revocation was retaliatory.  To prevail on a First Amendment retaliation claim, a plaintiff must establish that they (i) were engaged in First Amendment-protected activity; (ii) the defendants responded with adverse action that would chill a person of ordinary firmness; and (iii) there was a causal connection between the protected expression and the adverse action taken. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  Here, the first two prongs are not seriously in dispute. *See supra* Part I.A (discussing First Amendment protections for petitioning activity); *infra* Part III (discussing the Presidential Memorandum's chilling effect).  In assessing whether the adverse action is causally linked to First Amendment-protected activities, courts will look to the context surrounding the adverse action.  That context compels the conclusion that the revocation here is causally linked to Mr. Zaid's First Amendment-protected activities.

First, the retaliatory, by-the-batch, revocation effectuated by the Presidential Memorandum at issue in Mr. Zaid's lawsuit is precisely the kind of dogmatic, arbitrary, and patently unreasonable determination that falls outside the normal deference for fact-based determinations contemplated by *Lee*.  Mr. Zaid does not allege that the President mis-assessed his risk to national security because no national security assessment was made, and he does not ask this Court to second-guess a fact-based, case-specific determination regarding his qualification for a security clearance.  He challenges the termination of his security clearance (and those of indeterminate others) *without* any such determinations.  The abrupt and viewpoint-based termination of Plaintiff's security clearance is a violation of the First Amendment this Court has authority to correct.

Second, the public, highly inflammatory revocation of Mr. Zaid's security clearance is part and parcel of a campaign of presidential bullying and retaliation, and the surrounding circumstances make clear that Mr. Zaid's First-Amendment protected activity was the "but for" cause of his inclusion in the Presidential Memorandum. *Nieves v. Bartlett*, 587 U.S. 391, 398-99 (2019) (setting out legal standard for retaliation claim).

As an initial matter, the Presidential Memorandum does not even attempt to put forward a *non*retaliatory motive, relying instead on a breezy and empty reference to the "national interest." *See, e.g.*, *ABA v. U.S. Dep't of Just.*, No. 25-cv-1263-CRC, 2025 WL 1388891, at *8 (D.D.C. May 14, 2025) (concluding that government "has not identified any nonretaliatory DOJ priorities," where it merely stated that revoked grants "no longer aligned with DOJ's priorities"). The "one-fell-swoop" style of the Presidential Memorandum likewise betrays its retaliatory motivation. The individuals named in the memorandum share little, apart from a history of advocating for causes adverse to President Trump. *See id.* Indeed, the press coverage that preceded the Presidential Memorandum forthrightly dubbed the group "numerous antagonists," helpfully listing the political or legal actions each of the targeted people had taken to draw the President's ire.[7]

Courts must also consider context when evaluating retaliatory motive. Contextual evidence of temporal proximity, for example, can satisfy the causation requirement all on its own. *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2005); *ABA*, 2025 WL 1388891, at *6–8 (D.D.C. May 14, 2025) ("Courts may consider a defendant's contemporaneous statements when assessing retaliatory motive." (cleaned up)); *see also Nat'l Treasury Emps. Union v. Trump*, No.

---

[7] Miranda Devine, *Trump stripping the security clearances of numerous antagonists — including NY AG Letitia James, DA Alvin Bragg*, N.Y. Post (Feb. 8, 2025), https://perma.cc/4QS5-7Q68.

25-cv-0935-PLF, 2025 WL 1218044, at *10 (D.D.C. Apr. 28, 2025); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-cv-1030-PLF, 2025 WL 1387331, at *9 (D.D.C. May 14, 2025).

