UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARK S. ZAID, ESQ.,

    Plaintiff,

        v.

EXECUTIVE OFFICE OF THE PRESIDENT,
et al.,

    Defendants

Civil Action No. 1:25-cv-1365-AHA

**Amicus Brief of Prof. Aaron H. Caplan Regarding Attainder**

Stephen C. Leckar, D.C. Bar # 281691
Kalbian Hagerty, LLP
888-17th St., NW, Twelfth Floor
Washington, D.C. 20006
Telephone: (202) 223-5600
Facsimile: (202) 223-6625
sleckar@kalbianhagerty.com

Attorney for Amicus
Professor Aaron H. Caplan

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTEREST OF AMICUS ....................................................................................1

INTRODUCTION ..............................................................................................1

ARGUMENT .....................................................................................................2

    A.    The Fifth Amendment Due Process Clause Protects Against Executive Branch Acts of Attainder. ................................................................2

        1.    The Framers Knew and Loathed Bills of Attainder. ..........................2

        2.    Precedents Applying the Attainder Clauses ......................................6

        3.    Bills and Acts of Attainder Threaten Bedrock Constitutional Values. ..........................................................................................10

        4.    Like the Legislative Branch, the Executive Branch Has No Power to Impose Attainder. .......................................................................12

    B.    The Complaint States A Claim of Attainder Violation. ................................16

        1.    The Memorandum Specifies Who Will Be Affected. ..........................16

        2.    The Memorandum Imposes Punishment. ..........................................17

    C.    Attainder Theory Perfectly Matches the Facts and Circumstances of This Case. .................................................................................................20

CONCLUSION ................................................................................................22

CERTIFICATE OF COMPLIANCE ....................................................................23

CERTIFICATE OF SERVICE ...........................................................................23

# TABLE OF AUTHORITIES

## Cases

*Biden v. Knight First Amendment Institute*,
    141 S.Ct. 1220 (2021) .................................................................................. 13

*Board of Regenets v. Roth*,
    408 U.S. 564 (172) ...................................................................................... 19

*Calder v. Bull*,
    3 U.S. 386 (1798) ........................................................................................ 21

*Campbell v. District of Columbia*,
    894 F.3d 281 (D.C. Cir. 2018) ...................................................................... 9

\* *Cummings v. Missouri*,
    71 U.S. 277 (1866) ............................................................................... *passim*

*Dent v. West Virginia*,
    129 U.S. 114 (1889) ............................................................................ 13, 17

\* *Ex Parte Garland*,
    71 U.S. 333 (1866) .............................................................................. *passim*

*Ex Parte Wall*,
    107 U.S. 265 (1883) ..................................................................................... 14

*Flemming v. Nestor*,
    363 U.S. 603 (1960) ..................................................................................... 17

*Fletcher v. Peck*,
    10 U.S. 87 (1810) ........................................................................................ 11

*Foretich v. United States*,
    351 F.3d 1198 (D.C. Cir. 2003) ................................................................... 16

*Hawker v. New York*,
    170 U.S. 189 (1898) ............................................................................... 14, 17

*INS v. Chadha*,
    462 U.S. 919 (1983) ..................................................................................... 11

*Jenkins v. McKeithen*,
    395 U.S. 411 (1969) ..................................................................................... 18

*Jenner & Block LLP v. U.S. Department of Justice*,
  2025 WL 1482021 (D.D. C. May 23, 2025) ........................................................22

\* *Joint Anti-Fascist Refugee Committee v. McGrath*,
  341 U.S. 123 (1951) ...............................................................................*passim*

*Jones v. Brim*,
  165 U.S. 180 (1897)............................................................................................14

*Kennedy v. Mendoza-Martinez*,
  372 U.S. 144 (1963) ..........................................................................................17

*Lynce v. Mathis*,
  519 U.S. 433 (1997) ..........................................................................................16

*Nixon v. Administrator of General Services*,
  433 U.S. 425 (1977) ..........................................................................................20

*Palko v. Connecticut*,
  302 U.S. 319 (1937)............................................................................................13

*Perkins Coie LLP v. U.S. Department of Justice*,
  2025 WL 1276857 (D.D.C. May 2, 2025) ........................................................22

*Peters v. Hobby*,
  349 U.S. 331 (1955) ..............................................................................................8

\* *Pierce v. Carskadon*,
  83 U.S. 234 (1872) ...............................................................................*passim*

*The Slaughterhouse Cases*,
  83 U.S. 36 (1872)...............................................................................................16

*Timbs v. Indiana*,
  586 U.S. 146 (2019)............................................................................................13

*Trump v. Hawai'i*,
  585 U.S. 667 (2018)............................................................................................13

\* *United States v. Brown*,
  381 U.S. 437 (1965)...............................................................................*passim*

\* *United States v. Lovett*,
  328 U.S. 303 (1946)...............................................................................*passim*

*Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of The President,*
   2025 WL 1502329 (D.D.C. May 27, 2025) ..............................................................22

*Wisconsin v. Constantineau,*
   400 U.S. 433 (1971) ..................................................................................................9

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ................................................................................................14

## Court Rules

Local Civil Rule 7(o)(5) ................................................................................................ 1

FRAP 29(a)(4) .............................................................................................................. 1

## Constitutional Provisions

Art. I, §3, cl. 6 (Impeachment Trial Clause) .............................................................. 11

Art. I, §9, cl. 3 (Federal Attainder Clause) .................................................................. 5

Art. I, §10, cl. 1 (State Attainder Clause) ..................................................................... 5

Art. II, §3 (Take Care Clause) .................................................................................... 14

Art. III, § 3, cl. 1 (Treason Clause) ........................................................................ 4, 11

