**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARK S. ZAID, ESQ.

        Plaintiff,

    v.

EXECUTIVE OFFICE OF THE PRESIDENT,
*et al*.

        Defendants.

Civil Action No.: 1:25-cv-1365-AHA

**PLAINTIFF'S COMBINED MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND
IN REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................2

ARGUMENT .........................................................................................................................4

    I.      LEGAL STANDARD.................................................................................................4

        A.    Motion to Dismiss................................................................................................4

        B.    Preliminary Injunction .......................................................................................5

    II.     CONSTITUTIONAL CLAIMS AS TO THE SECURITY CLEARANCE PROCESS
          ARE REVIEWABLE .................................................................................................5

        A.    District and Circuit precedent make clear that challenges to methods and
            processes, like the challenge raised here, are not precluded by *Egan* or *Lee*. .............5

        B.    "Existing law" controls and the March 22, 2025 Rescinding Security Clearances
            Memorandum superseded nothing. ...............................................................................8

    III.    THE COMPLAINT PROPERLY STATES—AND SUCCEEDS ON—ALL
          CLAIMS ....................................................................................................................10

        A.    Count One properly alleges an APA claim to defeat a motion to dismiss and
            is likely to succeed on the merits. ...............................................................................10

        B.    Counts Two, Four, and Five adequately allege Fifth Amendment claims to
            defeat a motion to dismiss and are likely to succeed on the merits. .........................11

           1.    Count Two (Procedural Due Process).......................................................................12

           2.    Count Four (Vagueness) ...........................................................................................14

           3.    Count Five (Right to Counsel)...................................................................................15

        C.    Count Three adequately alleges First Amendment claims to defeat a motion to
            dismiss and is likely to succeed on the merits. ..........................................................16

           1.    Defendants' actions violate the Right to Petition Clause..........................................16

           2.    Defendants' actions violate Freedom of Speech and Association. ............................17

        D.    Count Six adequately alleges a Bill of Attainder claim to defeat a motion
            to dismiss. ...................................................................................................................18

           1.    The Constitution's prohibition on Bills of Attainder applies to the President...........18

a. The Framers intended to ban attainder in all its forms................................................18

b. The Rescinding Security Clearances Memorandum is a "bill" because it was meant to have the force and effect of law. ....................................................................20

c. Other prohibitions in Article I have been applied to Article II, and the Bill of Attainder Clause is no different. ..................................................................................23

    2.    The March 22, 2025 Presidential Memorandum functions as a Bill of Attainder.....25

a. Historical meaning of punishment ............................................................................27

b. Lack of non-punitive purposes.................................................................................28

c. Intent to punish.........................................................................................................29

IV.    A PRELIMINARY INJUNCTION IS WARRANTED ................................................31

    A.    Mr. Zaid's harm is irreparable, and the balance of the equities and public interest favor an injunction. .....................................................................................................31

    B.    The Complaint need not list specific officials for injunctive relief. ..........................32

CONCLUSION...................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Al-Aulaqi v. Panetta,*
   35 F. Supp. 3d 56 (D.D.C. 2014)...................................................................22

*Ams. for Clean Energy v. EPA,*
   864 F.3d 691 (D.C. Cir. 2017)......................................................................10

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................................4

*Atherton v. D.C. Office of the Mayor,*
   567 F.3d 672 (D.C. Cir. 2009).......................................................................4

*Bailey v. Fulwood,*
   793 F.3d 127 (D.C. Cir. 2015)...................................................................23, 24

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ......................................................................................4

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002).......................................................................22

*Borough of Duryea v. Guarnieri,*
   564 U.S. 379 (2011) ....................................................................................16

*Browning v. Clinton,*
   292 F.3d 235 (D.C. Cir. 2002).......................................................................4

*Caplin & Drysdale, Chartered v. United States,*
   491 U.S. 617 (1989) ....................................................................................15

*Clark v. Library of Congress,*
   750 F.2d 89 (D.C. Cir. 1984).......................................................................33

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ......................................................................................9

*Ctr. for Democracy & Tech. v. Trump,*
   507 F. Supp. 3d 213 (D.D.C. 2020)..............................................................15

*Cummings v. Missouri,*
   71 U.S. 277 (1866) ..................................................................................21, 27

*Davis v. Dist. of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) ................................................................ 32

*Dehainaut v. Pena*,
    32 F.3d 1066 (7th Cir. 1994) ............................................................. 23, 24

*\*Dep't of Navy v. Egan*,
    484 U.S. 518 (1988) .................................................................... *passim*

*Doe v. Austin*,
    2024 WL 864270 (D.D.C. Feb. 29, 2024) ........................................... 12

*Doe v. Cheney*,
    885 F. 2d 898 (D.C. Cir. 1989) .............................................................. 12

*\*Ex parte Garland*,
    71 U.S. 333 (1866) ............................................................................. 27, 28

*Ex parte Merryman*,
    17 F. Cas. 144 (C.C.D. Md. 1861) ...................................................... 24, 25

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ............................................................................... 14

*Gordon v. Holder*,
    721 F.3d 638 (D.C. Cir. 2013) ............................................................... 32

*Grayscale Invs., LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023) .............................................................. 10

*Gregorio v. Hoover*,
    238 F. Supp. 3d 37 (D.D.C. 2017) ........................................................... 4

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ............................................................................... 24

*Hettinga v. United States*,
    677 F.3d 471 (D.C. Cir. 2012) ................................................................. 4

*Hoffa v. Saxbe*,
    378 F. Supp. 1221 (D.D.C. 1974) .......................................................... 22

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
    417 F.3d 1299 (D.C. Cir. 2005) ............................................................... 2

*Jenner & Block LLP v. U.S. Dep't of Just.,
    2025 WL 1482021 (D.D.C. May 23, 2025) ................................................... passim

Joint Anti-Fascist Refugee Comm. v. McGrath,
    341 U.S. 123 (1951) ................................................................................ 20, 24

Kowal v. MCI Commc'ns Corp.,
    16 F.3d 1271 (D.C. Cir. 1994) ........................................................................ 4

Kowalski v. Tesmer,
    543 U.S. 125 (2004) ...................................................................................... 17

League of United Latin Am. Citizens v. Exec. Off. of the President,
    2025 WL 1187730 (D.D.C. Apr. 24, 2025) ................................................... 21

*Lee v. Garland,
    120 F.4th 880 (D.C. Cir. 2024) ................................................................ passim

Martinez v. Ryan,
    566 U.S. 1 (2012) .......................................................................................... 15

Meyer v. Grant,
    486 U.S. 414 (1988) ........................................................................................ 2

Mills v. Dist. of Columbia,
    571 F.3d 1304 (D.C. Cir. 2009) ..................................................................... 32

National Fed'n of Fed. Emps. v. Greenberg,
    983 F.2d 286 (D.C. Cir. 1993) .................................................................. passim

Nieves v. Bartlett,
    587 U.S. 391 (2019) ...................................................................................... 17

*Nixon v. Adm'r of Gen. Servs.,
    433 U.S. 425 (1977) ................................................................................ 26, 29

O'Donnell v. Barry,
    148 F.3d 1126 (D.C. Cir. 1998) ..................................................................... 12

Oryszak v. Sullivan,
    576 F.3d 522 (D.C. Cir. 2009) ....................................................................... 11

Paradissiotis v. Rubin,
    171 F.3d 983 (5th Cir. 1999) ......................................................................... 22

*Paredes v. Garland,*
   2023 WL 8648830 (D.D.C. Dec. 14, 2023) ............................................................. 4

*\*Perkins Coie LLP v. U.S. Dep't of Just.,*
   2025 WL 1276857 (D.D.C. May 2, 2025).................................................................*passim*

*Powell v. Alabama,*
   287 U.S. 45 (1932) ...................................................................................................... 15

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
   831 F.3d 500 (D.C. Cir. 2016)..................................................................................... 5

*Ramirez v. U.S. Immigr. & Customs Enf't,*
   471 F. Supp. 3d 88 (D.D.C. 2020)............................................................................. 10

*Rattigan v. Holder,*
   689 F.3d 765 (D.C. Cir. 2012)................................................................................. 6, 7

*Romero v. Dep't of Defense,*
   527 F.3d 1324 (Fed. Cir. 2008) .................................................................................. 8

*Schuler v. United States,*
   617 F.2d 605 (D.C. Cir. 1979).................................................................................... 4

*\*Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.,*
   468 U.S. 841 (1984) ..............................................................................................*passim*

*Sherley v. Sebelius,*
   644 F.3d 388 (D.C. Cir. 2011).................................................................................... 5

*Trump v. Thompson,*
   20 F.4th 10 (D.C. Cir. 2021) ...................................................................................... 9

*U.S. Dep't of Labor v. Triplett,*
   494 U.S. 715 (1990) .................................................................................................. 15

