**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARK S. ZAID, *Esq.*,

        *Plaintiff*,

   v.

EXECUTIVE OFFICE OF THE
PRESIDENT, *et al.*,

        *Defendants*.

Civil Action No. 25-01365 (AHA)

<u>**Memorandum Opinion and Order**</u>

The Constitution forbids government officials from using their power to retaliate against people for their speech, and that is so even when the speech is critical of the government. Eighty years ago, the Supreme Court captured that foundational promise in this way: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Last year, the Supreme Court put it like this: A government official cannot "use the power of the State to punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).

This case involves the government's retribution against a lawyer because he represented whistleblowers and other clients who complained about the government, carried out by summarily canceling the attorney's security clearance without any of the process that is afforded to others. In defending its actions, the government does not meaningfully rebut that the decision to deny this attorney the usual process was based on his prior legal work for clients adverse to the government.

The government instead asserts, emphasizes, and repeats that the executive branch has exclusive power to determine who meets the requirements for security clearance. *See Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) (observing that "the grant of security clearance to a particular employee, a sensitive and inherently discretionary judgment call, is committed by law to the appropriate agency of the Executive Branch"). That is well established, but does not answer the question in this case. It is equally well established that the executive branch's exclusive power to determine *who* satisfies the eligibility criteria for security clearance does not mean it can conduct that determination *however* it wants and free from the Constitution's limits. As Judge Randolph aptly laid out in this context over thirty years ago:

> All questions of government are ultimately questions of ends and means. The end may be legitimate, its accomplishment may be entrusted solely to the President, yet the judiciary still may properly scrutinize the manner in which the objective is to be achieved. Suppose the President has unlimited and judicially unreviewable constitutional power to determine which Executive Branch employees will be given access to the nation's secrets. No one would suggest the government therefore could, despite the Fourth Amendment, conduct random searches without warrants in the hope of uncovering information about employees seeking security clearances. Still less would anyone consider such unconstitutional searches and seizures to be immune from judicial review. The government may have considerable leeway to determine what information it needs from employees holding security clearances and how to go about getting it. But a large measure of discretion gives rise to judicial deference, not immunity from judicial review of constitutional claims.

*Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286, 290 (D.C. Cir. 1993). That guidance is sound, and it is binding.

Because the plaintiff here has shown he is likely to succeed on multiple claims, that he has been irreparably harmed, and that the equities and public interest favor injunctive relief, this court joins the several others in this district that have enjoined the government from using the summary revocation of security clearances to penalize lawyers for representing people adverse to it. *See Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105 (D.D.C. 2025); *Jenner & Block LLP*

*v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76 (D.D.C. 2025); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of the President*, 784 F. Supp. 3d 127 (D.D.C. 2025); *Susman Godfrey LLP v. Exec. Off. of the President*, 789 F. Supp. 3d 15 (D.D.C. 2025).

## I.    Background

Mark S. Zaid is an attorney who specializes in national security law, and whose practice is founded on representing current and former federal employees, military servicemembers, and government contractors. ECF No. 1 ¶¶ 1, 9, 22. This has included advising whistleblowers making complaints against the government and forming a nonprofit that facilitates pro bono representation for whistleblowers. *Id.* ¶¶ 1, 31. Because Zaid's practice relates to military, intelligence, and law enforcement, including providing counsel to current and former employees of the Central Intelligence Agency, Department of Defense, Defense Counterintelligence and Security Agency, and the Office of the Director of National Intelligence, giving competent advice requires him to access, review, and discuss classified material. *Id.* ¶ 9; ECF No. 9-2 ¶ 5. Zaid has accordingly held security clearance for over two decades, and been granted access to classified information through case-specific authorizations during the past three decades. ECF No. 9-2 ¶ 5, 16–22.

In recent years, Zaid has represented multiple government whistleblowers in settings disfavored by the present administration. In 2019, Zaid began representing a whistleblower in the intelligence community who complained about the President's interactions with Ukrainian President Volodymyr Zelensky. ECF No. 1 ¶ 34; ECF No. 9-2 ¶ 23. Zaid's representation included advising the whistleblower on how to bring the complaint to the proper authorities, protect their anonymity, and avoid retaliation. ECF No. 9-2 ¶ 23. The complaint ultimately resulted in the House of Representatives adopting articles of impeachment against the President. *Id.*; ECF No. 1 ¶ 34. When Zaid's representation of the whistleblower became public, the President publicly rebuked him, including by showing Zaid's photo at a 2019 rally and calling him a "sleazeball." ECF No. 1

¶ 36; ECF No. 9-2 ¶ 25. The President later said: "And [the whistleblower's] lawyer, who said the worst things possibly two years ago, he should be sued and maybe for treason. Maybe for treason, but he should be sued. His lawyer is a disgrace." ECF No. 1 ¶ 37; ECF No. 9-2 ¶ 26.

More recently, in February 2025, Zaid filed a lawsuit against the government on behalf of several Federal Bureau of Investigation employees to protect them from being targeted for work they did investigating the January 6 attack on the U.S. Capitol. ECF No. 1 ¶ 40. Four days later, a news source reported the President was planning to target Zaid, among others, by revoking his security clearance. *Id.* ¶ 39; ECF No. 9-2 ¶ 28. The next month, the Director of National Intelligence announced on social media that she had revoked Zaid's and others' security clearances and access to classified information. ECF No. 1 ¶ 41; ECF No. 9-5. And on March 22, 2025, the President issued a presidential memorandum to executive agency heads that included Zaid among a list of people for whom access to classified information was "no longer in the national interest." ECF No. 1 ¶ 44; ECF No. 9-6 at 1. The memorandum directed "every executive department and agency head to take all additional action as necessary and consistent with existing law to revoke any active security clearances held by the aforementioned individuals and to immediately rescind their access to classified information." ECF No. 1 ¶ 44; ECF No. 9-6 at 1.

In the days and weeks that followed, Zaid received letters from the relevant agencies stating they had revoked his security clearance and would deny him access to classified information, including documents he had filed on behalf of current clients. ECF No. 1 ¶¶ 47–51; ECF No. 9-2 ¶¶ 31–34, 43; ECF No. 9-7 (letter from Defense Counterintelligence and Security Agency); ECF No. 9-8 (letter from Central Intelligence Agency); ECF No. 9-9 (email from Office of the Director of National Intelligence). In an interview, the Director of National Intelligence expressly

mentioned revoking Zaid's clearance and agreed the recent revocations had been "fun." ECF No. 1 ¶ 52; ECF No. 9-2 ¶ 35.

Zaid filed this lawsuit against the Executive Office of the President, the Department of Defense, the Defense Counterintelligence and Security Agency, the Central Intelligence Agency, the Office of the Director of National Intelligence, and the United States. He claims the revocation of his clearance without any process violated the First and Fifth Amendments, the Administrative Procedure Act ("APA"), and the Constitution's prohibition on bills of attainder. ECF No. 1 ¶¶ 55–92. Zaid moves for a preliminary injunction, and the government moves to dismiss the complaint. ECF Nos. 9, 22.

## II.    Discussion

In its motion to dismiss and preliminary injunction opposition, the government argues that Zaid's claims are not justiciable under *Department of Navy v. Egan*, 484 U.S. 518 (1988), because they relate to the revocation of a security clearance. *See* ECF No. 22-1 at 5–17. The court therefore starts with that threshold question before considering the merits of each motion.