Here, the context surrounding the Presidential Memorandum brings the chain of causation into even sharper focus. Mr. Zaid's first notice that the President intended to revoke his security clearance came just four days after he filed a lawsuit on behalf of FBI employees who alleged they had been targeted because of their participation in the investigation of the January 6 attack on the Capitol. Compl. ¶ 40; Zaid Decl. ¶ 28; *see ABA*, 2025 WL 1388891, at *7. The revocation of Mr. Zaid's clearance without any of the usual procedural protections, Zaid Decl. ¶ 38, further evidences a retaliatory motive. *Cf. Lathram v. Snow*, 336 F.3d 1085, 1093–94 (D.C. Cir. 2003) (holding that a jury could infer discriminatory motive where agency departed from its normal process without justification). And that is to say nothing of the Trump administration's rash of retaliatory actions against other disfavored individuals and entities, many of which have already been enjoined for effectuating impermissible retaliation.[8]

Public officials who are bent on retribution are seldom forthcoming about their motivations. In this case, however, the Presidential Memorandum itself, the statements of President Trump and other executive officials, and the slate of other, unapologetically retributive actions the President has engaged in since taking office, all provide ample context to draw the

---

[8] *See, e.g.*, *Perkins Coie*, 2025 WL 1276857, at *27-38 (retaliatory suspension of security clearances, *inter alia*); *Jenner & Block*, 2025 WL 1482021, at *12 (same); *WilmerHale*, 2025 WL 1502329, at *23 (same); *ABA*, 2025 WL 1388891, at *7-8 (retaliatory revocation of ABA grants); *Associated Press*, 2025 WL 1039572, at *16-17 (retaliatory exclusion from press pool); *Am. Foreign Serv. Ass'n*, v-1030-PLF, 2025 WL 1387331, at *9-10 (D.D.C. May 14, 2025) (retaliatory removal of statutory labor protections); *see also Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685-WGY, 2025 WL 1235084, at *20 (D. Mass. Apr. 29, 2025) (ideological deportations in response to student activism).

conclusion that Mr. Zaid's First-Amendment protected advocacy was the but-for cause of the revocation.

## III. RELIEF IS NEEDED BECAUSE THE REVOCATION OF PLAINTIFF'S SECURITY CLEARANCE HAS IMPACTS FAR BEYOND THIS CASE

Never before has a presidential administration revoked security clearances in broadly publicized executive orders; nor has any administration ever explained to the world that it was revoking security clearances as a means of political retaliation. The effect (perhaps intended) is to send a message to any attorney who considers representing a client or cause the President personally dislikes: oppose Trump and his Administration and you, too, will lose your security clearance. Left unaddressed, Mr. Zaid's security-clearance revocation will cast a pall over the national security bar.

Core to protecting the freedoms of the First Amendment is the long recognized "principle that a government official cannot do indirectly what she is barred from doing directly." *Vullo*, 602 U.S. at 190 (citing *Bantam Books*, 372 U.S. at 67-69). For good reason. Permitting such constitutional evasion would reduce the First Amendment to a "simple semantic exercise." *Velazquez*, 531 U.S. at 547. The activities the President has targeted here—petitioning the government with assistance of counsel—are protected by the First Amendment. *See supra* Part I. The President, therefore, cannot directly suppress that expression. Nor can he evade the First Amendment by seeking to accomplish those ends through indirect means.

In *National Rifle Association of America v. Vullo*, a unanimous Supreme Court reaffirmed that "a government official cannot do indirectly what she is barred from doing directly." 602 U.S. at 190. There, a government official used the threat of regulatory investigations to pressure private companies into terminating relationships with the National Rifle Association, a group the government official disfavored. *Id.* at 181-85. The Constitution prohibits such "jawboning," that

is, the use of "informal censorship" "to evade the constraints that the First Amendment imposes on government's formal powers."  Genevieve Lakier, *Enforcing the First Amendment in an Era of Jawboning*, 93 U. Chicago L. Rev. (forthcoming 2026), at 3.  In *Bantam Books*, the Court looked "through forms to the substance" of what the government was trying to accomplish and recognized that "informal censorship" can violate the First Amendment.  *Bantam Books*, 372 U.S. at 67.  Informal censorship can be effectuated through coercive statements, including threats of legal sanction.  *Id.*; *Button*, 371 U.S. at 433 ("The threat of sanctions may deter the[] exercise [of First Amendment freedoms] almost as potently as the actual application of sanctions.").  *Vullo* reaffirmed what *Bantam Books* first indicated: the First Amendment "prohibits all efforts by governmental actors to coerce the private suppression of speech or to force private parties to disassociate from disfavored speakers."  Lakier, at 47; *Vullo*, 602 U.S. at 190.