Art. III, § 3, cl. 2 (Attainder of Treason Clause) ......................................................... 4

Amendment 14, § 1 (Privileges or Immunities Clause) .......................................... 15, 19

## Other Authorities

* Aaron H. Caplan, *Nonattainder as a Liberty Interest,* 2010 Wis. L. Rev. 1203 ....... *passim*

*The Federalist Papers* (1788) ................................................................................... 3, 5

Christopher R. Green, *Justice Gorsuch and Moral Reality,*
   70 Alabama L. Rev. 635 (2019) .............................................................................. 14

David Kairys, *The Bill of Attainder Clauses and Legislative and Administrative*
   *Suppression of "Subversives,"* 67 Colum. L. Rev. 1490 (1967) ............................ 12

\* Harold Hongju Koh et al., "No, The President Cannot Issue Bills of Attainder,"
JUST SECURITY (April 9, 2025), available at
https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/,
archived at https://perma.cc/2EWF-AFG5 ................................................... 4, 5, 15

Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause*,
18 St. Thomas L. Rev. 177 (2005) ............................................................3

Joel Feinberg, *The Expressive Function of Punishment*, in DOING AND DESERVING:
ESSAYS IN THE THEORY OF RESPONSIBILITY (1970) .................................................18

John Hart Ely, *A Suggested Approach to the Bill of Attainder Clause*,
72 Yale L.J. 330 (1962) ....................................................................... 10

Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES (1833)... 5, 11

Laurence Tribe, AMERICAN CONSTITUTIONAL LAW (2nd Ed. 1988) ................................... 12

Matthew Steilen, *Bills of Attainder*, 53 Hous. L. Rev. 767 (2016)...................................... 12

Note, *Beyond Process: A Substantive Rationale for the Bill of Attainder Clause*,
70 Va. L. Rev. 475 (1984) ......................................................................21

Note, *The Supreme Court, 1964 Term,* 79 Harv. L. Rev. 105 (1965) ................................ 12

Thomas Jefferson, *Notes on the State of Virginia* (1787) ....................................13

William Blackstone, COMMENTARY ON THE LAWS OF ENGLAND (1765) .............................2

Zechariah Chafee, Jr., THREE HUMAN RIGHTS IN THE CONSTITUTION OF 1787 (1956) ........3

**INTEREST OF AMICUS[1]**

Amicus Aaron H. Caplan is a Professor of Law at LMU Loyola Law School in Los Angeles. His teaching includes many subjects germane to this litigation, including Constitutional Law, First Amendment, Professional Responsibility, and Civil Procedure. He is the author of a casebook titled *An Integrated Approach to Constitutional Law* (Foundation Press 3rd Ed. 2023), and has published articles examining the interaction of due process and free speech principles. Of greatest importance to this brief is his article explaining how executive branch blacklisting can violate due process by depriving the liberty interest against acts of attainder. *Nonattainder as a Liberty Interest*, 2010 Wis. L. Rev. 1203 (hereafter, *Nonattainder*).

**INTRODUCTION**

Plaintiff Mark Zaid alleges that his security clearance – which is crucial to his law practice representing members of the US military and intelligence communities – was summarily withdrawn in a Presidential decree that singled him out for politically-motivated punishment without trial or any other process. Among other theories, the complaint alleges that this executive punishment violates rights protected by the Attainder Clause of the U.S. Constitution, Art. I, §9, cl. 3. Docket #1, ¶¶ 89 - 92 (Count VI of complaint). On these facts, attainder is more than just a metaphor: it is an independent basis for judgment. Executive branch *acts* of attainder violate constitutional rights in the same manner, and for the same reasons, as legislative branch *bills* of attainder.

---

[1] Pursuant to Local Civil Rule 7(o)(5) (incorporating FRAP 29(a)(4)), counsel for amicus certifies that no counsel for a party authored this brief in whole or in part, and that no person other than amicus or his counsel made a monetary contribution to the brief's preparation or submission, apart from reimbursement from LMU Loyola Law School for clerical expenses.

In addition to any other reasons offered by Mr. Zaid, defendants' motion to dismiss should be denied because plaintiff states a claim for an attainder violation. Given the number of issues in this case, and the relative unfamiliarity of the relevant history and case law for most of the bench and bar, this brief explains in greater detail how the executive action alleged in the complaint violates plaintiff's rights against acts of attainder.

## ARGUMENT

**A.    The Fifth Amendment Due Process Clause Protects Against Executive Branch Acts of Attainder.**

### 1.    The Framers Knew and Loathed Bills of Attainder.

Under the English law inherited by the newly independent U.S. States, "attainder" was an especially harsh form of punishment typically reserved for treason or other crimes against the state. Attainder went beyond the death penalty for the traitor, also preventing any inheritance of land or title by the traitor's descendants. 4 William Blackstone, COMMENTARY ON THE LAWS OF ENGLAND 374 (1765) ("the consequences of attainder are forfeiture, and corruption of blood").

In England, attainder could result from a successful criminal prosecution before the judiciary, or from a non-judicial declaration of guilt by Parliament. *Id.* at 256. These "bills of attainder" – first used in the 1300s and last imposed in 1798 – were acts of Parliament that would specify an individual (typically one suspected of disloyalty or unhealthy political ambition), declare the specified person guilty of some sort of wrongdoing, and then decree the punishment to be imposed. Parliament also had the ability to pass a "bill of pains and penalties" to impose punishments less severe than attainder. Famous bills of attainder, such as that imposed against the Earl of Strafford in 1641, were well known in the Founders' generation. Parliament disliked Strafford, a nobleman and military leader who had been given much power by Charles I. Parliament attempted to impeach Strafford to remove him from power, but there was no proof

2

that he had committed any impeachable offenses. Undeterred by the failure of impeachment, Parliament instead enacted a bill of attainder declaring Strafford guilty of treason and commanding punishment. Unlike the quasi-judicial impeachment process, a bill of attainder required no weighing of evidence. See Zechariah Chafee, Jr., THREE HUMAN RIGHTS IN THE CONSTITUTION OF 1787, at 109–13 (1956) (describing the Strafford attainder in the American imagination).