*United States v. Brown,*
   381 U.S. 437 (1965) ..............................................................................................*passim*

*United States v. Lovett,*
   328 U.S. 303 (1946) ..............................................................................................*passim*

*\*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President,*
   2025 WL 1502329 (D.D.C. May 27, 2025)...........................................................*passim*

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................ 5

*Wisconsin v. Constantineau*,
  400 U.S. 433 (1971) ...................................................................................... 13

\*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ............................................................................... *passim*

**Statutes**

U.S. Const. art. I, § 7 ......................................................................................... 19

U.S. Const. art. I, § 9, cl. 2 ............................................................................... 24

U.S. Const. art. I, § 9, cl. 3 ........................................................................ 19, 23

U.S. Const. art. I, § 9, cl. 8 ............................................................................... 23

U.S. Const. art. I, § 10, cl. 1 ..................................................................... 19, 23

5 U.S.C. § 702 ........................................................................................... 33, 34

50 U.S.C. § 3002 ............................................................................................... 11

50 U.S.C. § 3162a ...................................................................................... 8, 9, 22

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................ *passim*

D.C. R. Prof'l Conduct 1.3 ............................................................................... 13

# INTRODUCTION

Despite three consecutive rulings from three different courts within this District holding the exact opposite, Defendants continue to insist that summary, arbitrary, process-less revocations of security clearances are non-justiciable. They attempt to expand the holdings in *Egan* and *Lee*, misapplying them to the facts and claims raised here. They assert that the March 22, 2025 Rescinding Security Clearances Memorandum (the "Memorandum") automatically overrides decades' worth of law, procedures, and policy related to security clearance adjudication. Defendants make this claim notwithstanding the Memorandum's total silence as to recission or supersession, and despite its affirmative reliance on "existing law."

Under both the Fed. R. Civ. P. 12(b)(6) and the preliminary injunction standards, Mr. Zaid's claims survive and advance. Constitutional violations related to the denial of security clearance adjudicative processes are reviewable. The Memorandum superseded nothing. Defendants' actions violated the Administrative Procedure Act, the First and Fifth Amendments, and the Bill of Attainder Clause. Mr. Zaid's claims will succeed on the merits, the balance of equities supports an injunction, and he will continue to suffer irreparable harm without one. Through this consolidated filing, he respectfully asks that this Court deny Defendants' Motion to Dismiss and grant Plaintiff's Motion for a Preliminary Injunction.

## FACTUAL BACKGROUND

This consolidated Opposition and Reply Brief to Defendants' Motion to Dismiss and Opposition to Plaintiff's Motion for Preliminary Injunction (ECF No. 22-1), respectively, relies upon and incorporates by reference the factual background outlined in the Complaint (ECF No. 1, "Compl.") and Plaintiff's Memorandum of Law in Support of his Motion for a Preliminary Injunction (ECF No. 9-1, "MPI"), including its associated Declarations (ECF Nos. 9-2, 9-3), Expert Report (ECF No. 9-4), and associated exhibits (ECF Nos. 9-5 through 9-18).  In light of Defendants' briefing, certain facts from within these filings are worth recalling here.

### *The March 22, 2025 Memorandum*

The Memorandum states unequivocally that its recipients, the "Heads of the Executive Departments and Agencies," must act "consistent with existing law."  MPI Exhibit ("Ex.") 2, ECF No. 9-6 contains absolutely no reference to rescission or supersession of past Executive Orders, agency directives, or other Presidential Memoranda.  The individuals listed in the Memorandum fit neatly into one category: people who have spoken out against President Trump through protected speech.  Whether they are lawyers who have overseen or directly litigated cases adverse to him (Lisa Monaco, Mark Zaid, Norman Eisen, Letitia James, Alvin Bragg, and Andrew Weissmann), political rivals who criticized his conduct (Antony Blinken, Jacob Sullivan, Hillary Clinton, Elizabeth Cheney, Kamala Harris, Adam Kinzinger, Joseph R. Biden, Jr.), or witnesses in his impeachment hearings (Fiona Hill, Alexander Vindman), each of the named individuals has engaged in some form of speech where First Amendment protection is "at its zenith."  *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1305 (D.C. Cir. 2005) (quoting *Meyer v. Grant*, 486 U.S. 414, 425 (1988)).  This is what drew the President's ire.

### *Security Clearance Adjudication*

The authoritative security clearance documents included as Exhibits to the preliminary injunction motion and cited in J. William Leonard's Export Report ("Leonard Rep.," ECF No. 9-4) each include citations to their own sources of authority. For example, the SEAD-4 Adjudicative Guidelines and the Intelligence Community Policy Guidance No. 704-3, MPI Exs. 12 (ECF No. 9-16) and 13 (ECF No. 9-17), respectively, each cite the National Security Act of 1947, as amended, at the top of their sources of authority. They also cite other legislatively-implemented authorities like the Intelligence Reform and Terrorism Prevent Act and the Counterintelligence Enhancement Act, as well as various Executive Orders.

The SF-86 continues to be the primary document to initiate a clearance determination. Compl. ¶ 24, n.3. It expressly asks about past revocations. Ex. 15[1]; Zaid Decl. ¶ 47. In Section 25, applicants are required to answer the following Yes or No question:

> 25.2 Have you EVER had a security clearance eligibility/access authorization denied, suspended, or revoked? (Note: An administrative downgrade or administrative termination of a security clearance is not a revocation.).

Ex. 15 (capitalization in original).

Beneath Question 25.2 are two small boxes, "Entry 1" and "Entry 2," which the applicant is required to complete if the answer to Question 25.2 is "YES." The form requires the applicant to provide the date of the denial, the name of the agency that denied, and an explanation as to the reasons for denial. *Id*. The available space to provide "an explanation of the circumstances of the denial, suspension or revocation action" is limited. Currently, Mr. Zaid's revocations exceed the number of "entries" envisioned for this question. *See* Exs. 3 (ECF No. 9-7 (revocation by DCSA)), 4 (ECF No. 9-8 (revocation by CIA)), 5 (ECF No. 9-9 (revocation by ODNI)).

---

[1] Exhibit numbers continue in sequence from Plaintiff's Motion for Preliminary Injunction.

## ARGUMENT

### I.    LEGAL STANDARD

#### A.    Motion to Dismiss

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) 'tests the legal sufficiency of a complaint.'" *Paredes v. Garland*, No. CV 20-1255 (EGS), 2023 WL 8648830, at *7 (D.D.C. Dec. 14, 2023) (quoting *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)). A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), "a judge must accept as true all of the factual allegations contained in the complaint." *Gregorio v. Hoover*, 238 F. Supp. 3d 37, 45 (D.D.C. 2017) (citing *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009)). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (a court must also give the plaintiff the "benefit of all inferences that can be derived from the facts alleged."). Taken as true, a complaint's factual allegations need only rise above the speculative level. *Twombly*, 550 U.S. at 555. A claim is "plausible on its face" when the facts pled in the complaint allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

### B.  Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  When, as here, the government is a defendant, the third and fourth factors merge.  *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## II.  CONSTITUTIONAL CLAIMS AS TO THE SECURITY CLEARANCE PROCESS ARE REVIEWABLE

### A.  District and Circuit precedent make clear that challenges to methods and processes, like the challenge raised here, are not precluded by *Egan* or *Lee*.

Despite successive rulings within this District to the contrary, in their opposition to a preliminary injunction and motion to dismiss, Defendants persist in their misguided assertions that this Court cannot review constitutional violations related to the adjudicative *process*.  They do this by recasting Mr. Zaid's requested relief as judicial review of a security clearance *decision*.  True, he is requesting for his status to revert back the posture held prior to Defendants' unlawful actions.  But he is not seeking a determination from this Court as to his *eligibility*.  He is simply requesting that the agencies follow their own required procedures to adjudicate a clearance.