### A.    Zaid's Claims Are Justiciable Because They Challenge The Means Of Revoking His Clearance—Namely, The Denial Of Any Individualized Assessment—Not The Substance Of An Individualized Assessment

The government acknowledges it chose to revoke Zaid's security clearance without any of the process it usually affords but argues the legality of its summary revocation is "a quintessential political question" that cannot be reviewed by federal courts. *Id.* at 2. However, its position is premised on ignoring binding precedent that says otherwise, including simply omitting relevant caselaw from the motion to dismiss and preliminary injunction opposition. That precedent has rejected the proposition that "all security-clearance decisions are immune from judicial review," recognizing a distinction between the executive branch's "discretionary judgments regarding a particular employee's security clearance" (not reviewable) and claims that "relate to the

constitutionality of the methods used" to make such judgments (reviewable). *Greenberg*, 983 F.2d at 289–90; *see also Rattigan v. Holder*, 689 F.3d 764, 768, 770 (D.C. Cir. 2012) (explaining that the bar on judicial review "covers only security clearance-related decisions made by trained Security Division personnel" and does not apply to claims that do not require review of "whether the plaintiff's continued access to classified information was clearly consistent with national security"). As the D.C. Circuit has recognized, to insulate the latter category—claims challenging the legality of process used—from court review "would be to endorse untenable, and far-reaching, restrictions on judicial review of governmental actions." *Greenberg*, 983 F.2d at 290. Here, none of Zaid's claims challenge or otherwise ask the court to review an individualized national security determination—to the contrary, they challenge the legality of denying him any such individualized review. That kind of claim is one the court can, and therefore must, review. *See Jenner*, 784 F. Supp. 3d at 101 ("The Constitution does not tolerate such judicial abdication.").

Because the government's argument is premised on a selective account of precedent, the court starts with a more complete one. In *Department of Navy v. Egan*, 484 U.S. 518, the Supreme Court considered the "narrow question" of whether the Merit Systems Protection Board "has authority by statute to review the substance of an underlying decision to deny or revoke a security clearance in the course of reviewing an adverse action." *Id*. at 520. There, the plaintiff lost his job at a naval facility because he had been denied a required security clearance based on his criminal record. *Id.* at 521–22. The relevant agency had denied the plaintiff's security clearance under standard procedures, which included the opportunity to respond to the denial and provide favorable information about his character, after which the denial was upheld. *Id.* at 521–24. On appeal, the Federal Circuit held the Board had authority to review the merits of the agency's security clearance determination. *Id.* at 525. The Supreme Court disagreed. Citing the President's Article II authority

"to classify and control access to information bearing on national security," the Supreme Court explained that "no one has a 'right' to a security clearance" which is granted "only when 'clearly consistent with the interests of the national security.'" *Id.* at 527–28 (quoting Exec. Order No. 10,450, §§ 2, 7, 18 Fed. Reg. 2489, 2489, 2491 (Apr. 27, 1953)). The court reasoned that this determination represents "an attempt to predict [an individual's] possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information," and that such predictive judgment "must be made by those with the necessary expertise in protecting classified information." *Id.* at 528–29. The court held the Board lacked authority to review such decisions, explaining that "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* at 529. In so holding, the court took as a given that the Board could review certain issues related to the security clearance determination, including, "review of the fact of denial, of the position's requirement of security clearance, and of the satisfactory provision of the requisite procedural protections." *Id.* at 526.

The D.C. Circuit has since considered how *Egan*'s reasoning about the Merit Systems Protection Board applies to federal court review of claims relating to the denial of security clearance. In doing so, the circuit has recognized that the separation of powers and competency concerns discussed in *Egan* foreclose court review of claims that challenge the merits of a security clearance determination, but support court review of claims challenging the legality of the process used. Or, as the circuit itself described in the wake of *Egan*, it has distinguished between challenges to "ends and means." *Greenberg*, 983 F.2d at 290. So the circuit has held and reiterated that *Egan*'s reasoning forecloses court review of Title VII claims that "challenge the basis for [the] decision to

revoke [the plaintiff's] security clearance." *Lee*, 120 F.4th at 886–87 (discussing *Ryan v. Reno*, 168 F.3d 520 (D.C. Cir. 1999)). The circuit has similarly held that *Egan*'s reasoning forecloses APA review of an agency's determination of "'what constitutes an acceptable margin of error in assessing the potential risk' to national security inherent in granting any particular individual access to classified information." *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) (quoting *Egan*, 484 U.S. at 529). And, applying the same principle, the circuit has held *Egan*'s reasoning forecloses review of "constitutional challenges to adverse clearance decisions" because "federal courts generally may not second-guess the political branches' discretionary judgments about matters of national security." *Lee*, 120 F.4th at 887, 891. Citing to *Egan*'s reasoning and the eligibility standards agencies use to make individualized clearance determinations, *see* Exec. Order No. 12,968, 60 Fed. Reg. 40245, 40250 (Aug. 2, 1995), the circuit explained that reviewing constitutional challenges to such determinations would require "doing what *Egan* said is not reasonably possible"—second guessing the agencies' "predictive judgment" about the individual. *Lee*, 120 F.4th at 893–94 (quoting *Egan*, 484 U.S. at 529). The court accordingly held these discretionary clearance assessments raise a political question that cannot be resolved by federal courts because "at least absent congressional action to restrict executive discretion in this area, there are no manageable standards to support judicial review of clearance decisions." *Id.* at 891.

The D.C. Circuit has, at the same time, consistently recognized "[i]t is simply not the case that all security-clearance decisions are immune from judicial review." *Greenberg*, 983 F.2d at 289; *see also Lee*, 120 F.4th at 891 ("Of course, not every case touching on national security lies beyond judicial cognizance."). In particular, the circuit has held that claims challenging the legality of the process used to deny a security clearance do not implicate *Egan*'s concerns about nonexpert review of national security assessments but, rather, ask courts to resolve questions that are germane

to courts. In *Greenberg*, the circuit considered whether courts could review a claim that certain questions asked in the security clearance process violated the Fifth Amendment privilege against self-incrimination and the constitutional right to privacy. 983 F.2d at 287–90. The court rejected the government's argument that *Egan* foreclosed such claims, explaining that the plaintiffs were not challenging "discretionary judgments regarding a particular employee's security clearance," but rather "the constitutionality of the methods used to gather information on which such judgments presumably will be based." *Id*. at 290. In *Rattigan*, the circuit similarly held that courts may review a Title VII claim that a security clearance review was prompted by a government employee's knowing provision of false information. 689 F.3d at 770. The circuit explained that "*Egan*'s absolute bar on judicial review covers only security clearance-related decisions made by trained Security Division personnel and does not preclude all review of decisions by other FBI employees who merely report security concerns." *Id*. at 768. Because the Title VII claim at issue did not require the court to make any judgment "as to whether the plaintiff's continued access to classified information was clearly consistent with national security," it could "coexist with *Egan*." *Id*. at 770.

Here, all of Zaid's claims challenge the means of revoking his clearance—specifically, the decision to deny him the process afforded to others. Zaid does not challenge the merits of any individualized national security assessment; he challenges the government's decision to deprive him of such individualized assessment of his eligibility for clearance. It is undisputed that the presidential memorandum directed agencies to "revoke any active security clearances" and "immediately rescind" Zaid's access to classified information and that the relevant agencies then did so without any of the individualized security assessment they would ordinarily afford. ECF No. 9-6 at 1; ECF No. 1 ¶ 44; *see* ECF No. 40 at 51 (acknowledging agencies revoked Zaid's

clearance without any process). Based on the preliminary injunction record, the court finds the government has not conducted any individualized assessment of Zaid's eligibility for security clearance. It instead denied Zaid the process and individualized assessment afforded to others because of his prior representation of whistleblowers and other clients in matters that were adverse to the government. This procedural harm exists "regardless of how the government might have resolved any particular application." *Lee*, 120 F.4th at 893 (citing *Greenberg*, 983 F.2d at 291–95); *see also Wilmer*, 784 F. Supp. 3d at 149 (finding court review of security clearance revocations appropriate where law firm challenged "the President's process—or lack thereof—in suspending the firm's employees' security clearances").

Because Zaid's claims all challenge the legality of revoking his security clearance without meaningful process, they go only to the "methods used" to revoke his clearance. *Greenberg*, 983 F.2d at 290. That is, in contrast to cases where "all of [the plaintiff's] claims challenge the basis for DOJ's decision to revoke [their] security clearance," none of Zaid's claims challenge the basis for a security clearance determination. *Lee*, 120 F.4th at 887. His claims do not require the court to make any type of "predictive judgment" that is associated with individualized national security assessments. *Id.* at 893 (quoting *Egan*, 484 U.S. at 529). Nor do they require the court to override decisions "made by trained Security Division personnel," the only sort of decision the "absolute bar on judicial review covers." *Rattigan*, 689 F.3d at 768; *see also Egan*, 484 U.S. at 529 (reasoning that "[p]redictive judgment[s]" about who can be trusted with classified information "must be made by those with the necessary expertise").