The Presidential Memorandum sends a coercive message to any prospective attorney for a national security whistleblower in furtherance of punishing and suppressing both the attorney's and the client's First Amendment-protected activities.  By threatening any attorney that has a security clearance with revocation should they represent anyone whom the President dislikes, the Memorandum informally censors both lawful whistleblowing activity and constitutionally protected legal advocacy on behalf of those who blow the whistle.  *See* Pl.'s Mem. at 30.  The Memorandum engages in the most common jawboning model insofar as it seeks to chill the speech of a third party (whistleblowers) by suppressing the speech of another entity (attorneys).  *See* Jack M. Balkin, *Old-School/New-School Speech Regulation*, 127 Harv. L. Rev. 2296, 2309 (2014).  Yet

*Vullo*'s reasoning also extends *a fortiori* to the Memorandum's direct threats against attorneys themselves.[9]

When assessing jawboning claims, courts look to whether the conduct, "viewed in context, could be reasonably understood to convey a threat of adverse government action" to punish or suppress speech. *Vullo*, 602 U.S. at 191. This is a holistic, context-driven analysis, but non-exhaustive guideposts include: (1) the authority of the government official; (2) the content and purpose of the communications; and (3) the effect of the threats on the target audience. *Id.* at 191-94.

Here, the revocation of Mr. Zaid's clearance is part of the Trump Administration's "'broader campaign' of . . . using the power of the presidency to target individual lawyers and law firms associated with them based on personal dislike of their legal work." *Perkins Coie*, 2025 WL 1276857, at *37. When viewed in that context, Defendants' actions are more threatening than those in *Vullo* and cross well into the territory of unlawful coercion. First, the quintessential perpetrators of jawboning are those in the Executive branch[10]—and there is no doubt that the President wields extraordinary power, including the power to revoke security clearances pursuant to established procedures. Second, the content and transparent purpose of the President's

---

[9] In *Perkins*, Judge Howell applied the *Vullo* informal censorship principle in finding the President's threats of clearance revocation to the law firm Perkins Coie was coercive and intended to suppress Perkins' own expression and was an actionable First Amendment harm. *Perkins*, 2025 WL 1276857, at *21-22; *see also, e.g.*, *Jenner & Block*, 2025 WL 1482021, at *8 (same); *Am. Ass'n of Univ. Professors v. Rubio*, No. 25-cv-10685-WGY, 2025 WL 1235084, at *18-20 (D. Mass. Apr. 29, 2025) (preliminarily rejecting defendants' argument that *Vullo*'s informal censorship analysis did not apply to allegations of a deportation policy based on non-citizens' ideology because plaintiffs alleged that defendants "are acting directly against the would-be speakers"); *Pen Am. Ctr., Inc. v. Trump*, 448 F. Supp. 3d 309, 326 (S.D.N.Y. 2020) (press freedom organization plausibly alleged jawboning claim premised on Trump administration stripping member of press pass and threatening the same to other members).