During the Revolutionary War, the legislatures of the newly-independent American States often passed bills of attainder against British loyalists. In 1779, the New York legislature declared that 59 loyalists were guilty of the novel offense of having "voluntarily been adherent" to King George III; however, the attainted New Yorkers forfeited their property but were given the option of banishment in lieu of execution. John Jay wrote that "New York is disgraced by injustice too palpable to admit even of palliation." *Id.* at 93. Thomas Jefferson had a role in enacting a Virginia bill of attainder against a Tory named Josiah Phillips in 1778, but he later lamented that a political body had "decided rights which should have been left to *judiciary controversy*." *The Federalist* #48 (February 1, 1788) (original emphasis), quoting Thomas Jefferson, *Notes on the State of Virginia* (1787). See Jacob Reynolds, *The Rule of Law and the Origins of the Bill of Attainder Clause*, 18 St. Thomas L. Rev. 177, 193-200 (2005).

This wave of State-law attainders often included as targets the attorneys who might represent the legislatures' perceived enemies.

> As Revolutionary fervor swept through the colonies, attorneys associated with loyalist interests found themselves particularly vulnerable. Everyone understood that the surest way to curtail loyalist power was to limit their access to legal representation. … Accordingly, New Jersey closed its courts to Loyalist attorneys. Pennsylvania extended bills of pains and penalties to lawyers and other professionals, effectively destroying their livelihoods without judicial process. New York suspended Tory lawyers' right to practice their profession.

3

Harold Hongju Koh et al., *No, The President Cannot Issue Bills of Attainder*, JUST SECURITY (April 9, 2025), available at https://www.justsecurity.org/110109/president-cannot-issue-attainder-bills/, archived at https://perma.cc/2EWF-AFG5 (hereafter, Koh).

After war fever subsided and the Articles of Confederation of 1781 revealed their shortcomings, delegates gathered in Philadelphia in 1787 to draft our current Constitution. There was unanimous agreement that attainder was a vestige of tyranny that should have no place in the new nation. As ultimately ratified, the Constitution addressed attainder in the two locations necessary to close off the judicial and political paths by which attainder had been imposed under English and early American law.

For the judicial path, the Framers recognized that the accusation of treason had been misused for centuries. To ensure that unfounded or nebulous claims of disloyalty did not become the basis for criminal charges, Art. III, §3, cl. 1 imposed substantive and procedural limits that would allow treason prosecutions only under narrow circumstances. Next, Art. III, § 3, cl. 2 specified that "no attainder of treason shall work corruption of blood, or [permanent] forfeiture" of property.

For the political path, the Framers understood that English and early American law did not allow the king or a state governor to unilaterally impose attainder. By the 1400s, "the law was settled: even where a bill of attainder was introduced on the king's behalf, the Executive could not issue the bill alone: the consent of both branches of Parliament was requisite." Koh, *supra*. Not even Henry VIII – who sought attainder against hundreds of opponents – thought he could inflict this punishment unilaterally, instead asking Parliament to pass bills. For the Framers, this history meant that a purely executive attainder had never been allowed. Non-judicial attainder required the joint action of legislature and executive working together to pass

and sign a bill and then to enforce it. As a result, it would be sufficient to halt the legislative portion of the process. "The attainder was the king's instrument as much as Parliament's, and the Framers understood it as an abuse of governmental power broadly conceived, not merely a legislative excess. Thus, America's president, with powers much inferior to those of the British Crown, cannot claim a power even the king did not possess." Koh, *supra*.

The language effectuating this ban was straightforward. At the federal level, "No bill of attainder or ex post facto law shall be passed." Art. I, §9, cl. 3. The same prohibition was repeated for the states. Art. I, §10, cl. 1 ("No State shall … pass any bill of attainder [or] ex post facto law"). The linkage of bills of attainder and ex post facto laws made sense, because the attainder power would allow a legislature to punish people for conduct that was not criminal at the time it was performed.

The Attainder Clauses were adopted unanimously and without debate. *United States v. Brown*, 381 U.S. 437, 441 (1965). In *The Federalist* #44 (January 25, 1788), James Madison wrote that bills of attainder "are contrary to the first principles of the social compact, and to every principle of sound legislation." A few decades later, Joseph Story explained that when enacting bills of attainder, the legislature exercises "what may be properly deemed an irresponsible despotic discretion, being governed solely by what it deems political necessity or expediency, and too often under the influence of unreasonable fears, or unfounded suspicions. … The injustice and iniquity of such acts, in general, constitute an irresistible argument against the existence of the power." 3 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES §678 at 484-85 (1833). The Constitution's ban on bills of attainder has consistently been interpreted to also ban "bills of pains and penalties" that impose punishment less severe than execution. *Cummings v. Missouri*, 71 U.S. 277, 323 (1866).

### 2.    Precedents Applying the Attainder Clauses

### a)    Decisions Finding Bill of Attainder Violations

The Supreme Court has invalidated laws under the Attainder Clauses on five occasions.

Each involved enactments that singled out suspected political opponents for punishment during

times of intense political polarization.