At the time Mr. Zaid moved for a preliminary injunction, only one of four cases involving similarly targeted law firms had received a ruling on this issue.  *Perkins Coie LLP v. U.S. Dep't of Just.*, No. CV 25-716 (BAH), 2025 WL 1276857, at *20 (D.D.C. May 2, 2025).  Since that time, two more have followed.   In *Jenner and Block LLP v. U.S. Dep't of Just.*, No. CV 25-916 (JDB), 2025 WL 1482021 (D.D.C. May 23, 2025) and *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, No. CV 25-917 (RJL), 2025 WL 1502329 (D.D.C. May 27, 2025), both Judge

Bates and Judge Leon found neither *Dep't of Navy v. Egan*, 484 U.S. 518 (1988) nor *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024) barred their review of the plaintiffs' claims. Nevertheless, Defendants press their same rejected arguments here, insisting that those cases stand for something they do not. Defendants' Brief (ECF No. 22-1, "Def. Br.") at 8-19.[2]

In *Jenner*, Judge Bates acknowledged the clear holding of *Lee* that "courts may not second-guess 'an Executive Branch decision to deny or revoke a security clearance.'" *Jenner* at *10 (quoting *Lee*, 120 F.4th at 891). But he recognized that *Lee*'s holding spoke to decisions made by "trained Security Division personnel" using "predictive judgment[s]" about threats to national security. *Id*. at *11 (citing *Lee* and *Rattigan v. Holder*, 689 F.3d 765, 768 (D.C. Cir. 2012)). As in *Jenner*, the decision to revoke Mr. Zaid's clearance was not initiated by trained Security Division personnel using predictive judgments, but rather by agency heads reacting robotically to a Presidential Memorandum. Compl. ¶ 65. Reviewing this "bespoke" process "raises none of the concerns that make individual security-clearance determinations nonjusticiable." *Jenner* at *11. The *Jenner* decision observed that refusing to review an agency's process would "bless blanket security-clearance suspensions for all Muslims, Catholics, or disabled people." *Id*. This is precisely the point made by Mr. Zaid in his Complaint. Compl. ¶ 3 ("Indeed, what has befallen Mr. Zaid, for exercising his constitutional rights and for enabling his clients to exercise their own, is no different than if Defendants had blanketly revoked the clearances of a person or group because of some other protected category, such as race, gender or ethnicity.").

In *Wilmer*, Judge Leon similarly pointed out that *Lee* confirmed that "not every case touching on national security lies beyond judicial cognizance," and the Administration's blanket

---

[2] Unless otherwise noted, page numbers denoted in ECF citations herein indicate the pagination assigned by the ECF system.

suspension of Wilmer Hale employees' clearances fell fairly within judicial review.  *Wilmer* at

*11 (citing *Lee*, 120 F. 4th at 891).  He correctly noted that there, as in this case, "at issue here is

not the *merits* of any individual's suspension, but the *process* involved in the blanket suspension."

*Id*. (emphasis added).  Like Judge Howell in *Perkins Coie* and Judge Bates in *Jenner*, Judge Leon

found that *National Federation of Federal Employees. v. Greenberg*, 983 F.2d 286 (D.C. Cir.

1993) controlled on this point.  He noted that "[o]ur Circuit found that it could hear these

challenges, since the issue was 'the constitutionality of the methods used to gather information on

which such judgments presumably will be based,' not the 'discretionary judgments regarding a

particular employee's security clearance.'"  *Id*. at *12 (quoting *Greenberg*, 983 F.2d at 290); *see

also Jenner* at *11 ("courts may hear 'constitutional claims arising from the clearance revocation

process.'") (citations omitted; emphasis in original).  Judicial review of security clearances can

thus be organized into those reviewing the "ends" (a nonjusticiable, merits-based decision) and the

"means" (methods and processes subject to judicial review).  *Greenberg* used the following

hypothetical to drive home this point:

> Suppose the President has unlimited and judicially unreviewable constitutional
> power to determine which Executive Branch employees will be given access to the
> nation's secrets. No one would suggest the government therefore could, despite the
> Fourth Amendment, conduct random searches without warrants in the hope of
> uncovering information about employees seeking security clearances. Still less
> would anyone consider such unconstitutional searches and seizures to be immune
> from judicial review. The government may have considerable leeway to determine
> what information it needs from employees holding security clearances and how to
> go about getting it. But a large measure of discretion gives rise to judicial deference,
> not immunity from judicial review of constitutional claims.

*Greenberg*, 983 F.2d at 290.

If this District's decisions in *Perkins Coie*, *Jenner*, and *Wilmer* and the Circuit's decisions

in *Rattigan*, *Greenberg*, and *Lee* were not enough, one need look no further than the Government's

own argument in *Lee*'s precursor, *Egan*:

> We agree with the Board that it may examine whether the agency made such a determination [to revoke a security clearance], that is, whether the agency had procedures for denying or revoking clearances and whether the procedures were followed. The Board also could, in an appropriate case, find that a determination was not validly made because the employee was not afforded procedural protections guaranteed to him by the agency's regulations (such as notice, a statement of reasons for the proposed denial or revocation, and an opportunity to respond).

Brief for the Petitioner, *Dep't of the Navy v. Egan*, 484 U.S. 518 (1988), 1987 WL 880362, at *24–25 (emphasis in original); *see also Romero v. Dep't of Defense*, 527 F.3d 1324, 1329 (Fed. Cir. 2008) (quoting from the government's brief in *Egan*).

The Memorandum operates as a blanket suspension. Leonard Rep. ¶¶ 37-40 ("Indeed, it is just as 'blanket' of a revocation as [the *Perkins Coie* Executive Order], which would have the exact same effect if it had listed the approximately 1,200 employees of the subject law firm."). It follows none of the required procedures for security clearance adjudication. Id. ¶¶ 36, 41-43. Just as this Court could review any other constitutional violation committed by an Executive Branch claiming unlimited discretion, *Greenberg*, 983 F.2d at 290, so, too, can this case proceed.

> **B.**    **"Existing law" controls and the March 22, 2025 Rescinding Security Clearances Memorandum superseded nothing.**

Defendants' argument that "the President is not bound by EOs" is unavailing. Def. Br. at 15. As an initial matter, whether this is actually true is irrelevant. The Memorandum "direct[ed]" that executive departmental and agency heads act "consistent with existing law." MPI Ex. 2. Existing law at the time of the Memorandum included longstanding Executive Orders, agency directives, and policy guidance. *See* MPI at 28-30. These documents have not been blowing in the wind. The principles and procedures outlined in them have since been codified by Congress. For example, 50 U.S.C. § 3162a designates the Director of National Intelligence as the "Security Executive Agent for all departments and agencies of the United States." It explains that part of her duties is, "[u]nless otherwise designated by law, to serve as the final authority to designate a

Federal agency or agencies to determine eligibility for access to classified information or eligibility to hold a sensitive position in accordance with Executive Order No. 12968[.]" *Id*. at § 3162a(b)(5). While the same statute does provide for a "successor order" as a source of authority, 50 U.S.C. § 3162a(c)(5), the Memorandum is not a successor order.

The 2000 Office of Legal Counsel Opinion on which Defendants rely says as much. "Moreover, as with an executive order, a presidential directive would not lose its legal effectiveness upon a change of administration. Rather, in our view, because a presidential directive issues from the Office of the Chief Executive, it would remain in force, unless otherwise specified, pending any future presidential action." *Legal Effectiveness of A Presidential Directive, As Compared to an Exec. Ord.*, 24 U.S. Op. Off. Legal Counsel 29 (2000). Here, the Memorandum does not "otherwise specif[y]" because it does not so much as hint at the words "rescind" or "supersede." Nor could it. The paucity of actual content in the Memorandum could not believably replace the fulsome directives of EOs 10865, 12968, and 13467. Outside of the actual directive to revoke, the Memorandum is nothing more than a list of people the President dislikes. Perhaps most significantly, the Memorandum *relies on "existing law."*

Nothing in the Memorandum either expressly or impliedly revokes, supersedes, or suspends prior Executive Orders or agency actions. *See generally Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021) (relying on the binding nature of past executive orders). Moreover, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

### III.    THE COMPLAINT PROPERLY STATES—AND SUCCEEDS ON—ALL CLAIMS

#### A.    Count One properly alleges an APA claim to defeat a motion to dismiss and is likely to succeed on the merits.

Defendants' arguments as to Count One are repetitions of their arguments as to justiciability.    Def. Br. at 19-21.    But the D.C. Circuit's position on APA claims is entirely consistent with its approval of reviewing security clearances processes rather than decisions. "[T]he question is not what [the Court] would have done, nor whether [the Court] agree[s] with the agency action," but "whether the agency action was reasonable and reasonably explained." *Ams. for Clean Energy v. EPA*, 864 F.3d 691, 726 (D.C. Cir. 2017)  (internal quotations omitted).

The Court can see for itself the robust policies and procedures that have been built over the past seven decades.  *See* MPI Exs. 9-14.  "An agency acts arbitrarily and capriciously in violation of the APA when it makes a decision that is not based on a consideration of the relevant factors or fails to follow the necessary procedural requirements." *Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F. Supp. 3d 88, 182 (D.D.C. 2020).  "[D]issimilar treatment of evidently identical cases is the quintessence of arbitrariness and caprice." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (internal quotations omitted).  Here, the agency heads flouted the necessary procedural requirements, notwithstanding that they were directed to act "consistent with existing law."  Tellingly, Mr. Zaid maintained one of the highest clearance levels—TS/SCI—throughout 2024.  Compl. ¶ 38.  His treatment, then, of being deprived of these revocation procedures is markedly "dissimilar" to identical cases where cleared individuals' eligibility was called into question.  Mr. Zaid's position is even more compelling, as his own work involves assisting clients with challenging denials and revocations of their security clearances.  *Id*. at ¶ 22.  Part of his core practice involves operating within the framework of procedures that he is now being denied.  *Id*.