As mentioned, the government's principal approach here has been to offer an expansive reading of the cases it likes (*Egan* and *Lee*) and to leave out the cases it doesn't (*Greenberg* and *Rattigan*). Confronted with the latter cases, the government's response is twofold. First, it all but

asks this court to narrow those cases to their particular facts. *See* ECF No. 33 at 6, 9 (limiting *Greenberg* to "'methods and processes' that violated the Fourth Amendment" and *Rattigan* to whether "the correct component" of an agency made the clearance decision). But this court is required to faithfully apply precedent. *See Ramos v. Louisiana*, 590 U.S. 83, 125 n.6 (2020) ("In the American system of *stare decisis*, the result and the reasoning each independently have precedential force, and courts are therefore bound to follow both the result and the reasoning of a prior decision." (Kavanaugh, J., concurring in part)). That precedent rejected the government's expansive position as "untenable, and far reaching." *Greenberg*, 983 F.2d at 290. And even the cases the government selectively quotes from recognize the line between "ends and means." *Id.*; *see Lee*, 120 F.4th at 893 (explaining courts remain available to adjudicate claims that do not "seek review of 'discretionary judgments' regarding the merits of any 'particular employee's security clearance'" (quoting *Greenberg*, 983 F.2d at 290)).

This understanding of the law is also the uniform understanding in this district. *See, e.g.*, *Jenner*, 784 F. Supp. 3d at 100 ("In short, while the merits of any individual security clearance decision are unreviewable, courts may hear 'constitutional claims arising from the clearance revocation *process*.'" (quoting *El-Ganayni v. U.S. Dep't of Energy*, 591 F.3d 176, 183 (3d Cir. 2010))); *Wilmer*, 784 F. Supp. 3d at 148–49 (holding that challenges to "the President's process— or lack thereof—in suspending the firm's employees' security clearances," in contrast to "the merits of any individual's suspension," are judicially reviewable); *Susman*, 789 F. Supp. 3d at 38 (holding that "*Lee* does not extend so broadly as to foreclose [the plaintiff's] constitutional challenges to Defendants' blanket revocation of its employees' security clearances divorced from national security concerns"); *Perkins Coie*, 783 F. Supp. 3d at 145 (holding that challenges to the President's application of "a discriminatory policy to a group of individuals during the *process* of

making" security clearance decisions "are proper for judicial review"). Indeed, in *Egan* itself, the

government emphasized that court review would remain appropriate in these circumstances:

> We agree with the Board that it may examine whether the agency *made* such a [security clearance] determination, that is, whether the agency had procedures for denying or revoking clearances and whether the procedures were followed. The Board also could, in an appropriate case, find that a determination was not validly made because the employee was not afforded procedural protections guaranteed to him by the agency's regulations (such as notice, a statement of reasons for the proposed denial or revocation, and an opportunity to respond).

Brief for the Petitioner, *Egan*, 484 U.S. 518 (No. 86-1552), 1987 WL 880362, at *24–25.

The government, second, asks the court to just construe the presidential memorandum as

an individualized national security assessment. But the court finds the memorandum was not based

on any such assessment. It is undisputed that no government agency conducted an assessment of

Zaid's eligibility for clearance, and the memorandum itself does not purport to make any national

security assessment—in fact, it does not mention national security at all. *See* ECF No. 9-6. The

memorandum instead directs agencies to summarily revoke Zaid's clearance based on the

"national interest," which courts have consistently recognized as distinct from and more nebulous

than a particular determination about national security. *Id.* at 1; *see Perkins Coie*, 783 F. Supp. 3d

at 144 ("When the government does not even claim that a general policy about security clearances

was motivated by national security, judicial review of that policy could not threaten unduly

entangling the judicial branch in questions of national security."); *Wilmer*, 784 F. Supp. 3d at 149

(explaining precedent "does not require the Court to give unlimited deference to the broad concept

of national interest"). The memorandum's invocation of the phrase "national interest" to deny Zaid

any process does not implicate the separation of powers concerns present when the executive

branch has exercised its expertise to make an individualized national security assessment. *See Lee*,

120 F.4th at 889 ("The political question doctrine applies perhaps most vigorously to issues

bearing on national security."); *see also Perkins Coie*, 783 F. Supp. 3d at 144 (explaining that

declining court review "simply because the Executive branch invoked 'the national interest' would represent a breathtaking expansion of executive power at the expense of the constitutionally mandated role of the judicial branch and the concomitant safeguards for the individual rights of Americans").

Nothing in the memorandum indicates that it reflects any government official's expert assessment or predictive judgment. *See Lee*, 120 F.4th at 893; Exec. Order. No. 12,968, 60 Fed. Reg. at 40250 (providing that eligibility for access to classified information entails "appropriate investigation" of whether an individual's "personal and professional history affirmatively indicates loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment"). And the government does not argue the decision to summarily revoke Zaid's clearance was based on anything other than his prior representations of clients in matters adverse to the government. This court accordingly rejects the government's effort to recast its decision to revoke Zaid's clearance without process—without any individualized assessment—as an individualized national security assessment. *See Perkins Coie*, 783 F. Supp. 3d at 143 (noting that "each case relied upon by the government in which the challenged individual security clearance decision was found to be non-justiciable involved a challenge to an individualized process conducted by expert agency examiners that included consideration of articulable findings directly pertinent to the individual with the clearance").

Zaid's claims thus ask this court to determine whether the Constitution or other federal law makes it illegal to deny him the standard, individualized process afforded to others. These are not political questions; they are legal ones. *See Jenner*, 784 F. Supp. 3d at 101 ("Reviewing this process raises none of the concerns that make individual security-clearance determinations nonjusticiable."). And declining to consider them would be the very sort of judicial abdication that

precedent forbids. *Greenberg*, 983 F.2d at 290 (declining to endorse such "untenable, and far-reaching, restrictions on judicial review of governmental actions"); *see also Gill v. U.S. Dep't of Just.*, 875 F.3d 677, 685 (D.C. Cir. 2017) (Tatel, J., concurring) ("In my view, if [the plaintiff] could show that the government has a policy or practice of treating Muslims or naturalized citizens differently, his equal protection claims, like the claims at issue in *Greenberg*, would not be barred by *Egan*.").

### B.  Zaid Is Entitled To Preliminary Injunctive Relief

"A preliminary injunction is an extraordinary remedy never awarded as of right" and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). The plaintiff must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The court accordingly considers each of these factors.

#### 1.  Zaid Is Likely To Succeed On Multiple Claims

Based on the record at this stage, Zaid has shown he is likely to succeed, at a minimum, on his claims that the government's summary revocation of his security clearance and access to classified information violated the First Amendment, procedural due process, and the right to counsel.

##### a.  Zaid Is Likely To Show That The Summary Revocation Of His Clearance Violated The First Amendment

Zaid argues that summarily revoking his clearance as a response to his representation of whistleblowers and other clients in legal matters disfavored by the administration violated the First Amendment. *See* ECF No. 1 ¶¶ 68–74; ECF No. 9-1 at 27–31. The court agrees.

"The First Amendment prohibits government from 'abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 605–06 (2021) (quoting U.S. Const. amend. I). And to the same ends, the First Amendment prohibits government officials from retaliating against people for engaging in these protected activities. *See Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) ("As a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." (cleaned up)). To prevail on a First Amendment retaliation claim, a plaintiff must show "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). This requires the plaintiff to show that the adverse action was based on a "forbidden motive" and that "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences." *Nieves*, 587 U.S. at 398.

The government does not appear to dispute that the first two requirements are satisfied, and they clearly are. When Zaid petitioned the government and courts on behalf of whistleblowers and other clients, he was engaging in activity the First Amendment protects. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542–43 (2001) (recognizing that "advocacy by . . . attorney[s] to the courts" is protected by the First Amendment). And the adverse action here—revoking a person's security clearance—is more than sufficient to constitute retaliatory action. *Cf. Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994) (noting the First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to

punish her for exercising her free speech rights" (quoting *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 n.8 (1990))). Zaid has further supported this showing with evidence of the significant consequences for his practice as an attorney in the national security space. *See, e.g.*, ECF No. 9-2 ¶¶ 44–46 (attesting that summary revocation has hampered Zaid's ability to advocate for clients and has caused him to turn down new clients); ECF No. 42-1 ¶¶ 3–5 (attesting that summary revocation has diminished Zaid's ability to zealously advocate for prospective clients whose matters will likely require access to classified information).