[10] *See* Paul R. Verkuil, *Jawboning Administrative Agencies: Ex Parte Contacts by the White House*, 80 Colum. L. Rev. 943, 943 & 943 n.1 (1980).

campaign is to punish lawyers that represent those he disfavors. Take for example recent executive orders the President has issued against law firms: each references the firms' representations of clients that were either political or personal opponents of the President and then offers the firms' First Amendment protected activity as its basis. *Perkins Coie*, 2025 WL 1276857, at *32, *37-38. Finally, the reactions of those on the receiving end of these threats reflect their coercive and speech-suppressive nature: nine law firms have cut deals with the Trump administration to provide pro bono legal support for its preferred initiatives to avoid the sanctions in executive orders naming them or in anticipation of such orders.[11] If these powerful law firms "presumably possessing 'ordinary firmness' sought successfully to avoid being targeted by similar Executive branch actions," other lawyers would reasonably seek to avoid the same. *See Perkins Coie*, 2025 WL 1276857, at *32. The coercive effect of the Presidential Memorandum is even more potent than the executive orders targeting the law firms, as here the Memorandum specifically names the attorney who has been marked for punishment by the President. *See* Pl.'s Mem. at 24-25.

At bottom, government officials cannot "use the power of the State to punish or suppress disfavored expression." *Vullo*, 602 U.S. at 188; *accord Perkins Coie*, 2025 WL1276857, at *26. If, for example, Congress were to enact a law that read: "the President may revoke the security clearances of those whose views, or whose clients' views, he dislikes," courts would surely strike it down under the First Amendment. A similar fate would await a policy promulgated by the President forbidding attorneys from representing clients he dislikes or seeking results he disfavors. *See Perkins Coie*, 2025 WL 1276857, at *26. Such a policy would be rank viewpoint

---

[11] *See* Natalie K. Orpett & James Pearce, *The Law Firms' Deals with Trump Are Even Riskier Than They Seem*, Lawfare (May 16, 2025), https://perma.cc/ULX2-DZSL.

discrimination, effectively a prior restraint, and presumptively unconstitutional.[12] *See Velazquez*, 531 U.S. at 548; *Bantam Books*, 372 U.S. at 70; *Jenner & Block*, 2025 WL 1482021, at *8 (explaining that executive order targeting law firm was a type of ongoing retaliation akin to informal censorship and analogous to prior restraints); *see also* Part I.B.   The Presidential Memorandum attempts to achieve those same ends through indirect means.   That, the President cannot do.

President Trump's threats have had their intended effect.   Some law firms have capitulated to the President's demands and lawyers not yet implicated are reluctant to draw his gaze.[13]   Court intervention is needed to end this campaign of coercion.

## CONCLUSION

For all the foregoing reasons, *Amici* respectfully urge the Court to grant Plaintiff Mark Zaid's Motion for Preliminary Injunction.

Dated: May 28, 2025                              Respectfully submitted,

                                                   */s/ David A. Schulz*
                                                   David A. Schulz (#459197)
                                                   Tobin Raju
                                                   Stacy N. Livingston
                                                   John Langford
                                                   MEDIA FREEDOM &
                                                     INFORMATION ACCESS CLINIC

---

[12] Such policies may also run afoul of precedent barring unconstitutional conditions. *Agency for Int'l Dev. v. Alliance for Open Society Inst.*, 570 U.S. 205, 214 (2013) (explaining that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protection freedom of speech even if he has no entitlement to that benefit.") (cleaned up).

[13] *See Perkins Coie*, 2025 WL 1276857, at *30 (detailing law firms "that chose to negotiate deals with the Trump White House to avoid being targeted by similar Executive Orders"); *see also* Michael Birnbaum, *Law Firms Refuse to Represent Trump Opponents in the Wake of His Attacks*, Wash. Post (Mar. 25, 2025), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/ (detailing difficulties individuals with interests adverse to the Trump administration have faced in obtaining legal counsel).

YALE LAW SCHOOL[*]
127 Wall Street
New Haven, CT 06520
(212) 850-6103
schulzd@ballardspahr.com

*Counsel for Amici Curiae First Amendment Scholars*

---

[*] This brief does not purport to offer the institutional views of Yale Law School, if any. Law student Eli Scher-Zagier was integral to the research, drafting, and editing of this brief.