Several laws enacted in 1865, in the wake of the Civil War, were aimed at the supporters

of the vanquished Confederacy. These laws denied legal rights to people who could not swear an

oath that they had not supported the Confederacy – a group that could be reduced to a finite list

of named persons. The state law in *Cummings v. Missouri*, 71 U.S. 277 (1866) denied business

and occupational licenses to those who could not take the oath. (The challenger in *Cummings*

was a member of the clergy, but the statute would also reach licensed attorneys.) The Court

found the Missouri law to be an unconstitutional bill of attainder. It specified the persons to be

affected as "a whole class," even if they were not identified by name, *id.* at 323; the denial of

otherwise available business licenses constituted punishment, *id.* at 320; and of course there was

no trial, *id.* at 329. The federal law in the companion case *Ex Parte Garland*, 71 U.S. 333 (1866),

prohibited any person who could not take the oath from acting as an attorney in the federal

courts. The Supreme Court also invalidated that law, because it effectively specified which

people would receive punishment for past disloyalty. *Id.* at 377. A few years later, *Pierce v.

Carskadon*, 83 U.S. 234, 239 (1872), invalidated a West Virginia law that barred former

Confederates from collecting debts in that state's courts. The law's unconstitutionality was so

obvious that the Court resolved it in a two-sentence opinion citing *Cummings* and *Garland*.

The Supreme Court next encountered bills of attainder during the mid-twentieth century's

politically fraught anti-Communist turmoil. *United States v. Lovett*, 328 U.S. 303 (1946),

involved three employees of federal agencies who, along with a few dozen others, had been

denounced on the floor of Congress by Rep. Martin Dies, the chair of the House Committee on Un-American Activities. Dies called the employees "irresponsible, unrepresentative, crackpot, radical bureaucrats" and affiliates of "communist front organizations." *Id.* at 308-09. The Committee then conducted hearings and determined that the three had engaged in "subversive activity" – a deliberately vague term not defined by statute but invented by the Committee for purposes of the investigation. *Id.* at 311-12 & n.3. Armed with this dubious finding, Congress included a proviso in an appropriations bill forbidding use of the funds "to pay any part of the salary, or other compensation for the personal services, of Goodwin B. Watson, William E. Dodd, Jr., and Robert Morss Lovett." *Id.* at 305 n.1. The Court held that even though Congress had the power of the purse, it could not use that power to specify persons for punishment without trial. *Id.* at 316-17.

The federal statute in *United States v. Brown*, 381 U.S. 437 (1965), was not as blatant as the *Lovett* statute in naming specific individuals, but it named a group with a finite and identifiable membership: the Communist Party. Specifically, the statute made it a crime for any member of the Communist Party to serve as an officer or employee of a labor union. *Brown* held that this was a specification of targeted individuals, *id.* at 461; that it imposed punishment, *id.* at 457-58; and of course it provided no trial. "The purpose of the statute before us is to purge the governing boards of labor unions of those whom Congress regards as guilty of subversive acts and associations." *Id.* at 460. The Court accordingly found the statute to be "void as a bill of attainder." *Id.* at 440.

### b)  Decisions Analogous to Bill of Attainder Violations

Beyond the five cases where a Court majority found a violation of the Attainder Clauses, several other cases struck down blacklisting laws on various grounds, while at least one justice

also relied on the Attainder Clauses. *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951), involved President Truman's Executive Order 9835 of 1947, sometimes known as "The Loyalty Order." The Loyalty Order directed the U.S. Attorney General to make a list of organizations deemed "totalitarian, fascist, communist or subversive." The list would be given to the Loyalty Review Board of the Civil Service Commission, which in turn would encourage federal agencies to use the list to dismiss employees on grounds of disloyalty. When several organizations challenged their listing, five Justices issued five separate opinions explaining why the blacklisting was improper. None received more than two votes. Justice Burton (joined by Justice Douglas) held that the act was *ultra vires* because "patently arbitrary" decisions on whether an organization was subversive exceeded Executive Order's scope. *Id.* at 137-38. Justice Douglas's solo concurrence found a combination of due process violations, including vagueness, lack of notice, and lack of opportunity to be heard. *Id.* at 176. Justice Jackson found a due process violation in the lack of a hearing, *id.* at 187, while Justice Frankfurter's wordy concurrence found a violation "when judged by our whole experience with the Due Process Clause," *id.* at 165. Justice Black argued that the blacklisting violated the Due Process Clause and the First Amendment – and the Attainder Clause.

> Officially prepared and proclaimed governmental blacklists possess almost every quality of bills of attainder, the use of which was from the beginning forbidden to both national and state governments. It is true that the classic bill of attainder was a condemnation by the legislature following investigation by that body, while in the present case the Attorney General performed the official tasks. But I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution.

*Id.* at 143-44 (Black, J., concurring).

The plaintiff in *Peters v. Hobby*, 349 U.S. 331 (1955), lost a federal position under the same Loyalty Order. He had been cleared of accusations by his own agency, but the Loyalty

Review Board *sua sponte* reopened an investigation that led to his dismissal. Citing doctrines of constitutional avoidance, *id.* at 338, the majority decided the case on *ultra vires* grounds: the Executive Order empowered the Board to review dismissal recommendations, not to initiate them. *Id.* at 339-40. Concurring separately, Justice Douglas found it necessary to reach the constitutional questions, *id.* at 350, which included the right to confront accusers and the lack of even the "rudiments of a fair trial." *Id.* at 351. Justice Douglas also analogized the case to an executive branch act of attainder: "If [plaintiff] were condemned by Congress and made ineligible for government employment, he would suffer a bill of attainder, outlawed by the Constitution. An administrative agency – the creature of Congress – certainly cannot exercise powers that Congress itself is barred from asserting." *Id.* at 352. Justice Black expressed agreement with the Douglas dissent. *Id.* at 349.