*Oryszak v. Sullivan*, 576 F.3d 522 (D.C. Cir. 2009) provides no escape hatch for Defendants here. Def. Br. at 10, 14, 20. If anything, its holding fortifies that the APA is the appropriate vehicle for challenging security decision processes. Consistent with its decisions in *Lee* and *Greenberg*, the D.C. Circuit in *Oryszak* agreed with the district court that "decision" on the merits of a clearance "was committed to agency discretion." *Oryszak*, 576 F.3d at 524. But its decision rested on *Egan*, where, as cited above, the Government itself admitted that processes were reviewable. Perhaps more presciently to Defendants' arguments, *Oryszak* took note that as the Commander in Chief, "the President has constitutional authority, *subject to appropriate limitation by the Congress*, 'to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information.'" *Id*. at 525 (citing *Egan*, 484 U.S. at 527) (emphasis added). Here, Congress indicated its approval of the prudence demonstrated by past EOs when it codified them into law. *See, e.g.*, 50 U.S.C. § 3002 ("In enacting this chapter, it is the intent of Congress to . . . provide for the establishment of integrated policies and procedures for the departments, agencies, and functions of the Government relating to the national security.").

**B.    Counts Two, Four, and Five adequately allege Fifth Amendment claims to defeat a motion to dismiss and are likely to succeed on the merits.**

Taking all of the allegations in the Complaint as true, as one must under a Rule 12(b)(6) standard, Mr. Zaid has adequately alleged three separate Fifth Amendment violations. Given the similarities between these arguments and those of recent plaintiffs within this District who obtained similar injunctions, these Counts are likely to succeed the merits.

### 1.    Count Two (Procedural Due Process)

Defendants' portray Mr. Zaid's procedural due process claim as centered around a property interest. It is not. They direct much of their argument against Count Two towards this straw man. Def. Br. at 24-25. As outlined in the MPI, the harm generated by the allegations of Count Two is in Mr. Zaid's liberty interests. MPI at 32. And contrary to their assertions, *Doe v. Cheney*, 885 F. 2d 898 (D.C. Cir. 1989), does not refute a liberty interest in maintaining a security clearance. Def. Br. at 23. *Cheney* stands for the proposition that there *is* a liberty interest at stake when a security clearance is denied. The plaintiff in that case simply did not meet the standard factually. Notably, the Court found that he had "received appropriate process." *Cheney*, 885 F. 2d at 910. He received notice of the agency's concerns, consideration by a board of appraisal, was able to submit written materials in his own support, and even interacted directly with the head of the agency. *Id*. It would have been unnecessary for the court to go through this analysis if there was not a liberty interest on the line. By contrast, not a single one of those measures happened here, and Mr. Zaid's reliance on his security clearance to enable him to continue his chosen profession is just as crucial to him as it was to the federal employee in *Cheney*. *See, e.g.*, Compl. ¶¶. 22-33, 54.

Courts within this District have plainly disagreed with Defendants' arguments as to liberty interests. *Doe v. Austin*, No. CV 22-3474 (RC), 2024 WL 864270, at *12 (D.D.C. Feb. 29, 2024) ("Defendant argues that Plaintiff could not have a protected interest in a security clearance. The Court disagrees with that broad assertion.") (collecting cases). This makes sense, as "[t]he Constitution protects an individual's 'right to follow a chosen trade or profession' without governmental interference." *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998).

The Government's contention that Mr. Zaid "may still practice law and may argue in court," Def. Br. at 24, rings hollow. As alleged in the Complaint, Mr. Zaid has been denied access to classified documents in active cases and has been forced to turn down new clients. Compl. ¶¶

50, 51, 54. No lawyer could ethically "still practice law" or "argue in court" for a client in a lawsuit while knowing that he could not view the underlying complaint or review the discovery necessary to analyze his case. *See* D.C. R. Prof'l Conduct l .3(a) (requiring a lawyer to "represent a client zealously and diligently within the bounds of the law") *and* D.C.R. Prof'l Conduct 1.3, cmt. [l] ("The duty of a lawyer, both to the client and to the legal system, is to represent the client zealously within the bounds of the law, including the Rules of Professional Conduct and other enforceable professional regulations, such as agency regulations applicable to lawyers practicing before the agency.").

As to the effect of Defendants' actions on Mr. Zaid's reputation, Defendants opt for the head-in-the-sand approach to the reprehensible behavior by Executive Branch leadership that has accompanied his revocation. Even if it is true that a security clearance denial is not, by itself, a mark on one's reputation, that conclusion assumes that a denial followed proper procedures and was not nationally televised.[3] What has happened here has no precedent. Never before has the revocation of an individual's security clearance been nationally publicized in such a cavalier, mocking, and degrading fashion. *See* Compl. ¶¶ 36, 37, 41, 42, 52, 53, (describing the President's comments that Mr. Zaid is a "sleazeball" who committed "treason" and Director Gabbard's boasting proclamations of the revocation, including laughing about it during a highly publicized interview memorialized on the Internet). When one's "good name, reputation, honor, [and] integrity" are jeopardized by government action, "notice and an opportunity to be heard are essential." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). Mr. Zaid's case establishes all

---

[3] The disclosure of the revocation itself, made without Mr. Zaid's consent, almost certainly violates the Privacy Act. The unprecedented and intrusive nature of the announcement cuts sharply against any argument of "routine use." Plaintiff reserves his right to bring such a claim.

the elements of a "reputation-plus" claim under the Fifth Amendment and his constitutional claims are properly pled and likely to succeed on the merits.

### 2.    Count Four (Vagueness)

Defendants' challenge to Count Four is another rehash of their defense of the law firm Executive Orders. Def. Br. at 25-27. Like here, the *Wilmer* plaintiff argued that the challenged order "is unconstitutionally vague because it does not give WilmerHale fair notice of what is prohibited and how the Firm can avoid sanctions in the future." *Wilmer* at *26; MPI at 35. And like here, Defendants argued that the vagueness doctrine did not apply because the challenged order was not proscriptive. *Id.*; Def. Br. at 26. But as in *Wilmer*—not to mention *Perkins Coie* and *Jenner*—the challenged order directed adverse action against the plaintiff. Further, neither the law firm orders nor the Memorandum provide any notice to plaintiffs of "how [they] should act in the future to avoid these sanctions." *Wilmer* at *26 (citing *FCC v. Fox Television Stations, Inc*., 567 U.S. 239, 253 (2012). Mr. Zaid does not even have the benefit of the "Fact Sheets" that accompanied the law firm orders. *Id*. at *3. Neither he nor anyone else who currently possesses a clearance can possibly determine how to avoid a summary clearance revocation in the future; though as referenced above, the best guess is to avoid engaging in protected speech that angers the President. In other words, Mr. Zaid and others can best avoid future revocations through chilling. "When speech is involved, rigorous adherence to those requirements [of the void for vagueness doctrine] is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253–54. The Memorandum affords no such rigor.

Just like the law firms' challenges to their respective vague Executive Orders, Count Four of Mr. Zaid's Complaint properly states a claim and is likely to succeed on the merits.

### 3. Count Five (Right to Counsel)

Defendants' challenge to Count Five is scant on content. It banks again on a misapplication of *Lee* to claim that the claim is beyond review of this Court. Def. Br. at 27-28. Notably, contrary to Defendants' assertions, *id.*, it does not matter whether Mr. Zaid alleged in the Complaint that his clients lack a second choice of counsel. He does not need to show this to have prudential, third-party standing.[4] *See Ctr. for Democracy & Tech. v. Trump*, 507 F. Supp. 3d 213, 223–24 (D.D.C. 2020); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989); *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720 (1990). Taking all allegations in the Complaint as true, Count Five establishes that Mr. Zaid's active clients are being deprived of their counsel of choice. Compl. ¶¶ 51, 72, 85.

"The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell v. Alabama*, 287 U.S. 45, 68-69 (1932). Such a right "is the foundation for our adversary system." *Martinez v. Ryan*, 566 U.S. 1, 12 (2012). By strategically preventing Mr. Zaid from representing future whistleblowers, Defendants' constitutional violations span both his and his clients' rights. As Judge Bates succinctly noted in *Jenner*, "[w]hen the government draws legal scrutiny, its response must be to defend itself in court, not to intimidate those who would force it to do so." *Jenner* at *9. By revoking Mr. Zaid's security clearance and access to classified information without due process, Defendants have forced litigants to proceed in active cases *pending against the Defendants themselves* without the litigants' chosen counsel.