The record also shows Zaid will likely establish the final requirement, that his protected expression, petitioning on behalf of people or in matters disfavored by the government, is what caused the government to summarily revoke his clearance. The President expressed repeated, public displeasure with Zaid—calling him a "sleazeball" and saying he should be sued for "treason"—and expressly tied it to his representation of a government whistleblower. ECF No. 9-2 ¶¶ 25–26. The record also shows that the decision to summarily revoke Zaid's clearance took place just days after Zaid filed a lawsuit against the government on behalf of FBI employees to protect them from being targeted for their work related to the January 6 attack on the U.S. Capitol. ECF No. 1 ¶ 40. And that decision was made just days apart from several other presidential orders found to be targeting attorneys based on their choice of clients. *See Perkins Coie*, 783 F. Supp. 3d at 150–65; *Jenner*, 784 F. Supp. 3d at 94–99; *Wilmer*, 784 F. Supp. 3d at 150–152; *Susman*, 789 F. Supp. 3d at 41–48. Based on the preliminary injunction record, the court finds that Zaid's representation of whistleblowers and other clients adverse to the government was the sole reason for summarily revoking his security clearance.

The government does not meaningfully contest that this is a "forbidden motive," but posits that Zaid's clearance might have been summarily revoked based on the "obvious non-retaliatory

grounds" of protecting classified information. ECF No. 22-1 at 26. The court finds that assertion is not credible or supported by the record. That explanation appears nowhere in the presidential memorandum, which summarily directed agencies to revoke security clearances without any mention of concerns related to protecting classified information. *See* ECF No. 9-6. The government unquestionably has a weighty interest in the protection of classified information, but those interests were not at play here. *See, e.g.*, *Jenner*, 784 F. Supp. 3d at 102 (concluding that executive order directing officials to suspend security clearances held by law firm employees "does not engage in the sort of 'legitimate consideration of speech' . . . that might sometimes be necessary to keep classified information in safe hands" (quoting *Reichle v. Howards*, 566 U.S. 658, 668 (2012))).[1]

Zaid has accordingly shown he is likely to succeed in showing that the summary revocation of his security clearance violated the First Amendment.

>    *b. Zaid Is Likely To Show That The Summary Revocation Of His Clearance Violated Procedural Due Process*

Zaid also argues that revoking his security clearance without process violated procedural due process. To succeed on this claim, a plaintiff must show: (i) government action depriving him of a protected interest in life, liberty, or property, and (ii) inadequate process. *Reed v. Goertz*, 598 U.S. 230, 236 (2023).

---

[1]    The government repeats its argument that the court cannot consider whether the government acted with "forbidden motive" in this context under *Egan* and *Lee*, noting that the court concluded the plaintiff's First Amendment claim in *Lee* was not reviewable. ECF No. 22-1 at 26. That argument fails for the same reasons already discussed: applicable precedent, including *Lee*, forbids an inquiry as to the merits of a revocation decision; it does not forbid inquiry into the legality of process used. Indeed, *Lee* was explicit about this, reasoning that the plaintiff's First Amendment claim was not reviewable because, like the plaintiff's other claims, it "rest[ed] on injuries arising from the revocation and challenge[d] its substantive basis." *Lee*, 120 F.4th at 895.

Zaid argues the government's summary revocation of his security clearance deprived him of a liberty interest, citing to several cases in this circuit recognizing that one can have a liberty interest in their clearance. *See* ECF No. 9-1 at 25; *see, e.g.*, *Doe v. Austin*, No. 22-cv-3474, 2024 WL 864270, at *12 (D.D.C. Feb. 29, 2024) (explaining that "a federal agency's revocation of a security clearance may give rise to a due process claim for injury to a *liberty* interest"). The D.C. Circuit has held that a liberty interest is implicated where government action changes a plaintiff's status, including by excluding him from "employment opportunities" or precluding him from pursuing his "chosen career." *Kartseva v. Dep't of State*, 37 F.3d 1524, 1527–28 (D.C. Cir. 1994); *see also Greene v. McElroy*, 360 U.S. 474, 492 (1959) (revocation of a security clearance possibly implicates Fifth Amendment liberty interest where action "has seriously affected, if not destroyed, [plaintiff's] ability to obtain employment in the aeronautics field").

To show a deprivation of this type of liberty interest, a plaintiff must show the government "both altered his status and stigmatized his reputation." *Doe v. Cheney*, 885 F.2d 898, 910 (D.C. Cir. 1989). Zaid has introduced credible evidence of both. He has introduced evidence that because of the summary revocation he can no longer maintain his national security practice of representing current and former government employees whose cases involve classified information. ECF No. 9-2 ¶¶ 44–46; ECF No. 42-1 ¶¶ 3–5, ECF No. 50-1 ¶¶ 3–4. The summary revocation has interfered with Zaid's ongoing attorney-client relationships because he is no longer able to access classified information or use classified information he previously learned. ECF No. 1 ¶¶ 50–51, 54; ECF No. 9-2 ¶ 43. For example, following the summary revocation of his security clearance, Zaid was denied access to a whistleblower complaint he helped his client file, which has hindered his representation of that client. ECF No. 9-2 ¶ 43. Zaid has also turned down numerous clients who have approached him for representation since the summary revocation and during the pendency of

this litigation. *Id.* ¶ 46; ECF No. 50-1 ¶ 5; *see Doe v. Casey*, 796 F.2d 1508, 1523 (D.C. Cir. 1986) (change in status includes "foreclosing the employee's future employment opportunities"), *aff'd in part, rev'd in part sub nom. Webster v. Doe*, 486 U.S. 592 (1988). The court finds based on the preliminary injunction record that the summary revocation of Zaid's clearance concretely and dramatically impedes his ability to pursue his chosen career as a national security attorney. The court accordingly concludes Zaid has shown this government action effected a "change in status" that implicates a liberty interest. *Kartseva*, 37 F.3d at 1527; *Casey*, 796 F.2d at 1523.

Zaid has also shown stigmatization of his reputation that goes beyond revocation of the security clearance itself. Unlike the typical clearance revocation, the decision here was announced publicly, after comments at the highest levels that described Zaid as a "sleazeball" who may have committed "treason." ECF No. 9-2 ¶¶ 25–26. Before the presidential memorandum was even issued, the Director of National Intelligence stated in a social media post that she had revoked Zaid's security clearance. *Id.* ¶ 29. And in conjunction with the summary revocation, the Director issued a press release stating that the people losing their clearances, which included Zaid, had "abused public trust for political purposes." ECF No. 9-11. The Director went on to discuss the summary revocation, mentioning Zaid by name, during a publicly accessible interview. ECF No. 1 ¶ 52; ECF No. 9-2 ¶ 35. The court finds that these accusations of untrustworthiness and dishonesty, alongside the summary revocation, stigmatized Zaid's reputation. *See Doe v. U.S. Dep't of Just.*, 753 F.2d 1092, 1111–12 (D.C. Cir. 1985) (government stigmatized plaintiff's reputation where plaintiff "was discharged on the basis of allegations of unprofessional conduct and dishonesty, and the charges were allegedly disseminated to prospective employers, public and private"); *cf. Cheney*, 885 F.2d at 910 (reasoning that agency's actions were not stigmatizing where it "did not make public accusations that will damage [the plaintiff's] standing and associations in

the community"). Zaid has accordingly shown that the government infringed a protected liberty interest.