Finally, in *Wisconsin v. Constantineau,* 400 U.S. 433 (1971), a local police chief instructed taverns and liquor stores not to sell any alcohol to the plaintiff. In an opinion that became the source of the due process "stigma-plus" doctrine, *see*, *e.g.*, *Campbell v. District of Columbia*, 894 F.3d 281, 284 (D.C. Cir. 2018), the majority found that "when a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." 400 U.S. at 437. Justice Black, joined by Justice Blackmun, dissented on jurisdictional grounds, but he agreed that if state law authorized the blacklisting described in plaintiff's complaint, it would be unconstitutional. "The effect of such sweeping powers, if there is nothing else in the State's law to limit them, is practically the same as that of an old common-law bill of attainder. … And here the Wisconsin law purports on its face to place such arbitrary and tyrannical power in the hands of minor officers and others that these modern bills of attainder can be issued *ex parte*, without notice or hearing of any kind or

character. It is impossible for me to believe that the Supreme Court of Wisconsin would uphold any such boundless power over the lives and liberties of its citizens." *Id.* at 444. See *Nonattainder* at 1215-27 & 1263-64 (examining *Constantineau*).

Significantly, no opinion of any justice in these cases ever rejected the invocations of attainder principles by Justices Black, Douglas, and Blackmun.

### 3.    Bills and Acts of Attainder Threaten Bedrock Constitutional Values.

Bills and acts of attainder threaten several constitutional values that are relevant to the present case.

#### a)    Procedural Fairness

By insisting that punishment for wrongdoing be channeled into judicial forums, the attainder ban demands procedural fairness. Courts, after all, are governed by the many procedural protections of Article III and of the Fifth and Sixth Amendments. In the political branches, by comparison, anything goes. Punishment could be imposed on the basis of hearsay evidence, knowingly false evidence, or no evidence at all. Punishment could be motivated by whim, jealousy, or cruelty. No method exists for the accused to mount a defense, because unlike courts, political actors are not constrained by the adversarial system and are not required to state reasons for their decisions. See *Nonattainder* at 1232-34.

#### b)    Separation of Powers

The Attainder Clause has a profound relationship to separation of powers. Prof. John Hart Ely's influential student note, *The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause*, 72 Yale L.J. 330 (1962), was among the first to connect the Attainder Clauses to separation of powers. For Ely, the Attainder Clause kept the legislature from invading the province of the judiciary in much the same way that the Article III case or

controversy requirement kept the judiciary from intruding into the role of the legislature. *Id.* at 343. The Attainder Clause prevents any single branch of government from acting simultaneously as lawmaker, prosecutor, judge, jury, and executioner.

Ely's reasoning was endorsed in *Brown*, which confirmed that "the Bill of Attainder Clause was intended not as a narrow, technical (and soon to be outmoded) prohibition [on a specific form of legislation], but rather as an implementation of the separation of powers." 381 U.S. at 442. See also *INS v. Chadha*, 462 U.S. 919, 962 (1983) (Powell, J., concurring).

### c)        Political Persecution

The Attainder Clauses belong to a cluster of constitutional provisions designed to avoid political persecution. *Nonattainder* at 1236-37. These include a narrow definition of treason in Art. III, § 3, cl. 1, and an impeachment process that requires Senators to act "on oath or affirmation," Art. I, § 3, cl. 6, which demarcates impeachment from ordinary legislative activity and requires Senators to mentally view themselves as judge and jury, rather than as purely political actors. Along the same lines, the founding generation understood that attainder was a symptom of, and a goad to, unchecked political passion and vindictiveness. Justice Story observed that "in the hands of a reigning faction, [the power of attainder] might be, and probably would be, abused to the ruin and death of the most virtuous citizens. Bills of this sort have been most usually passed in England in times of rebellion, or of gross subserviency to the crown, or of violent political excitements; periods, in which all nations are most liable (as well the free, as the enslaved) to forget their duties, and to trample upon the rights and liberties of others." 3 Joseph Story, COMMENTARIES at 484-85 (1833). Chief Justice John Marshall observed that the ban on attainder helps avoid "the violent acts which might grow out of the feelings of the moment" and

"those sudden and strong passions to which men are exposed." *Fletcher v. Peck*, 10 U.S. 87, 137-38 (1810).

**4.    Like the Legislative Branch, the Executive Branch Has No Power to Impose Attainder.**

A legislative branch bill of attainder is tyranny of the majority in its purest form: on majority vote, a person is declared a wrongdoer and punished without trial. An executive branch act of attainder imposed through executive order is an even more concentrated form of tyranny. It imposes the same harms to the constitutional values described above as a legislative bill of attainder does.

Application of the Attainder Clauses to executive action has scholarly support. "It would make no sense to view the ban [on attainder] as less applicable to executive officers or administrative agencies than to legislative assemblies." Laurence Tribe, AMERICAN CONSTITUTIONAL LAW §10-6 at 661 (2nd Ed. 1988), citing Note, *The Supreme Court, 1964 Term,* 79 Harv. L. Rev. 105, 121 (1965) (the Attainder Clauses should be understood "not to prohibit trial by a particular *body* but rather to prohibit trial by legislative *method*, that is, to assure a defendant adequate judicial safeguards regardless of what body tries him") (emphasis added by Tribe). See also Matthew Steilen, *Bills of Attainder*, 53 Hous. L. Rev. 767, 891 (2016) ("the primary purpose of the Bill of Attainder Clauses was to prohibit a summary form of *proceeding,* rather than a proceeding in a certain *body*"); David Kairys, *The Bill of Attainder Clauses and Legislative and Administrative Suppression of "Subversives,"* 67 Colum. L. Rev. 1490, 1500-02 (1967) ("no principled distinction can be made, for the purposes of the bill of attainder clauses, between legislatures and administrative agencies").