---

[4] Notwithstanding this, the Declaration of Marc Polymeropoulos says exactly that. ECF No. 9-3, Declaration of Marc Polymeropoulos ("Poly. Decl.") ¶ 17.

**C.    Count Three adequately alleges First Amendment claims to defeat a motion to dismiss and is likely to succeed on the merits.**

**1.    Defendants' actions violate the Right to Petition Clause.**

Defendants dismiss Mr. Zaid's right to petition claim by suggesting that "[h]e may still petition the Government or litigate in any court he sees fit," Def. Br. at 14, 27.  But this fundamentally misconstrues Mr. Zaid's claim and minimizes the Memorandum's impact.  Here, the President's retaliatory directive to rescind a group of clearances, including that of Mr. Zaid, in the name of the "national interest" eviscerates this sacred First Amendment right by sanctioning Mr. Zaid for providing good-faith representations of clients, including lawful whistleblowers.  As Judge Howell found in a similar context in *Perkins Coie*, the violation of the right to petition the government "is straightforward" in this context: "retaliation based on the exercise of the right to petition the government via access to the courts violates that right, and the associated liberty interest, in the same way that retaliation based on protected speech violates the First Amendment." *Perkins Coie* at *43–44 (citing *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387-93 (2011)).

Judge Leon echoed that principle in *Wilmer*, finding that the firm "both alleged and show[ed] that the Order violates the Petition Clause by "(1) punishing the firm for its past representation of clients in litigation and (2) undermining the firm's ability to pursue litigation in the future," finding it explicitly targeted the firm "at least in part for the litigation it has pursued, including election and immigration lawsuits." *Wilmer* at *18.  He added that "[t]he Order also suspends their security clearances, which restricts their access to the classified information they need to pursue cases involving national security" and would "severely hinder WilmerHale's ability to effectively bring cases." *Id.* at *19.  Accordingly, the retaliatory action taken by President Trump for Mr. Zaid's past representation of lawful whistleblowers before Congress and the judiciary, has decisively "deprived plaintiff of [his] liberty interest in petitioning the government,"

which "extends to all departments of the Government." *Perkins Coie* at *44 (citation omitted). The irreparable harm to Mr. Zaid and would-be whistleblowers will only deepen the longer the Memorandum stands.

### 2.    Defendants' actions violate Freedom of Speech and Association.

Defendants do not even attempt to address the implications of their actions on Mr. Zaid's and his clients' rights to associate with each other. *See Perkins Coie* at *38 (collecting cases); *see also Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004) (allowing lawyers to bring First Amendment claims on behalf of clients with whom they have a relationship). Their response instead is—yet again—to wield *Lee* as shield against being held accountable for their constitutional violations. Def. Br. at 28-29. Defendants lay out the two-prong test for retaliation as explained in *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019), requiring a plaintiff to demonstrate that (1) a government official took adverse action based on that forbidden motive; and (2) non-retaliatory grounds could not have provoked the consequences. Defendants' refusal to even engage with the first prong, Def. Br. at 28, proves the danger of misinterpreting *Lee*: forbidden motives will go unchecked if the processes meant to prevent them are nonjusticiable. Defendants' attempt to provide a basis that satisfies the second prong falls short. Of course, as Defendants offer, revoking a security clearance to "protect classified information" might justify revocation. Def. Br. at 28, 32. But that hypothetical is divorced from the facts of this case. There has been no reference about the purpose of the revocation, other than the undefined "national interest." All prior revocation justifications such as the considerations outlined in SEAD-4, according to Defendants, were no longer applicable by operation of the Memorandum.

In truth, the names listed on the Memorandum are there because the individuals exercised their First Amendment rights. For Mr. Zaid, specifically, this right took the shape of associating with whistleblowers. This baldly retaliatory act should not be countenanced by this Court.

**D.    Count Six adequately alleges a Bill of Attainder claim to defeat a motion to dismiss.**

The Memorandum functions as, and therefore is, an unlawful bill of attainder.  The Constitution's prohibition on attainder applies just as much to the Executive as it does to Congress.  Defendants' argument to the contrary asks this Court to recognize an unlimited authority for the President to issue acts of attainder, so long as he does not use the words "bill" or "punishment" when doing so.  Def. Br. at 30-31.  This interpretation would have been flatly rejected by the Framers and should not be credited by this Court.

**1.    The Constitution's prohibition on Bills of Attainder applies to the President.**

**a.    The Framers intended to ban attainder in all its forms.**

In 1787, bills of attainder were at the forefront of the Framers' minds.  A parliamentary act signed into validity by the King, English bills of attainder were largely understood to function both as tyrannical tools of retribution and as a means of prevention through deprivation of property rights.  *United States v. Brown*, 381 U.S. 437, 458–60 (1965); *see also* Jacob Reynolds, The Rule of Law and the Origins of the Bill of Attainder Clause, 18 St. Thomas L. Rev. 177, 182 (2005) (describing attainder as the "extinction of a person's civil rights" meaning they could no longer own property or pass it to their heirs, having "forfeited [it] to the crown.").  At the time of the Constitutional Convention, the enactment of bills of attainder would have been understood in the context of the preceding three centuries, when such bills were produced by a legislature in conjunction with a consenting monarch.[5]

---

[5] The most notable beneficiary of bills of attainder during this era was King Henry VIII, who attainted 130 people over a 38-year reign through his Parliaments.  *See* Matthew Steilen, Bills of Attainder, 53 Hous. L. Rev. 767, 802-04 (2016).  Another infamous attainder resulted in the execution of the Earl of Strafford, notwithstanding his having prevailed at an impeachment trial.  Charles I's reluctant consent to the legislature's bill capped the climax of a dramatic showdown between Parliament, angry mobs, and the Crown.  *Id*. at 812-17.

The Framers feared a retributive government and took pains to strip away any insidious tools it might have at its disposal. During the Founding era, many signatories of the Declaration of Independence were themselves the targets of bills of attainder. *See, e.g.*, Thomas Jefferson, Autobiography, 1790, available at https://avalon.law.yale.edu/19th_century/jeffauto.asp (last visited June 9, 2025).[6] It is against this backdrop that the Framers expressly prohibited bills of attainder not once, but twice, while drafting the very first Article of the Constitution. *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder . . . shall be passed [by the Congress]"); U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder . . . ."). "[I]t was such an important protection from government encroachment that it was included in the original Constitution, as opposed to waiting to introduce it in the Bill of Rights" and immediately "placed outside the reach of the state legislatures as well." J. Reynolds at 203 (2005). Both clauses passed with no dissent among the delegates. *Brown*, 381 U.S. at 441 ("The provisions outlawing bills of attainder were adopted by the Constitutional Convention unanimously, and without debate.").

When viewing the attainder clauses in their historical context, it becomes clear why the prohibition would only be articulated in Article I rather than Article II. As described above, the Framers only understood bills of attainder to be acts created in the legislature to be signed by a King. This procedure was memorialized in Article I by requiring bills of any nature to be signed by the President. U.S. Const. art. I, § 7. The Framers would have understood that prohibiting bills

---

[6] Jefferson's written recollection is as follows: "And I was informed afterwards by Peyton Randolph that [Jefferson's "A Summary View of the Rights of British America" pamphlet] had procured me the honor of having my name inserted in a long list of proscriptions enrolled in a bill commenced in one of the houses of parliament, but suppressed in embryo by the hasty step of events which warned them to be a little cautious . . . The names I think were about 20 which he repeated to me, but I recollect those only of Hancock, the two Adamses, Peyton Randolph himself, Patrick Henry, & myself.").

of attainder in the legislature was an effective block on the President's ability to sign them into law. This concept is further bolstered by the Framers' chief concern that corruption would surface in Congress, not from the intentionally diminished office of an Executive. As James Madison observed, the legislative branch "derives a superiority in our governments" with "constitutional powers being at once more extensive, and less susceptible of precise limits," while "the executive power" was envisioned to be "restrained within a narrower compass . . . more simple in its nature." The Federalist No. 48 (Madison); *see also Brown*, 381 U.S. at 443–44 (noting Alexander Hamilton's concern that "[i]f the legislature can disfranchise any number of citizens at pleasure by general descriptions [in bills of attainder], it may soon confine all the votes to a small number of partisans, and establish an aristocracy or an oligarchy[.]")

In sum, attainder was rejected by the Framers as "contrary to the first principles of the social compact" with full cognition of the Americans' "wear[iness] of the fluctuating policy" and "sudden changes" prompted by public entities that "affect[] personal rights." The Federalist No. 44 (Madison). As Justice Black noted, it defies logic to conclude that "the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 144 (1951) (Black, J., concurring).