The government's arguments to the contrary are not persuasive. First, it cites cases recognizing that one cannot have a property interest in a security clearance. *See* ECF No. 22-1 at 20–21. But Zaid asserts impairment of a liberty interest, not a property interest. Second, the government advances an absolute rule that no individual can have a liberty interest in his security clearance. ECF No. 22-1 at 20. But, as explained, numerous courts have rejected that absolute rule. *See Austin*, 2024 WL 864270, at *12 ("Defendant argues that Plaintiff could not have a protected interest in a security clearance. The Court disagrees with that broad assertion.") (collecting cases); *see also Cheney*, 885 F.2d at 909 (recognizing the availability of a liberty interest due process claim in the security clearance revocation context but holding that such a claim was "untenable" on the facts presented); *Ranger v. Tenet*, 274 F. Supp. 2d 1, 9–10 (D.D.C. 2003) (holding that plaintiff plausibly alleged procedural due process claim based on the government's revocation of his security clearance). And, irrespective of whether there can be a liberty interest in a security clearance in the abstract, the government does not dispute that a liberty interest is impaired when government action alters status—including by excluding the plaintiff from employment opportunities or precluding him from pursuing his chosen career—and stigmatizes the plaintiff's reputation. *See Cheney*, 885 F.2d at 910; *Kartseva*, 37 F.3d at 1527.

Third, the government argues that revoking someone's security clearance does not itself show reputational harm. ECF No. 22-1 at 22–23. That seems fair enough. *See Cafeteria & Rest. Workers Union, Loc. 473*, 367 U.S. 886, 898 (1961) (observing that revocation of an identification badge for failure to meet security requirements does not "bestow a badge of disloyalty or infamy"); *Molerio v. FBI*, 749 F.2d 815, 824 (D.C. Cir. 1984) (observing that being "denied [clearance] on

unspecified grounds in no way implies disloyalty or any other repugnant characteristic"). But this is, again, a superficial response. As set forth above, Zaid's argument is not that revocation in the abstract harmed his reputation, but that the government's summary revocation of his clearance with speeches, press releases, and interviews accusing him of disloyalty, including a contemporaneous press release stating that he had "abused public trust for political purposes," harmed his reputation.

Upon recognition of a liberty interest, due process analysis typically proceeds to whether the government afforded sufficient process before depriving the plaintiff of the interest. *See, e.g.*, *Ranger*, 274 F. Supp. 2d at 9 ("In addition to satisfying *Cheney*'s two-part test, [the plaintiff] must establish that he was deprived of his liberty interest without due process of law."). But the government does not argue Zaid was afforded any process before his clearance was revoked. *See* ECF No. 40 at 51 (acknowledging the relevant agencies revoked Zaid's clearance without conducting any individualized process). The court accordingly concludes Zaid is likely to succeed in showing that the government deprived him of a liberty interest without due process of law. *See Ranger*, 274 F. Supp. 2d at 9 (holding that plaintiff stated a procedural due process claim where CIA did not afford plaintiff "a meaningful opportunity to contest the basis for its decision to revoke his security clearance"); *cf. Cheney*, 885 F.2d at 910 (holding that plaintiff received appropriate process where he received notice of agency's concerns, submitted voluntarily to psychiatric exam, received consideration by a board of appraisal, submitted written materials in his defense, and had an interview with the agency director).

c. *Zaid Is Likely To Show That The Summary Revocation Of His Clearance Violated The Right To Counsel*

Zaid argues that the summary revocation of his clearance because of his prior work for clients adverse to the government has also interfered with, and in some cases prevented, his

representation of current and prospective clients in matters adverse to the government, depriving them of their Fifth Amendment right to counsel of their choice. *See* ECF No. 1 ¶¶ 83–88; ECF No. 9-1 at 31–33. The court agrees. A litigant's right to counsel in civil cases includes the right to the counsel of their choice and, while that right is not absolute and can be overridden when compelling reasons exist, the sole reason here—avenging counsel's representations of the very same types of clients who are adverse to the government—is not a legitimate, let alone a compelling, reason.

The Supreme Court recognized "[t]he invalidity of a governmental attempt to deny counsel to a civil litigant" over ninety years ago. *Am. Airways Charters, Inc. v. Regan*, 746 F.2d 865, 873 (D.C. Cir. 1984) (citing *Powell v. Alabama*, 287 U.S. 45, 68–69 (1932)). "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Powell*, 287 U.S. at 68–69. For example, "[i]f in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.* at 69. Courts have long recognized the "right to choose counsel without interference by officialdom" in civil cases inherent in the Fifth Amendment's guarantee of due process. *Am. Airways Charters*, 746 F.2d at 872; *see McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1262 (5th Cir. 1983) (recognizing that civil litigants "have a right to be represented by counsel and this ordinarily implies a right to lawyers of their choice"); *Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n*, 837 F.2d 600, 618 (3d Cir. 1988) (same); *In re BellSouth Corp.*, 334 F.3d 941, 955 (11th Cir. 2003) (same); *see also Muniz v. Meese*, 115 F.R.D. 63, 66 n.11 (D.D.C. 1987) (recognizing "the violation of civil liberties that is implied by a government intrusion into [citizens'] right to select and to be represented by counsel of their choice"). The right to counsel of choice must be balanced against the government's interests, and

it "may be overridden when 'compelling reasons exist.'" *McCuin*, 714 F.2d at 1263 (quoting *Bottaro v. Hatton Assocs.*, 680 F.2d 895, 897 (2d Cir. 1982)); *see also In re BellSouth Corp.*, 334 F.3d at 956 (recognizing that "a litigant's freedom to hire the lawyer of his choice can be overridden if a court finds that the choice would interfere with the orderly administration of justice").

Zaid has shown his clients have been deprived of their chosen counsel without compelling reason. The court credits Zaid's evidence that the summary revocation of his security clearance has prevented him from zealously representing his clients in pending cases against the government. ECF No. 9-2 ¶¶ 43–45. This includes requiring him to disregard classified information he has learned in the course of those representations and which is necessary to those representations. ECF No. 1 ¶¶ 49–50. One of Zaid's clients attests that the summary revocation of Zaid's security clearance "has deprived [him] of [Zaid's] unique qualifications and expertise, and of [his] choice of counsel." ECF No. 9-3 ¶ 17. The client states that "[t]here is no other attorney [he] trust[s] who has the type of experience on [anomalous health incident] matters, let alone holding authorized access to classified information, besides Mr. Zaid." *Id.* The summary revocation of Zaid's security clearance has also prevented Zaid from participating in classified portions of his client's interview with a legislative committee despite his client's specific request that Zaid be present to represent them. ECF No. 50-1 ¶ 3. By summarily revoking the clearance essential to these representations, the government has forced his clients to litigate their cases without the benefit of their chosen counsel. ECF No. 9-2 ¶ 43.[2]

---

[2]    The government does not contest that Zaid has third party standing to assert his client's due process right to counsel; he plainly does. *See* ECF No. 40 at 62–63; *see also U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720–21 (1990) (concluding that lawyer had third party standing to assert due process right to obtain legal representation on behalf of clients); *Caplin & Drysdale, Chartered*

The government has little to say in response to this claim. It largely returns to its threshold argument that *Egan* forecloses any court review, which is incorrect for reasons explained. ECF No. 22-1 at 25; *see supra* Part II.A. To be sure, no one could doubt the government has a "compelling interest in withholding national security information from unauthorized persons in the course of executive business." *Egan*, 484 U.S. at 527 (quotation marks and citation omitted). So, no one could reasonably dispute that the executive branch's expert determination that a lawyer's security clearance or access to classified information is no longer consistent with national security would justify the accompanying effect on the availability of the lawyer to serve as counsel in cases requiring such clearance or access. Just as the state and courts have a compelling interest in limiting counsel to those who are admitted to the relevant jurisdiction and those who lack a conflict of interest, the government's interest in protecting national security can surely justify the effect of limiting the universe of counsel. But here, the summary revocation of Zaid's security clearance was not based on any national security interest. Instead, on this record, the government's sole interest was retribution against an attorney for representing clients adverse to the government. That is not a legitimate governmental interest, and it cannot override the right of Zaid's clients to their chosen counsel. *See Custom Retaining Walls, LLC v. Parton*, No. 23-cv-316, 2024 WL 3223688, at *4, 6 (W.D. Tex. May 10, 2024) (holding that there was "no compelling reason to override Plaintiffs' right to counsel of their choice" where the government required clients to file ethics complaints against their chosen counsel as a condition to reconsideration, seemingly because of chosen counsel's success in a different suit against the government).[3]

---

*v. United States*, 491 U.S. 617, 623 n.3 (1989) (concluding that law firm had third party standing to challenge statute's restriction on criminal defendants' right to counsel).