The Constitution's text contains three paths that extend Art. I bill of attainder principles to the executive branch.

12

a)    **Due Process**

The Due Process Clauses protect against wrongful deprivation of "liberty," a term that incorporates "fundamental" rights. *Timbs v. Indiana*, 586 U.S. 146, 150 (2019). And the Fifth Amendment Due Process Clause binds all branches of the federal government, the executive branch included. This type of incorporation across branches – which we might call "horizontal incorporation" – explains why the President must respect First Amendment rights, even though that Amendment is phrased in terms of the powers of "Congress." See, e.g., *Biden v. Knight First Amendment Institute*, 141 S.Ct. 1220 (2021) (Thomas, J., concurring) (assessing Presidential compliance with the Speech Clause); *Trump v. Hawai'i*, 585 U.S. 667 (2018) (assessing Presidential compliance with the Establishment Clause). Under any possible standard for determining whether a right is fundamental enough to be incorporated, the Attainder Clause qualifies. Given the horrors that flowed from English bills of attainder, it is no exaggeration to say that "neither liberty nor justice would exist" if they were allowed. *Palko v. Connecticut*, 302 U.S. 319, 326 (1937).

Two cases from the late nineteenth century illustrate how the Supreme Court has treated freedom from attainder as a due process liberty interest.

The state law in *Dent v. West Virginia,* 129 U.S. 114 (1889), denied medical licenses to persons who had not attended medical school. The case was framed as a due process challenge. The word "attainder" appears nowhere in the opinion, but the result turned entirely on Attainder Clause precedents. The opinion included a string cite to five cases for the proposition that the "great purpose" of the Due Process Clause "is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizen." *Id.* at 124. But to resolve the case, the opinion gave close discussion of only three precedents: *Cummings*, *Garland*, and *Pierce*. *Id* at

13

125-28. The majority correctly concluded that these cases were distinguishable, and that the West Virginia law was not a forbidden bill of attainder.

The law in *Hawker v. New York*, 170 U.S. 189 (1898), denied medical licenses to convicted felons. This time, the challenge was framed purely in terms of the Attainder Clause, and the defendant relied largely on *Cummings* and *Garland*. *Id.* at 198. In upholding the law, the Court relied extensively on the due process decision in *Dent*, while also citing other due process precedents like *Jones v. Brim,* 165 U.S. 180 (1897), and *Ex Parte Wall*, 107 U.S. 265 (1883). Together, *Dent* and *Hawker* show that freedom from attainder has long been viewed as a liberty protected by the Due Process Clauses.

### b)      Legislative Supremacy and the Take Care Clause

From the founding until sometime after the Civil War, legislative supremacy was the dominant constitutional paradigm. This meant, among other things, that Congress must take the lead in initiating federal policy. Once Congress spoke, the President's role was to "take care that the laws be faithfully executed." Art. II, §3. Not until later in our history did it become accepted that a President could ever initiate wholly new governmental policy in the absence of legislation or an executive power enumerated or implied in Art. II. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) (describing a "zone of twilight" that might allow Presidential action where Congress is silent). The framing-era understanding of legislative supremacy meant that if Congress could make no law on certain subjects – such as freedom of speech and religion in the First Amendment – the executive would necessarily lack power to act in those arenas. See Christopher R. Green, *Justice Gorsuch and Moral Reality*, 70 Alabama L. Rev. 635, 659-661 (2019). For this reason, the Framers would have felt no need to specify in Art. II that the President could not independently impose attainders. The President

may only faithfully execute laws that are allowed to exist. He therefore may not duplicate or unilaterally impose through executive action any type of law forbidden by Art. I, § 9, be it attainder, ex post facto punishment, suspending habeas corpus in peacetime, granting titles of nobility, accepting emoluments from foreign princes without Congressional approval, or establishing preferences among ports of different states.

Even without reference to the Take Care clause, the history behind the Attainder Clauses provides further structural evidence that the President is barred from imposing acts of attainder, even though the language accomplishing this appears in Art. I. Unless it were somehow enacted over a veto, a bill of attainder will become law only with the President's involvement through the Art. I presentment requirement. As Prof. Koh asks: "How could a president alone have the authority to issue by executive order what would be unconstitutional if enacted with his signature and congressional approval?" Koh, *supra.*

### c)      Privileges or Immunities of Citizens of the United States

Section 1 of the Fourteenth Amendment directs that no State shall "make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." No directly parallel language expressly states that the *federal* government may not make or enforce laws that abridge privileges or immunities of citizens of the United States, but it is a necessary inference. A privilege or immunity that the federal government is free to abridge could not possibly be a privilege or immunity of a citizen of the United States.

One purpose of the new language in the Fourteenth Amendment's Privileges or Immunities Clause was to ensure that the States could not do what the United States was already forbidden from doing. The words "make or enforce" in the new amendment reflected the existing understanding that the federal legislature could not "make," and the federal executive branch

could not "enforce," any decree with the force of law that would abridge federal privileges or immunities.

Admittedly, the much-criticized decision in *The Slaughterhouse Cases*, 83 U.S. 36 (1872), defined "the privileges or immunities of citizens of the United States" very narrowly But even under that decision, the protected privileges or immunities include those rights that "owe their existence to the Federal government, its national character, its Constitution, or its laws," *Id.* at 79. Freedom from federal-level attainder is undoubtedly a right that owes its existence to the federal government and its Constitution. Since it is a privilege or immunity of citizens of the United States, it is protected against violation by the States, Congress, and the President.