> **b.    The Rescinding Security Clearances Memorandum is a "bill" because it was meant to have the force and effect of law.**

Defendants cannot escape the fact that the Memorandum was intended to have the force and effect of law. In fact, the crux of their argument is that the Memorandum overrides prior Executive Orders already incorporated by Congress into statute and implemented by agencies for decades. *See, e.g.*, Def. Br. at 21 (citing 24 U.S. Op. Off. Legal Counsel 29 (2000) which discusses Presidential directives having "the force and effect of law").

Taking Defendants at their word—that the Memorandum was meant to override all previous law that sprang from past Executive Orders—the bill of attainder prohibition must attach to Presidential acts. Indeed, one of the seminal cases on bills of attainder, *United States v. Lovett*, 328 U.S. 303, 315 (1946), took care to point out that any color of legislative acts, "no matter what their form," can run afoul of the attainder clause. *See also Cummings v. Missouri*, 71 U.S. 277, 325 (1866) (the attainder prohibition is "levelled at the thing, not the name."). Here, that form is an Executive action that defies the separation of powers: the President's rewriting of codified law, masquerading as a Presidential Memorandum.

"The President's power, if any, to issue [an Executive Order] must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Like Executive Orders, authority for Presidential Memoranda can derive from Article I (authority expressly granted to the President by Congress) or Article II (the President's inherent authority) and is often a blend of both. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 2025 WL 1187730, at *15 (D.D.C. Apr. 24, 2025). To determine whether a Presidential directive is violative of the separation of powers, a court can look to what, precisely, the order directs. For example, in *Youngstown*, the Court observed that President Truman's order "does not direct that a congressional policy be executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588. This was its fatal flaw.

The Court observed that the challenged order in *Youngstown* had a preamble, proclamation, and authorization that mirrored a statute but was not actually implementing one. *Id*. at 588. Years later, the D.C. Circuit would remark that "had President Truman merely instructed the Secretary of Commerce to secure the Government's access to steel '[t]o the extent permitted by law,'

*Youngstown* would have been a rather mundane dispute over whether [an Executive Branch official] had statutory authority to act as he did." *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). This distinction is crucial here. While the Memorandum does expressly direct agency heads to act "consistent with existing law," it is a Potemkin provision. By Defendants' own argument, President Trump did *not* intend the agencies to act in accordance with existing law and instead intended for the Memorandum to *supersede* all prior applicable Executive Branch regulations or directives and, apparently, statutory law. *See* Def. Br. at 15, 21.

Some of the law the President believes he is superseding includes Congress's codification of the procedures outlined in EOs 12968 and 10865 through 50 U.S.C. § 3341(a)(9)(A). Similarly, through 50 U.S.C. § 3162a, Congress conferred upon the Director of National Intelligence "the final authority to designate a Federal agency or agencies to determine eligibility for access to classified information or eligibility to hold a sensitive position in accordance with Executive Order No. 12968 . . . or successor order." 50 U.S.C. § 3162a(c)(5). But as explained above, the Memorandum is *not* a successor order to EO 12968. This brash attempt to supplant congressional action not only signals that the President's power "is at its lowest ebb," *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring), it places the Memorandum squarely on the wrong side of the separation of powers. *Cf. Bldg. & Const. Trades Dep't*. 295 F.3d at 33 (noting that an Executive Order that was "not self-executing [sic]" did not preempt a legislative act).

By arguing that the Memorandum has the force of law, Defendants must also accept that their new "law" functions as a bill of attainder.[7] *See Hoffa v. Saxbe*, 378 F. Supp. 1221, 1239

---

[7] One decision in this District did address an Executive Branch bill of attainder claim with drastically dissimilar facts. *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 81-82 (D.D.C. 2014), addressed the military's targeting of an American citizen who had become a leader within the

(D.D.C. 1974) (plaintiff's challenge to an executive action "[did] not legally distinguish" his case from another plaintiff's challenge to a state statute as a bill of attainder); *Dehainaut v. Pena*, 32 F.3d 1066, 1071 (7th Cir. 1994) (noting that executive actions can be limited by the Bill of Attainder Clause if a case is analyzed "functionally rather than structurally").

c.    **Other prohibitions in Article I have been applied to Article II, and the Bill of Attainder Clause is no different.**

The President is not free to implement acts of attainder like the one here simply because the Framers did not duplicate the prohibition in Article II. Such logic would lead to absurd results. For example, Article I expressly bars the legislature from granting titles of nobility. Like the attainder guarantee, it is mentioned twice and passed without debate. *See* U.S. Const. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States[]"); U.S Const. art. I, § 10, cl. 1 ("No State shall . . . grant any Title of Nobility."); The Federalist No. 44 (Madison) ("The prohibition with respect to titles of nobility is copied from the articles of Confederation and needs no comment."). Also like the Bill of Attainder Clause, there can be no straight-faced argument that the Framers envisioned a President who could appoint Dukes and Earls.

Perhaps unsurprisingly, the Titles of Nobility Clause's applicability to Article II entities has not been tested heavily in the courts. But other Article I provisions have. In *Bailey v. Fulwood*, 793 F.3d 127 (D.C. Cir. 2015), the D.C. Circuit addressed Article I's Ex Post Facto Clause, the alter-ego of the dual-hatted Bill of Attainder Clause. U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."). In *Bailey*, the court analyzed whether the United States Parole Commission ("USPC") violated the Ex Post Facto Clause in denying a petitioner's

---

terrorist group al-Qa'ida. But the district court relied on a case that left the door *open* to Executive Branch attainders. *Id.* (citing *Paradissiotis v. Rubin,* 171 F.3d 983, 988 (5th Cir.1999) (finding no bill of attainder for lack of a punitive quality)).

application for parole. *Bailey*, 793 F.3d at 129.  Ultimately, the court found no violation, since the USPC did not actually rely on a retroactive application of law.  *Id.* at 134.  But tellingly, there was no debate that this Article I prohibition applies to Article II actors.  Instead, the Circuit Court was far more concerned about the activity of the USPC rather than whether it had "passed" an ex post facto "law."  *Cf. Dehainaut v. Pena*, 32 F.3d 1066, 1070-71 (7th Cir. 1994) (discussing a functional, not structural, application of the attainder ban).

Another example is found in the prohibition against suspending habeas corpus, directed only to Congress in Article I.  *See* U.S. Const. art. I, § 9, cl. 2  ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").  But that does not open the door to unconditional suspension of habeas rights under Article II.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (citing *Youngstown* to note that war is not a "blank check" for the Executive Branch to violate habeas corpus rights).  Article II applicability of the Suspension Clause was addressed head-on in 1861 at the outset of the Civil War, when the Maryland Circuit Court decided *Ex parte Merryman*, 17 F. Cas. 144 (C.C.D. Md. 1861).  In sum, *Merryman* held that President Lincoln's suspension of the writ was unconstitutional because the authority to overcome the Constitution's prohibition on suspension rests solely with Congress.  In other words, limitations on Congress outlined in Article I could not be circumvented through Article II action, when those limitations were so clearly important to the Framers.  In a soliloquy bearing a striking resemblance to Justice Black's concurrence in *Joint Anti-Fascist Refugee Comm. v. McGrath* nearly a century later, Supreme Court Chief Justice Taney, sitting at the Circuit, reflected:

> The people of the United Colonies, who had themselves lived under [habeas corpus] protection, while they were British subjects, were well aware of the necessity of this safeguard for their personal liberty. And no one can believe that, in framing a government intended to guard still more efficiently the rights and liberties of the

> citizen, against executive encroachment and oppression, they would have conferred on the president a power which the history of England had proved to be dangerous and oppressive in the hands of the crown[.]

*Ex parte Merryman*, 17 F. Cas. 144, 150 (C.C.D. Md. 1861).

### 2. The March 22, 2025 Presidential Memorandum functions as a Bill of Attainder.

Having established that the Bill of Attainder Clause restricts the President as much as Congress, the next task is to determine whether the Rescinding Security Clearances Memorandum is, in fact, a bill of attainder. To find that an act is a bill of attainder requires a finding of three characteristics: (1) specification of the affected persons; (2) punishment; and (3) lack of a judicial trial. *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 847 (1984).