[3]    The government also asserts that Zaid's right to counsel claim should be dismissed because Zaid has failed to show that his clients lack a second choice of counsel. ECF No. 22-1 at 25–26.

The court accordingly concludes that Zaid is likely to succeed in showing that the summary revocation of his security clearance violated his clients' Fifth Amendment right to counsel of their choice. *See Susman*, 789 F. Supp. 3d at 53–54 (holding executive order violates the Fifth Amendment right to counsel "because governmental attempts to deny counsel to a civil litigant are invalid" (cleaned up)); *Perkins Coie*, 783 F. Supp. 3d at 168–71 (holding executive order violates Fifth Amendment right to counsel where it "would adversely impact plaintiff's representations of clients in civil matters involving the government").

### 2. *Zaid Has Shown Irreparable Harm*

The court also finds Zaid has shown irreparable harm absent preliminary injunctive relief—indeed he has shown multiple independent forms of irreparable harm. Both personal constitutional deprivations Zaid has substantiated at this stage are of the type courts recognize as irreparable. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). So too does "a violation of Fifth Amendment due process rights . . . support[] injunctive relief." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020); *see also Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." (alteration in original)); *Mills v. District of Columbia*, 571 F.3d

---

But the case the government cites merely recognizes that the right to counsel of choice "must be balanced against the government's interest in the fair, orderly, and effective administration of the courts which, in a given case, may require an accused to resort to his second choice of counsel." *United States v. Koblitz*, 803 F.2d 1523, 1528 (11th Cir. 1986). As explained, here the government lacks any legitimate interest that could override Zaid's clients' right to their chosen counsel.

1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (cleaned up)).

In addition to his constitutional injuries, Zaid has shown harm to his reputation, including accusations of disloyalty from the nation's highest offices that directly threaten his standing as a national security lawyer. ECF No. 9-2 ¶¶ 25–26, 29, 35–37; *see Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (holding that irreparable harm was apparent where defendant's conduct "could not fail to damage [plaintiff's] good name"); *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017) ("Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction."); *Xiaomi Corp. v. Dep't of Def.*, No. 21-cv-280, 2021 WL 950144, at *9 (D.D.C. Mar. 12, 2021) (collecting cases). Zaid has also attested that the likely unlawful summary revocation of his clearance would need to be disclosed on future security clearance applications. ECF No. 9-2 ¶ 47.

Zaid has also substantiated that his clients are being denied their chosen counsel. As described, Zaid has introduced credible evidence that he cannot properly advise current clients because he is precluded from accessing classified material and using classified information, including information that he learned in the course of the representations. *See id.* ¶¶ 43–45; ECF No. 1 ¶¶ 49–50. Zaid has also introduced evidence showing that his clients would like him to represent them in pending matters requiring access to classified information, but the summary revocation of the clearance necessary for these representations denies them that choice. *See* ECF No. 9-3 ¶ 17; ECF No. 50-1 ¶ 3–4. Such interference with the attorney-client relationships is precisely the type of harm that is "beyond remediation" by a court after the fact. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *see Emons Indus., Inc. v. Liberty Mut. Ins. Co.*, 749 F. Supp. 1289, 1293 (S.D.N.Y. 1990) (holding that forcing a client to

forgo its counsel of choice "would be irreparable, as it would be impossible to quantify the harm suffered, and therefore impossible to compensate for it with money damages").

The government does not dispute that denial of these rights is irreparable harm. It instead first returns to its legal argument that Zaid "does not have a right to a security clearance, much less a justiciable First Amendment right." ECF No. 22-1 at 31. That argument is mistaken for the reasons explained, and it does not rebut Zaid's showing of irreparable harm. Second, the government argues that "the fact that Plaintiff has waited nearly two months to seek a preliminary injunction" undercuts Zaid's claim of irreparable harm. *Id.* at 32. But as the government acknowledges, a delay in filing is "not determinative." *Id.* The D.C. Circuit has instructed that "a delay in filing is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). Here, the government has not offered any credible reason why the delay in filing affects the particular types of irreparable harm at issue, and the court finds the delay does not detract from the harms shown.

3.  *The Balance Of The Equities And The Public Interest Favor A Preliminary Injunction*

The balance of the equities and the public interest generally "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (explaining that the government's "harm and the public interest are one and the same, because the government's interest *is* the public interest"). Here, those factors also favor Zaid. As the D.C. Circuit has explained, "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668. And there are strong public interests in enjoining the kind of retaliatory action at issue here, which has the potential to substantially chill lawyers in their representation of clients in proceedings adverse to the government. *See Perkins Coie*, 783 F. Supp. 3d at 180 (noting strong interest of firm and clients, "as well as the American legal system and the public more broadly, in issuance of an

injunction to protect the independence of counsel to represent their clients vigorously and zealously, without fear of retribution from the government simply for doing the job of a lawyer"); *Jenner*, 784 F. Supp. 3d at 115 (noting that retaliatory action "casts a chill over the whole of the legal profession, leaving lawyers around the country weighing the necessity of vigorous representation against the peril of crossing the federal government").

The government again gestures vaguely at "national security interests." ECF No. 22-1 at 33. However, neither in the presidential memorandum nor otherwise has any expert agency official made any national security assessment concerning Zaid, or even purported to justify the summary revocation on that basis. The balance of the equities and the public interest weigh in Zaid's favor. The court will therefore order preliminary injunctive relief.[4]

---

[4]    The court's conclusion that Zaid is entitled to preliminary relief is premised on application of the legal claims discussed to the specific record in this case, including evidence developed as to Zaid's work as a national security lawyer, his representation of clients who have petitioned the government, reprisal for those representations, reputational injury, and interference with client representations. The relief accordingly addresses the summary revocation of Zaid's security clearance and no one else's.

The government argues that although Zaid has named the United States as a defendant, any relief afforded to Zaid must name the specific federal officials who are enjoined. ECF No. 22-1 at 33–34 (citing 5 U.S.C. § 702). Zaid has submitted a proposed order naming the officials against whom relief should run, ECF No. 31-2, satisfying the requirement that injunctions against the United States "specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance." 5 U.S.C. § 702; *see, e.g.*, *Jenner*, 784 F. Supp. 3d at 116 ("Section 702 does require Jenner eventually to list the individual federal officers it seeks to enjoin; it just need not do so in the caption of the complaint.").

The government asks the court to impose an appropriate bond, but does not support its request with any showing of concrete economic injury. *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) ("In cases where the government is the enjoined party and no concrete economic injury is established, as is the case here, courts routinely waive the bond requirement."). The court accordingly finds it appropriate to impose a nominal injunction bond of $1. *See Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 31–32 (D.D.C. 2025) (ordering the plaintiff to post a nominal bond of $1 where the defendants had not shown that they would "suffer any 'material monetary injury' from the proposed injunction" (citation omitted)).

### C.  The Complaint States A Claim For The Remaining Counts

Along with its opposition to the preliminary injunction motion, the government moves to dismiss the complaint for failure to state a claim under Rule 12(b)(6). To survive dismissal for failure to state a claim, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The court "must take all the factual allegations in the complaint as true," though it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

For the reasons above, Zaid has plausibly alleged violations of the First Amendment, procedural due process, and the right to counsel. Zaid's remaining claims—under the APA, void for vagueness doctrine, and the Bill of Attainder clause—are also plausibly alleged at this stage. The court therefore denies the government's motion to dismiss.

### 1.  Zaid Plausibly Alleges The Summary Revocation Of His Clearance Violated The APA

The APA requires courts to "hold unlawful and set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the agency defendants do not dispute that their summary revocation of Zaid's security clearance is final agency action.

The parties dispute whether Zaid has plausibly alleged that this action was contrary to law. An agency action is contrary to law when the agency does not "act in accordance with the law governing" its particular action. *Sissel v. Wormuth*, 77 F.4th 941, 947 (D.C. Cir. 2023); *see N. Am.'s Bldg. Trades Unions*, 783 F. Supp. 3d at 310 (holding agency action was contrary to law because it "flatly contradict[ed] the unambiguous requirements of [an executive order] and its

implementing regulations"); *E. Band of Cherokee Indians v. U.S. Dep't of the Interior*, 534 F. Supp. 3d 86, 97 (D.D.C. 2021) (explaining that "[a]gency action is obviously 'not in accordance with law' if it violates some extant federal statute or regulation").