**B.    The Complaint States a Claim of Attainder Violation.**

When an act of Congress is challenged as a bill of attainder, courts ask if the law is "singling out disfavored persons and meting out summary punishment for past conduct." *Lynce v. Mathis*, 519 U.S. 433, 440 n.12 (1997). Phrased as a set of elements, the D.C. Circuit has distilled it to two: "a law is prohibited under the bill of attainder clause if it (1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (internal citation and punctuation omitted). "Both 'specificity' and 'punishment' must be shown before a law is condemned as a bill of attainder." *Id.* This same framework can be applied to Plaintiff's challenge to the executive branch Memorandum revoking security clearances.

**1.    The Memorandum Specifies Who Will Be Affected.**

The Memorandum on its face specifies whose security clearances will be revoked, identifying Plaintiff by name.

It makes no difference that other people are also on the list. Many of the historical bills of attainder, like the New York act of 1779 or the appropriations rider in *Lovett*, contained a list of

people all considered subversive for related reasons. Although it was possible to attaint a single person in a single bill, as with the Earl of Strafford, separate legislation for each target was never required.

### 2. The Memorandum Imposes Punishment.

Several constitutional provisions come into play only when punishment is threatened, including the Attainder Clauses, the Ex Post Facto Clauses, the Double Jeopardy Clause, the Self-Incrimination Clause, and the Cruel and Unusual Punishment Clause. See *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963) (listing factors that help identify punishment); *Flemming v. Nestor*, 363 U.S. 603, 616 (1960) ("Each case [defining punishment] has turned on its own highly particularized context"); *Nonattainder* at 1245-59 (under the Attainder Clauses, the essence of punishment is harsh retaliatory treatment imposed as a response to perceived wrongdoing). In some cases, it may be a fairly debatable question whether a governmental action is punishment, as opposed to acceptable regulation of conduct. Indeed, the hybrid attainder and due process opinions in *Dent* and *Hawker* both used a "punishment v. regulation" framing.

Denial or revocation of a security clearance will not always be punishment that would give rise to a constitutional claim. But on a motion to dismiss where the facts are viewed in the light most favorable to the plaintiff, Zaid has adequately alleged that under these circumstances revocation of his security clearance is punitive. In no small part, this can be seen in the resemblance between the Memorandum and its historical forbears. Thwarting a person's ability to pursue a trade is a routine feature of American attainders, as seen in *Cummings*, *Garland*, *Lovett*, and *Brown*. "Disqualification from the pursuits of a lawful avocation, or from positions of trust, *or from the privilege of appearing in the courts*, or acting as an executor, administrator, or guardian, may also [be], and often has been, imposed as punishment." *Cummings*, 71 U.S. at

320 (emphasis added). The Civil War attainders all took aim at the ability of politically

disfavored people from accessing the courts, from the licensure ban that would reach attorneys in

*Cummings*, to the ban on practice in federal courts in *Garland*, to the banning of certain clients'

claims in *Pierce*. Many of the State-level bills of attainder in the 1770s had targeted the lawyers

of British loyalists as a way of disadvantaging their clients.

It is also no coincidence that the Memorandum and the accompanying pejorative

statements from the President and other officials were deliberately crafted to stigmatize Plaintiff.

Some criminal law theorists propose that stigma is an indispensable feature of punishment.

"Punishment is a conventional device for the expression of attitudes of resentment and

indignation, and of judgments of disapproval and reprobation … Punishment, in short, has a

symbolic significance largely missing from other kinds of penalties." Joel Feinberg, *The*

*Expressive Function of Punishment*, in Doing And Deserving: Essays In The Theory Of

Responsibility 98 (1970). Amicus does not believe that stigma is a necessary feature of every

punishment, but stigmatization is one way that attainder does its punitive work. *Nonattainder* at

1256.

An apt authority for treating official pronouncements of wrongdoing (without more) as a

form of punishment is *Jenkins v. McKeithen*, 395 U.S. 411 (1969), another splintered opinion

about blacklisting. The case involved Louisiana's Labor-Management Commission of Inquiry,

which had no law enforcement power, but could hold one-sided hearings and issue findings that

named individuals had committed crimes incident to labor union activity. The plurality observed

that the Commission "very clearly exercises an accusatory function" and that the Commission "is

used to find named individuals guilty of violating the criminal laws of Louisiana and the United

States and to brand them as criminals in public." *Id.* at 427-28. Where such accusations are a

government agency's sole function, the Due Process Clauses require it to provide trial-like

procedures such as a right to call witnesses and confront accusers. Indeed, "the rigorous

protections relevant to criminal prosecutions might well be the controlling starting point." *Id.* at

428 (internal citation omitted). In his concurrence, Justice Black came close to analyzing *Jenkins*

as an Attainder Clause case. He said the law was "nothing more nor less than a scheme for a

nonjudicial tribunal to charge, try, convict, and punish people without courts, without juries,

without lawyers, without witnesses – in short, without any of the procedural protections that the

Bill of Rights provides." *Id.* at 432-33.

Finally, defendants argue that "access to classified information is a privilege, not a right."

Docket #22 at 29 (Motion to Dismiss). The rights/privileges distinction, once considered

persuasive in due process cases, has largely been abandoned as empty formalism.  "The Court

has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once

seemed to govern the applicability of procedural due process rights." *Board of Regents v. Roth*,

408 U.S. 564, 571 (1972). The Privileges or Immunities Clause on its face acknowledges

protection for "privileges." And it would contradict Attainder Clause precedent to say that denial

of a "privilege" that is not constitutionally specified can, by definition, never be punishment.