Defendants do not even attempt to dispute the first and third elements. Def. Br. at 30-32. To be sufficiently specific for a finding of attainder, an act of attainder must apply to "named individuals or to easily ascertainable members of a group." *United States v. Lovett*, 328 U.S. 303, 315 (1946). The Memorandum does exactly that. It is literally titled "Rescinding Security Clearances and Access to Classified Information *from Specified Individuals*."[8] MPI Ex. 2 (emphasis added). Moreover, to the best of Plaintiff's knowledge, it is the first time in history that the Director of National Intelligence has nationally broadcast the identities of people whose security clearances have been revoked, styled more as a triumphant political victory than a sober,

---

[8] Though not party to this lawsuit, it is impossible to see how the Memorandum is not an attainder against "any other members of Joseph R. Biden, Jr.'s family," the only non-named members of the Memorandum. To imagine that President Biden's five-year-old grandchild, not to mention his future great- and great-great-grandchildren, would be forever prevented from obtaining a security clearance is the exact type of "corruption of blood" and denial of inherited property rights that the Framers loathed. *See, e.g.*, Aaron H. Caplan, Nonattainder As A Liberty Interest, 2010 Wis. L. Rev. 1203, 1229 (2010) (discussing the Framers' understanding of "corruption of blood" and a corresponding prohibition in Article III punishments for treason); *see also* Steilen, *supra* note 1, at 784-85 (discussing attainders' ability to corrupt "blood issue").

heavily consequential national security decision. *See, e.g.*, MPI Exs. 1, 6, 7. Additionally, Mr. Zaid's deprivation of any judicial trial before his public tar-and-feathering is self-evident from the summary nature of the revocations. Mr. Zaid was not even afforded prior notice, much less a hearing or a trial. *See Lovett*, 328 U.S. at 317 (noting that trials allow for analysis of "previous law or fixed rule"); MPI Exs. 3, 4, 5 (informing Mr. Zaid of immediate, final revocation).

The only element left for this Court to consider, then, is whether the Memorandum was meant as a punishment towards those it named. On this factor, the Supreme Court has made clear that the omission of the word "punishment" and the lack of any traditional punitive measures, e.g., prison time or fines, does not preclude an act from constituting punishment under attainder principles. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 475 (1977) ("Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee."). Instead, courts should apply a "functional test" that analyzes whether the action can reasonably be said to further nonpunitive purposes. *Id.* Importantly for Mr. Zaid's case, "[p]unishment is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct." *Selective Serv. Sys.*, 468 U.S. at 851–52 (1984).

The inquiry will look at three factors: (1) whether the challenged act meets the historical meaning of legislative punishment; (2) whether it can be reasonably said to further nonpunitive legislative purposes; and (3) whether the record evinces an intent to punish. *Id.* at 852 (citing *Nixon*, 433 U.S. at 473, 475–76, 478). Against the facts of this case, each of these factors align with attainder.

### a.    Historical meaning of punishment

In America, punishment through the lens of a bill of attainder has most often taken the form of "bars to participation by individuals or groups in specific employments or professions." *Selective Serv. Sys.*, 468 U.S. at 852.  For example, in *Cummings v. Missouri*, 71 U.S. 277 (1867), the challenged attainder disqualified a priest from practicing as a clergyman.  In *United States v. Brown*, 381 U.S. 437 (1965), the attainder at issue barred Communist Party members from serving as officers in labor unions.  In *Lovett*, 328 U.S. 303, the challenged law prohibited three specified Government employees from collecting salaries.

Perhaps most instructive for Mr. Zaid's case is *Ex parte Garland*, 71 U.S.. 333 (1866).  There, in the aftermath of the Civil War, Congress passed a law which forbade lawyers from being admitted to the federal bar unless they swore that they never served in the Confederate government. *Garland*, 71 U.S. at 335–36.  In effect, this would have disbarred Southern lawyers from the federal bar.  For those who made their money as federal practitioners, this was a serious problem.  Here, Mr. Zaid has built a decades-long career as a national security lawyer.  *See* Compl. ¶¶ 31-33.  To unilaterally declare that he is unfit to review classified information has the immediate effect of barring him from his chosen—and well-earned—profession.  Already, he has been restricted from reviewing relevant case documents in active litigation, had to turn down referrals, and will forever be required to disclose the revocation on future clearance applications.  *See* Zaid Decl. ¶¶ 34, 43, 46; Ex 15.

Defendants argue that Mr. Zaid is not suffering punishment because he "still has his job, still may practice law, and still may appear in any court."  Def. Br. at 33; *id*. at 24 ("At all events, Plaintiff may still practice law and may argue in any court . . . Going forward, he is only deprived of the ability to access classified information as part of his legal practice, but that limitation is

coextensive with the revocation itself.")  Not so.  As alleged in the Complaint, the Rules of Professional Conduct will prevent him from continued representation on any cases which require his access to classified material.  Defendant CIA's preposterous suggestion that Mr. Zaid "may continue to represent any current or future clients" but that he cannot "make use of classified information" that he has already learned only underscores this point.  Compl. ¶¶ 49-50.

In *Garland*, the Court confronted a nearly exact dynamic.  It acknowledged that the challenged bill of attainder may not bar attorneys from practicing law, generally, since they would necessarily have been admitted to state court as a prerequisite for federal admission.  But it recognized the petitioner's bar from federal practice, notwithstanding his continued admission to the Arkansas state bar, still constituted punishment.  *Garland*, 71 U.S. at 377 (acknowledging that even if the law did not bar affected attorneys from the practice of law generally, the exclusion would be "at least from its practice in the courts of the United States").  Applying the same analysis here, it is of no moment that Mr. Zaid could now, after three decades of practice in national security law, attempt to learn the field of family law, real estate, or intellectual property.  For attorneys, the test is not whether they can no longer practice law, but whether they will suffer a "perpetual exclusion" from "any of the professions or any of the ordinary avocations of life."  *Id*.  If this occurs, "it can be regarded in no other light than as punishment[.]"  *Id*.

### b.    Lack of non-punitive purposes

As described both in the Complaint and in Mr. Zaid's Motion for a Preliminary Injunction, the security clearance adjudication process is far from a black box.  The methods used by the agencies have been refined, published, and made publicly available through directives and guidance which outline the reasoning behind which someone might be denied a clearance.  *See, e.g.*, MPI Ex. 12, ECF No. 9-16 (SEAD-4 Adjudicative Guidelines).  When this happens, the

written notice provided by the adjudicating agency will reflect these nonpunitive, national security-based purposes for the denial or suspension. *See* Leonard Rep. ¶¶ 31–32.

In *Nixon*, the Court looked to the four corners of the challenged statute to determine its legislative purpose. *Nixon*, 433 U.S. at 476–77. Within the text of the act, Congress had cited valid policy reasons for passing the challenged bill, such as protecting information needed to effectuate prosecutions and preserving access to Nixon Presidency material of historical significance. However, "[w]here such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers." *Id*. at 476. Here, the Memorandum contains not so much as a nod to any of the valid purposes for denial outlined in SEAD-4's Adjudicative Guidelines. In fact, Defendants now claim to be superseding those nonpunitive purposes entirely. In the face of this glaring absence of any legitimate, nonpunitive purposes, this Court would be "reasonable to conclude" that the Memorandum's purpose was to punish Mr. Zaid.

### c.    Intent to punish

Ascertaining whether there is an intent to punish involves a review of the record similar to determining a nonpunitive purpose. For example, the Court in *Nixon* found that there was "no evidence presented to us, nor is there any to be found in the legislative record, to indicate that Congress' design was to impose a penalty upon Mr. Nixon . . . as punishment for alleged past wrongdoings." *Nixon*, 433 U.S. at 478 (quoting the district court record).

Here, as described above, there is no legislative record since the President improperly breached the separation of powers by attempting to create new law through decree. Plus, under a Fed. R. Civ. P. 12(b)(6) standard, the record will be the facts as alleged in the Complaint. But notwithstanding the absence of a legislative record, this Court can still find a record of an intent to

29

punish.  The President has openly admitted to his desire to inflict damage on Mr. Zaid and his reputation.  His personal attacks against Mr. Zaid rival the bombast of politicians in the lead-up to McCarthy-era politics which set the stage for *Lovett*.  In 1943, ranting on the floor of the House of Representatives, Congressman Dies called the individuals targeted by the challenged attainder "irresponsible, unrepresentative, crackpot, radical bureaucrats."  *Lovett*, 328 U.S. at 308.  This articulated intent is the rhetorical mirror of Mr. Trump's description of Mr. Zaid as a "sleazeball" who committed "treason" for his representation of a whistleblower.  Compl. ¶¶ 36, 37.  Further, Director Gabbard has publicly stated that her mass revocation of clearances of other similarly situated individuals was because they "never apologized" for their supposed misconduct.  *See* MPI Ex. 6, ECF No. 9-10 (Megyn Kelly interview of Director Gabbard, provided in native format).  In her interview with television personality Megyn Kelly, while discussing Mr. Zaid's revocation, Director Gabbard described in plain terms the reasoning behind her revocation of certain former federal prosecutors' and FBI agents' security clearances, claiming that they had conducted criminal acts by falsifying witness statements.  Acting as judge, jury, and executioner, she straightforwardly explained that she summarily revoked security clearances to hold people "accountable" for their "crimes."[9]

In sum, Mr. Zaid's security clearance was preceded by the President calling him a "sleazeball" who committed "treason."  It was followed by the Director of National Intelligence explaining that she was revoking people's clearances in order to hold them accountable for unprosecuted crimes.  This alone establishes a punitive intent.