Zaid argues the agency defendants' summary revocation of his security clearance and access to classified information was contrary to law because it failed to comply with applicable regulations and executive orders. ECF No. 1 ¶ 57. Executive Order 10865 provides that classified access "may not be finally denied or revoked" without a written statement of reasons, an opportunity to respond and appear before the revoking authority, and an opportunity to cross-examine adverse witnesses. Exec. Order No. 10,865, § 3, 25 Fed. Reg. 1583, 1583 (Feb. 20, 1960). Executive Order 12968 sets forth similar procedures. Exec. Order No. 12,968, § 5, 60 Fed. Reg. 40245, 40252 (Aug. 2, 1995). And Executive Order 13467 provides agencies "may not establish additional investigative or adjudicative requirements." Exec. Order No. 13,467, § 2.1(c), 73 Fed. Reg. 38103, 38105 (June 30, 2008). As for regulations, the Director of National Intelligence published the SEAD-4 directive, which establishes the "single, common adjudicative criteria" for clearance eligibility. Off. of the Dir. of Nat'l Intel., Security Executive Agent Directive 4: National Security Adjudicative Guidelines, at 1 (2017). The directive reinforces that individuals facing denial or revocation of a security clearance should receive the protections outlined in Executive Order 12968. *Id.* at 3. Intelligence Community Policy Guidance 704-3, which governs denial or revocation of access to sensitive information, guarantees written notice, the right to counsel, an opportunity to respond, and an opportunity to appeal. Off. of the Dir. of Nat'l Intel., Intelligence Community Policy Guidance Number 704.3, at 1–2 (2008). And Department of Defense Directive 5220.6 provides for an opportunity to respond, a hearing, the right to counsel, and the right to

present evidence before a final unfavorable clearance decision is made. Dep't of Def., Directive Number 5220.6, at 4 (1992).

The agency defendants do not dispute that they did not follow these procedures to revoke Zaid's clearance. They, first, reiterate that the summary security clearance revocation is not reviewable, citing *Oryszak*, 576 F.3d 522. ECF No. 22-1 at 17–18; *see Oryszak*, 576 F.3d at 525 (holding that *Egan*'s reasoning forecloses APA review of an agency's determination of "'what constitutes an acceptable margin of error in assessing the potential risk' to national security inherent in granting any particular individual access to classified information" (quoting *Egan*, 484 U.S. at 529)). But, as described above, Zaid does not ask the court to review the merits of his summary security clearance revocation under the APA, which would be foreclosed by *Egan* and *Oryszak*. Zaid alleges the process followed—or more accurately, the lack of process—in revoking his clearance did not comply with existing regulations and procedures and therefore ran afoul of the APA. That challenge to the process or "means" of revoking his clearance is suitable for court review. *Greenberg*, 983 F.2d at 290.

The agency defendants argue, second, that their decision to revoke Zaid's clearance without any of the process required by existing executive orders and regulations is not contrary to law because their actions followed the presidential memorandum and, according to the agency defendants, those orders and regulations "do not apply to decisions by the President to revoke an individual's security clearance nor cases, like here, where the agencies are not making any independent or legally distinct determination." ECF No. 22-1 at 18. According to the agency defendants, the presidential memorandum "supersedes any Executive Branch regulations on which [Zaid] relies." *Id.* at 19. But the presidential memorandum did not purport to supersede anything; to the contrary, it expressly directed agency heads to act "consistent with existing law." ECF No.

1 ¶ 44. The above executive orders, rules, and regulations governing security clearances are all "existing law," and the agency defendants concede they were not followed. *See* ECF No. 40 at 51; *N. Am.'s Bldg. Trades Unions*, 783 F. Supp. 3d at 310 ("Agencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures." (citing *Ass'n for Women in Sci. v. Califano*, 566 F.2d 339, 344 (D.C. Cir. 1977); *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002))). Zaid has accordingly stated a claim that the agency defendants' summary revocation of his security clearance violated the APA.[5]

> 2. *Zaid Plausibly Alleges The Summary Revocation Of His Clearance Violated The Void For Vagueness Doctrine*

Zaid argues the standard applied to explain why his clearance would be revoked without process—that it is not in the "national interest"—violates the prohibition on vague laws. ECF No. 1 ¶¶ 75–82. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304

---

[5]    Zaid also argues the agency defendants acted arbitrarily and capriciously by denying him the usual process afforded to others without any reasoned or legitimate explanation and by revoking his clearance without any consideration of the factors required by law. ECF No. 1 ¶ 58; *see also Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (explaining that an agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). Given the court's conclusion that Zaid has stated an APA claim and given that Zaid's arbitrary and capricious argument is premised on the same agency action and administrative record, the court need not separately analyze that argument at this stage.

(2008)). The void for vagueness doctrine addresses at least two due process concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* "When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–54.

The presidential memorandum here was one of a series of presidential orders targeting lawyers and law firms—specifically ones that "in one way or another, did not bow to the current presidential administration's political orthodoxy,"—by, among other things, revoking and suspending security clearances "without individualized explanation, consideration, or opportunity to be heard." *Jenner*, 784 F. Supp. 3d at 88, 101. Each of those presidential orders purported to summarily suspend security clearances not based on criteria used to assess national security risk, but in the name of the broad concept of "national interest." *See Perkins Coie*, 783 F. Supp. 3d at 128; *Jenner*, 784 F. Supp. 3d at 90; *Wilmer*, 784 F. Supp. 3d at 138; *Susman*, 789 F. Supp. 3d at 30. Like the executive orders, the presidential memorandum here does not purport to define "national interest," nor does it give Zaid or any other individual who holds or wishes to hold a security clearance any guidance as to how to avoid summary revocation of their clearance. The standard thus "fails to provide a person of ordinary intelligence fair notice of what is prohibited." *Fox*, 567 U.S. at 253 (citation omitted).

The government argues that the void for vagueness doctrine does not apply because the presidential memorandum does not proscribe any conduct—it merely initiates a process to revoke security clearances. ECF No. 22-1 at 24. But the memorandum directs agency heads to take adverse action against Zaid and the other individuals listed. *See* ECF No. 1 ¶ 44. And the memorandum does not provide any notice to Zaid or anyone else with a security clearance as to "how [they]

should act in the future to avoid these sanctions." *Wilmer*, 784 F. Supp. 3d at 165. The memorandum leaves it to Zaid and others "to predict which causes . . . the President personally dislikes and then steer clear of those causes." *Id.* at 166. That is the kind of chilling effect the void for vagueness doctrine is designed to prevent. *See Fox*, 567 U.S. at 253–54 ("When speech is involved, rigorous adherence to [due process] requirements is necessary to ensure that ambiguity does not chill protected speech."); *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of [a regulation of speech] raises special First Amendment concerns because of its obvious chilling effect on free speech."). Consistent with the other courts in this district to consider whether the "national interest" standard for summary revocation of security clearances satisfies the Constitution's prohibition on vague laws, the court concludes Zaid has stated a vagueness claim. *See Perkins Coie*, 783 F. Supp. 3d at 177 (finding executive order void for vagueness where it left law firm "to guess at what is and is not permissible in the government's view, while already facing the threat of adverse actions during the guessing"); *Wilmer*, 784 F. Supp. 3d at 166 (holding "the Order fails to provide 'fair notice of conduct that is forbidden or required'" (quoting *Fox*, 567 U.S. at 253)); *Susman*, 789 F. Supp. 3d at 52 (holding that "[b]ecause the Order threatens penalties without sufficiently defining the conduct that triggers liability, it is unconstitutionally vague").