Consider the right to practice law in federal courts from *Garland*, the right to seek judicial

enforcement of a debt in *Pierce,* or the right to be paid for one's government employment in

*Lovett*.  Moreover, the Attainder Clauses are not limited to burdens that resemble criminal

punishment: to the contrary, the Attainder Clauses have long been understood to forbid both bills

of attainder and bills of pains and penalties (connoting any less severe punishment). *Cummings*,

71 U.S. at 323. "The deprivation of any rights, civil or political, previously enjoyed, may be

punishment, the circumstances attending and the causes of the deprivation determining this fact."

19

*Id.* at 320. The Supreme Court "often has looked beyond mere historical experience" of the forms of punishment "traditionally judged to be prohibited," and instead recognized that "new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee." *Nixon v. Administrator of General Services,* 433 U.S. 425, 475 (1977).

**C.    Attainder Theory Perfectly Matches the Facts and Circumstances of This Case.**

As exemplified by the splintered opinions in *McGrath*, government actions that raise attainder objections are likely to implicate multiple legal theories. This is because bills and acts of attainder are so noxious that they inevitably offend numerous constitutional principles.

Here, Plaintiff alleges that the Memorandum violates the First Amendment rights of speech, association, and petition; the right to counsel; and many varieties of procedural rights, including due process. Freedom from attainder belongs on the list of liberty interests implicated by this case. Highlighting the attainder argument has an additional benefit as a basis for decision: it allows reference to pertinent cases whose facts are alarmingly on point.

Like *Cummings, Garland, Lovett*, and *McGrath*, the Memorandum employs nonjudicial processes to punish perceived political opponents. It escapes no one's notice that Plaintiff is included in a list that includes people the President considers his enemies, including political opponents (Hillary Clinton, Joe Biden and people associated with them), figures from his first impeachment (Liz Cheney, Adam Kinzinger, Fiona Hill, Alexander Vindman), and prosecutors who brought charges against him when he did not hold office (Letitia James, Alvin Bragg). It does not purport to be a list of people who mishandled classified information but instead is a list of people who criticized or opposed the President.

Like *Lovett, McGrath,* and *Constantineau*, the Memorandum identifies the disfavored party by name. Like *Lovett*, the Memorandum formed part of a public denunciation that was

20

intended to stigmatize and deter others from associating with the denounced party. Like *Cummings* and *Lovett*, the Memorandum builds upon powers that are capable of being used in a non-punitive manner but twists them into unmistakably punitive forms. Like *Lovett,* the Memorandum seeks to withhold lawfully obtained financial benefits. Like *Cummings, Garland, Lovett, Brown, McGrath,* and *Peters*, the Memorandum attacks employment. Like *Garland* and the early American bills of attainder, the Memorandum specifically targets lawyers and cripples their ability to perform their constitutionally significant duties. Like *Lovett*, the Memorandum depicts lawful past conduct as somehow wrongful, according to vague or unstated standards newly concocted for the occasion. And like *McGrath* and *Peters*, the quest to punish leads to procedural shortcuts and deviation from established practices.

The complaint adequately alleges that the Memorandum and its surrounding statements constitute punishment of an attorney who is perceived by those in power as politically threatening – or associated with such people. As Justice Iredell observed in *Calder v. Bull*, 3 U.S. 386, 399-400 (1798), "attainders, on the principle of retaliation and proscription, have marked all the vicissitudes of party triumph." The reference to "party triumph" indicates one of the core separation of powers concerns behind the Attainder Clauses, namely that the political branches are not well situated to do work customarily viewed as judicial. Indeed, attainders can be especially dangerous when used to punish political activity protected by the First Amendment. See Note, *Beyond Process: A Substantive Rationale for the Bill of Attainder Clause*, 70 Va. L. Rev. 475, 500–01 (1984).

The President's withdrawal of Plaintiff's security clearance is alleged to flow from a desire for personal vengeance with roots in his first impeachment. But it is part of a larger pattern of attacks on the independence of the legal profession. Many of the other people stripped of

security clearances in the Memorandum are also lawyers involved in representation that displeased the President (including Jacob Sullivan, Lisa Monaco, Norman Eisen, Letitia James, Alvin Bragg, and Andrew Weissmann). Other judges of this Court have granted summary judgment against the President's Executive Orders singling out specific law firms for harsh treatment because they represented clients or hired employees that the President considered political enemies. See *Perkins Coie LLP v. U.S. Department of Justice*, 2025 WL 1276857 (D.D.C. May 2, 2025); *Jenner & Block LLP v. U.S. Department of Justice*, 2025 WL 1482021 (D.D.C. May 23, 2025); and *Wilmer Cutler Pickering Hale & Dorr LLP v. Executive Office of The President*, 2025 WL 1502329 (D.D.C. May 27, 2025). Plaintiff's allegations of politically-driven punishment of an attorney should be considered in a similar light.

## CONCLUSION

In addition to other grounds that may justify it, Defendants' motion to dismiss should be denied because the complaint states a claim of attainder violation. Plaintiff should be allowed to demonstrate at trial or on summary judgment that he was specified for punishment without trial.

Dated: June 13, 2025        Respectfully submitted,

KALBIAN HAGERTY, LLP

By:     /s/ Stephen C. Leckar
         Stephen C. Leckar
           (Bar No. 281691)
         888 17th Street, N.W.
         Suite 1200
         Washington, D.C. 20006
         Telephone: (202) 223-5600
         Facsimile: (202) 223-6625
         sleckar@kalbianhagerty.com

Attorney for Professor Amicus
Aaron H. Caplan

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7(o), I hereby certify that this brief conforms to the requirements of Local Rule 5.4, complies with the requirements set forth in FRAP 29(a)(4), and does not exceed 25 pages in length.

## CERTIFICATE OF SERVICE

I hereby certify on June 13, 2025 that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

By:    /s/ Stephen C. Leckar
Stephen C. Leckar