---

[9] While MPI Ex. 6 is a brief excerpt of this interview, this particular exchange between Director Gabbard and Ms. Kelly occurs later in the interview, at approximately 54:40 through 55:40.  It can be viewed by accessing https://www.youtube.com/watch?v=6tFyUP0TgrM (last visited June 11, 2025).

Yet one final point warrants discussion. The Supreme Court has made clear that in the context of attainder, "[p]unishment is not limited solely to retribution for past events, but may involve deprivations inflicted to deter future misconduct." *Selective Serv. Sys.*, 468 U.S. at 851–52 (1984). This is precisely Defendants' goal for Mr. Zaid. Recall that he first drew President Trump's attention by representing a whistleblower who filed a classified complaint that led to the President's impeachment six years ago. Zaid Decl. ¶ 23; Compl. ¶¶ 34, 35. By revoking his clearance, the President ensured that Mr. Zaid's representation of the IC Whistleblower can never be repeated in the future, since he will be incapable of assisting with the filing of a classified complaint. As long as the attainder holds, Mr. Zaid will be prevented from competently representing would-be whistleblowers like the IC Whistleblower who lawfully speak out against any administration. Truly, this is punishment in its most insidious form.

## IV.    A PRELIMINARY INJUNCTION IS WARRANTED

### A.    Mr. Zaid's harm is irreparable, and the balance of the equities and public interest favor an injunction.

Defendants focus on Mr. Zaid's economic damages in an attempt to discount his irreparable harm. As alleged in his Declaration, Mr. Zaid is permanently damaged from Defendants' actions. For the remainder of his career, he will be required to disclose the revocations on future security clearance applications. Zaid Decl. ¶ 47. As demonstrated by Exhibit 15, the SF-86 does not even envision this type of scenario, offering limited space to denote and explain up to two past revocations. Ex. 15. In other words, for the rest of his career as a national security litigator, Defendants' actions will stand squarely in the way of his clearance. These types of roadblocks can be all but fatal to a career as cleared counsel.

Regardless of the economic damage, Defendants' focus on economic harm ignores that if the Court finds any one of the above constitutional violations is proven, the harm has already

occurred. "[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (*quoting Davis v. Dist. of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (internal quotations omitted). Defendants' violation of Mr. Zaid's First and Fifth Amendment Rights, as well as his constitutional rights against attainder, establish irreparable harm. *See Wilmer* at *32.

Finally, Defendants appear to argue that restoring Mr. Zaid's constitutional rights—an accomplished attorney known for standing up to government overreach—insufficiently balances the equities or serves the public interest. Def. Br. at 34. They return to their go-to fallacy—that this case is about security clearance decisions rather than processes—to say that an injunction "implicates national security interests" and separations of powers concerns. *Id*. As explained here and in Mr. Zaid's opening MPI, judicial review of an agency's refusal to follow its own processes does no such thing. *See* Compl. ¶ 3 ("This case is about methods and process."). But "enforcement of an unconstitutional law is *always* contrary to the public interest." *Gordon*, 721 F.3d at 653 (emphasis added). These two merged factors weigh unequivocally in favor of an injunction.

## B.    The Complaint need not list specific officials for injunctive relief.

Finally, Defendants argue that the Executive Office of the President ("EOP") and the United States are improperly named as defendants and that the Court cannot enjoin them. Def. Br. at 35–37. Defendants raised versions of these arguments in the *Jenner* and *Wilmer* litigation—and lost. *See Jenner*, at *23–24; *Wilmer*, at *31 n. 35 (ruling that the EOP and the United States are

"both proper defendants").  Their attempt to employ them here—without reckoning with this Court's rulings—is equally unpersuasive.  Mr. Zaid has attached an Amended Proposed Order to this filing that comports with the rulings in *Jenner* and *Wilmer* and this Court should grant Mr. Zaid's relief based on that Amended Proposed Order.

Section 702 is clear.  It waives sovereign immunity for all nonstatutory and First Amendment actions, and states that "'[t]he United States may be named as a defendant in any [] action, and a judgement or decree may be entered against the United States,' if the action (1) is in a court of the United States; (2) seeks relief other than monetary damages; and (3) 'stat[es] a claim that an agency or an officer or employ thereof acted or failed to act in an official capacity or under color of legal authority." *Wilmer*, at *31 n. 35 (quoting 5 U.S.C. § 702); *see also Clark v. Library of Congress*, 750 F.2d 89, 102 (D.C. Cir 1984) ("5 U.S.C. § 702 [] eliminate[s] the sovereign immunity defense in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity.") (emphasis added).  As such, Mr. Zaid's suit against both the EOP and the United States is permitted.

Further, Defendants argue that only specific officers, rather than offices and departments, or the United States, may be enjoined.  But, again, that argument was explicitly rejected by this Court.  *Jenner*, at *24 ("Jenner has standing to obtain an injunction against those agencies and agency heads for the same reasons it has standing to challenge the order generally.")  Defendants essentially repeat their argument in *Jenner*, claiming Mr. Zaid, by naming the EOP and the United States, is improperly seeking to enjoin the President.  *See also id.* at *23 (the United States "see[s] in the inclusion of the United States a ploy to 'enjoin the President by another name'") (citing Defendants' *Jenner* Motion to Dismiss at 32).  But, as Judge Bates noted, the principle that courts should avoid enjoining the President "has no application here because Jenner has not sued the

President." *Id*. at *24.  Mr. Zaid, too, has not sued the President, and the relief he seeks is entirely within the ambit of Section 702 and this Court's authority.

Two days after Mr. Zaid filed his Proposed Order for Preliminary Injunction, ECF No. 9, this Court clarified in *Jenner* that while plaintiffs can secure an injunction against an agency or department, "Section 702 does require [plaintiff] eventually to list the individual federal officers it seeks to enjoin; it just need not do so in the caption of the complaint." *Jenner* at *24.  To that end, Mr. Zaid has now submitted an amended Proposed Order listing such individual federal officers—namely the Directors of Agency Defendants Central Intelligence Agency and the Defense Counterintelligence and Security Agency, the Director of National Intelligence, the Secretary of Defense, the head of the Executive Office of the President, the White House Chief of Staff, and their corresponding deputies.  *See attached* Amended Proposed Order.

## CONCLUSION

For the foregoing reasons and those previously stated, the Court should DENY Defendant's Motion to Dismiss and GRANT Plaintiff's Motion for Preliminary Injunctive Relief, allowing this case to proceed on the merits while preventing further irreparable harm.

Dated: June 13, 2025                                    Respectfully submitted,


*/s/ Abbe David Lowell*                              */s/ Norman L. Eisen*
Abbe David Lowell (D.C. Bar #358651)          Norman L. Eisen (D.C. Bar # 435051)
David A. Kolansky (NY Bar #5887765)           DEMOCRACY DEFENDERS FUND
LOWELL & ASSOCIATES, PLLC                     600 Pennsylvania Avenue, SE, #15180
1250 H Street, N.W., 2nd Fl.                  Washington, D.C. 20003
Washington, DC 20005                          Tel: (202) 594-9958
Tel: (202) 964-6110                           norman@statedemocracydefenders.org
Fax: (202) 964-6116
alowellpublicoutreach@lowellandassociates.com
dkolanksy@lowellandassociates.com


*/s/ Margaret M. Donovan*                            */s/ Kevin T. Carroll*
Margaret M. Donovan (D.C. Bar #CT0026)        Kevin T. Carroll (D.C. Bar #1021479)
Christopher M. Mattei (*pro hac vice forthcoming*)   1751 Pinnacle Drive
KOSKOFF, KOSKOFF & BIEDER, PC                 Tysons, VA 22102
350 Fairfield Ave., Suite 501                 Tel: (718) 791-5761
Bridgeport, CT 06604                          kevintcarroll@hotmail.com
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com
cmattei@koskoff.com


*/s/ George W. Croner*                               */s/ D.E. Wilson, Jr.*
George W. Croner (*pro hac vice forthcoming*)        D.E. Wilson, Jr. (D.C. Bar #932178)
KOHN, SWIFT & GRAF, P.C.                       LANKFORD & REED, PLLC
1600 Market Street, Suite 2500                120 North St. Asaph Street
Philadelphia, PA 19103                        Alexandria, VA 22314
Tel: (215) 238-1700                           Tel: (703) 299-5000
gcroner@kohnswift.com                         ewilson@LRfirm.net


*/s/ Eugene R. Fidell*
Eugene R. Fidell (D.C. Bar #112003)
FELDESMAN LEIFER LLP
1129 20th Street NW, Ste. 400
Washington, D.C., 20036
Tel: (202) 466-8960
efidell@feldesman.com


                                        *Counsel for Plaintiff Mark S. Zaid*