### 3. Zaid Plausibly Alleges The Summary Revocation Of His Clearance Violated The Bill Of Attainder Clause

Finally, the complaint asserts a violation of the Constitution's Bill of Attainder clause. ECF No. 1 ¶¶ 89–92. Article I, section 9 of the Constitution states: "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. The next section states: "No State shall . . . pass any Bill of Attainder." U.S. Const. art. I, § 10, cl. 1. Zaid alleges the presidential memorandum's summary revocation of his security clearance functions as a bill of attainder by

singling him out by name for punishment, including damage to his reputation and livelihood as a national security lawyer. ECF No. 1 ¶ 91.

The government moves to dismiss this claim, arguing, first, that the Constitution's prohibition on bills of attainder applies only to the legislative branch, not the executive branch. ECF No. 22-1 at 29. But as Zaid points out, other protections lodged in Article I, including the prohibitions on titles of nobility and suspending the writ of habeas corpus, are logically applied to the President as well. *See* ECF No. 30 at 23–24. Professor Aaron H. Caplan's amicus brief details the history of attainder under English law, the Framers' loathing of such practices, and the Framers' understanding that English and early American law did not permit the king or a state governor to impose attainder unilaterally. ECF No. 27-1 at 2–5; *see, e.g.*, The Federalist No. 44, at 282 (James Madison) (Clinton Rossiter ed., 1961) (describing bills of attainder as "contrary to the first principles of the social compact"). Based on this history, which the government does not rebut, it is hard to imagine the Framers would have prohibited legislative bills of attainder while leaving the executive branch free to attaint whomever it likes. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 144 (1951) (Black, J., concurring) ("I cannot believe that the authors of the Constitution, who outlawed the bill of attainder, inadvertently endowed the executive with power to engage in the same tyrannical practices that had made the bill such an odious institution."); *Peters v. Hobby*, 349 U.S. 331, 352 (1955) (Douglas, J., concurring) ("An administrative agency—the creature of Congress—certainly cannot exercise powers that Congress itself is barred from asserting."); *see also Perkins Coie*, 783 F. Supp. 3d at 173 n.36 (assumption that attainder prohibitions apply only to legislative branch is "called into question, particularly where executive orders appear to stand in for laws, by the constitutional text, which, in art. I, § 9, cl. 3, does not expressly limit the prohibition to the Congress, and then, in the following section

10 applies the prohibition to the States, as well as consideration of the history of bills of attainder").[6]

The government argues, second, that the presidential memorandum is not a bill of attainder because it does not impose punishment. ECF No. 22-1 at 29. The D.C. Circuit has recognized that "a law is prohibited under the bill of attainder clause 'if it (1) applies with specificity, and (2) imposes punishment.'" *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) (citation omitted). Although the government does not dispute the memorandum singles out Zaid, satisfying the requisite specificity, it claims the revocation of security clearance "cannot constitute a punishment." ECF No. 22-1 at 29. But binding precedent rejects that rigid approach. The Supreme Court held by 1866 that "a forbidden attainder could embrace '[t]he deprivation of any rights, civil or political, previously enjoyed,' if the attending circumstances and causes of the deprivation demonstrated that the deprivation amounted to 'punishment.'" *Foretich*, 351 F.3d at 1217 (alteration in original) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 320 (1866)). The "list of punishments forbidden by the Bill of Attainder Clause has expanded to include bars to participation by individuals or groups in specific employments or professions." *Selective Serv. Sys. v. Minn. Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852 (1984); *see also id.* n.9 (collecting cases involving profession-based disadvantages or constraints).

---

[6]    The government cites several cases for the general proposition that bills of attainder are legislative acts. ECF No. 33 at 20. It is no doubt true that most challenges have arisen in that context. But none of the government's cases suggest that the executive branch is at liberty to issue bills of attainder and, to the contrary, some cases expressly acknowledge the Constitution may demand a more nuanced approach. *See Dehainaut v. Pena*, 32 F.3d 1066, 1070–71 (7th Cir. 1994) ("[T]he Supreme Court has not directly ruled either way on the applicability of the attainder ban to actions of executive and administrative agencies, and an argument can be made for analyzing each case functionally rather than structurally."); *id.* at 1071 ("[I]t is a conceivable step to also view an agency policy interpreting the language of a presidential directive issued pursuant to statutory authority as the functional equivalent of a legislative enactment for bill of attainder purposes." (citation omitted)).

Here, the government asks the court to presume the presidential memorandum was issued for the "obvious nonpunitive purpose" of "protect[ing] classified information." ECF No. 22-1 at 29–30. But to do so would be to ignore Zaid's allegations, which must be taken as true as they relate to the motion to dismiss. On those allegations, the memorandum was issued not based on any legitimate purpose or concern, but as retribution for Zaid's representation of whistleblowers and other clients in matters adverse to the government. ECF No. 1 ¶¶ 72–73; *see Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 476 (1977) (explaining that where no legitimate purpose is apparent, "it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decisionmakers"). Zaid also alleges that this retribution has prevented him from fulfilling his ethical obligations to advocate for the very same category of clients and "damaged his reputation and livelihood as a national security lawyer." ECF No. 1 ¶ 91. So, while it is undoubtedly true that a denial of security clearance will generally not be punishment, here Zaid has plausibly alleged the memorandum imposes punishment. *See Nixon*, 433 U.S. at 475 ("Our treatment of the scope of the Clause has never precluded the possibility that new burdens and deprivations might be legislatively fashioned that are inconsistent with the bill of attainder guarantee."); *Perkins Coie*, 783 F. Supp. 3d at 173 n.36 (observing that executive order was in many ways "indistinguishable from a bill of attainder" insofar as it "targets plaintiff specifically, finds facts and declares plaintiff guilty of 'racial discrimination,' 'unethical' and 'egregious' conduct, and imposes multiple forms of punitive adverse actions, without notice or other judicial process protections"). Accordingly, Zaid has plausibly alleged that the summary revocation of his security clearance pursuant to the presidential memorandum violated the Bill of Attainder clause.

## III.    Conclusion

For these reasons, the court grants in part and denies in part Zaid's motion for preliminary injunction, ECF No. 9, and denies the government's motion to dismiss, ECF No. 22. Zaid asks for

a preliminary injunction requiring the defendants to "immediately and fully restore" his security clearance and access to classified information. ECF No. 31-2 at 2. The court crafts interim relief tailored to Zaid's particular showing on this record, including the specific claims likely to succeed, irreparable harm, and equities. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (acknowledging that the court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case"). Here, Zaid has substantiated that he is entitled to preliminary relief regarding the summary revocation of his security clearance by the Defense Counterintelligence and Security Agency, the Central Intelligence Agency, and the Office of the Director of National Intelligence, and denials of his access to and ability to use classified information pursuant to the presidential memorandum. This does not include any revocation or other lapse in security clearance or access to classified information independent of the presidential memorandum and pursuant to ordinary agency process and applicable law.

Consistent with this opinion, the court orders:

- The Executive Office of the President; White House Chief of Staff; White House Deputy Chief of Staff; Department of Defense; Secretary of Defense; Deputy Secretary of Defense; Defense Counterintelligence and Security Agency; Director of the Defense Counterintelligence and Security Agency; Deputy Director of the Defense Counterintelligence and Security Agency; Central Intelligence Agency; Director of the Central Intelligence Agency; Deputy Director of the Central Intelligence Agency; Office of the Director of National Intelligence; Director of National Intelligence; Principal Deputy Director of National Intelligence; and the United States of America, and their officers, agents, employees, and attorneys, are enjoined from giving effect to security clearance revocations or denials of access

to or the ability to use classified information made pursuant to the March 22, 2025, Presidential Memorandum entitled "Rescinding Security Clearances and Access to Classified Information from Specified Individuals" as to Mark S. Zaid, including security clearance revocations by the Defense Counterintelligence and Security Agency, the Central Intelligence Agency, and the Office of the Director of National Intelligence. *See* ECF No. 9-7; ECF No. 9-8; ECF No. 9-9. Nothing in this order shall bar the defendants from suspending or revoking any security clearance or access to classified information for reasons independent of the presidential memorandum and pursuant to ordinary agency process and applicable law.

The preliminary injunction shall not go into effect for twenty-one days, until January 13, 2026, to provide the government with the opportunity to consider next steps, including whether to appeal. The defendants shall file a status report by December 30, 2025, advising the court of their proposed next steps.

 

 

AMIR H. ALI
United States District Judge

Date:   December 23, 2025